## EXHBIT A

**Execution Version**

**$145,000,000**

**TERM LOAN AND GUARANTY AGREEMENT**

**among**

**NICKLAUS COMPANIES, LLC,**
**as Borrower,**

**and**

**THE SUBSIDIARIES OF THE BORROWER LISTED AS GUARANTORS ON THE
SIGNATURE PAGES HERETO,**
**as Guarantors,**

**and**

**EMIGRANT GB LLC,**
**as Lender**

**Dated as of May 25, 2007**

LA\1714629.12

# TABLE OF CONTENTS

**Page**

ARTICLE I          DEFINITIONS...................................................................................1
   Section 1.01     Defined Terms .........................................................................1
   Section 1.02     Terms Generally .....................................................................21
   Section 1.03     Obligations Not Affected........................................................21

ARTICLE II         AMOUNT AND TERMS OF CREDIT ..............................................22
   Section 2.01     Commitments...........................................................................22
   Section 2.02     Notice of Borrowing; Funding of Loan ...................................22
   Section 2.03     Repayment and Amortization of Loan; Evidence of Debt. ............22
   Section 2.04     Optional Prepayment of Loan..................................................23
   Section 2.05     Mandatory Payment of Loan. ..................................................23
   Section 2.06     Interest. ...................................................................................24
   Section 2.07     Payments Generally; Allocation of Proceeds. ..........................25
   Section 2.08     Indemnity for Returned Payments ...........................................26

ARTICLE III        REPRESENTATIONS AND WARRANTIES..................................26
   Section 3.01     Organization ...........................................................................26
   Section 3.02     Due Execution ........................................................................26
   Section 3.03     Financial Statements................................................................27
   Section 3.04     Real Property ..........................................................................27
   Section 3.05     Liens........................................................................................27
   Section 3.06     Compliance with Law..............................................................28
   Section 3.07     Insurance..................................................................................28
   Section 3.08     Litigation.................................................................................28
   Section 3.09     Investment and Holding Company Status .................................28
   Section 3.10     Taxes........................................................................................28
   Section 3.11     ERISA......................................................................................28
   Section 3.12     Material Agreements ...............................................................28
   Section 3.13     Capitalization and Subsidiaries................................................29
   Section 3.14     Common Enterprise .................................................................29
   Section 3.15     Labor Disputes........................................................................29
   Section 3.16     Environmental Matters ............................................................30
   Section 3.17     Solvency..................................................................................30
   Section 3.18     Security Interest in Collateral ..................................................31

ARTICLE IV         CONDITIONS OF LENDING ........................................................31
   Section 4.01     Conditions of Lending .............................................................31

ARTICLE V          AFFIRMATIVE COVENANTS .....................................................33
   Section 5.01     Financial Statements, Reports, etc............................................33
   Section 5.02     Existence..................................................................................34

Section 5.03    Insurance...........................................................................35
Section 5.04    Obligations and Taxes..................................................35
Section 5.05    Notice of Event of Default, etc....................................35
Section 5.06    Access to Books and Records........................................35
Section 5.07    Maintenance of Properties and Intellectual Property Rights...........36
Section 5.08    Compliance with Laws...................................................36
Section 5.09    Additional Collateral; Further Assurances ....................36
Section 5.10    Environmental Covenant ...............................................37
Section 5.11    Key Man Life Insurance. ...............................................37
Section 5.12    EBITDA Event ...............................................................39

ARTICLE VI      NEGATIVE COVENANTS ..........................................39
Section 6.01    Liens ...............................................................................39
Section 6.02    Merger, etc......................................................................40
Section 6.03    Indebtedness ..................................................................40
Section 6.04    Guarantees and Other Liabilities ..................................41
Section 6.05    Dividends........................................................................41
Section 6.06    Transactions with Affiliates...........................................42
Section 6.07    Investments.....................................................................42
Section 6.08    Disposition of Assets .....................................................43
Section 6.09    Nature of Business .........................................................43
Section 6.10    Restrictive Agreements..................................................43
Section 6.11    Prepayment of Indebtedness; Subordinated Indebtedness...............43
Section 6.12    EBITDA Event ...............................................................44

ARTICLE VII     EVENTS OF DEFAULT ...............................................44
Section 7.01    Events of Default ...........................................................44

ARTICLE VIII    CONVERSION...............................................................46
Section 8.01    Right of Conversion.......................................................46
Section 8.02    Adjustments to Conversion Percentage .........................47

ARTICLE IX      MISCELLANEOUS ......................................................49
Section 9.01    Notices............................................................................49
Section 9.02    Waivers; Amendments ...................................................50
Section 9.03    Expenses .........................................................................51
Section 9.04    Successors and Assigns ..................................................51
Section 9.05    Survival...........................................................................52
Section 9.06    Counterparts; Integration; Effectiveness .......................52
Section 9.07    Severability......................................................................53
Section 9.08    Right of Setoff ................................................................53
Section 9.09    Governing Law; Jurisdiction; Consent to Service of Process .........53
Section 9.10    WAIVER OF JURY TRIAL ..........................................54
Section 9.11    Headings..........................................................................54
Section 9.12    Confidentiality ................................................................54
Section 9.13    Violation of Law.............................................................55
Section 9.14    USA PATRIOT Act.........................................................55

ii

Section 9.15    Disclosure ........................................................................................55
Section 9.16    Interest Rate Limitation ...................................................................55

ARTICLE X        LOAN GUARANTY ...........................................................................55
Section 10.01    Guaranty ...........................................................................................55
Section 10.02    Guaranty of Payment ........................................................................56
Section 10.03    No Discharge or Diminishment of Guaranty.....................................56
Section 10.04    Defenses Waived ...............................................................................57
Section 10.05    Rights of Subrogation .......................................................................57
Section 10.06    Reinstatement; Stay of Acceleration .................................................57
Section 10.07    Information ........................................................................................57
Section 10.08    Maximum Liability............................................................................57
Section 10.09    Contribution.......................................................................................58
Section 10.10    Liability Cumulative.........................................................................58

ANNEX A              Commitment Schedule
ANNEX B              Notice of Borrowing

EXHIBIT A-1          Form of PIK Note
EXHIBIT A-2          Form of Replacement Loan Note
EXHIBIT B            Form of Security and Pledge Agreement
EXHIBIT C            Form of Guaranty of Collection
EXHIBIT D            Form of Specified Person Agreement
EXHIBIT E-1          Form of Opinion of Latham & Watkins LLP
EXHIBIT E-2          Form of Opinion of Haile, Shaw & Pfaffenberger, P.A.
EXHIBIT F            Form of Joinder Agreement
EXHIBIT G            Form of Intercompany Subordination Agreement

SCHEDULE 3.04        Real Property
SCHEDULE 3.05        Liens
SCHEDULE 3.06        Compliance with Laws
SCHEDULE 3.09        Litigation
SCHEDULE 3.11        Taxes
SCHEDULE 3.13        Material Agreements
SCHEDULE 3.14        Capitalization and Subsidiaries
SCHEDULE 3.16        Labor Disputes
SCHEDULE 3.17        Environmental Matters
SCHEDULE 4.01(j)     Material Consents
SCHEDULE 6.07        Investments
SCHEDULE 6.10        Restrictions and Conditions

LA\1714629.12

# TERM LOAN AND GUARANTY AGREEMENT

TERM LOAN AND GUARANTY AGREEMENT dated as of May 25, 2007 among NICKLAUS COMPANIES, LLC, a Delaware limited liability company (the "Borrower"), certain of the direct or indirect subsidiaries of the Borrower listed as "Guarantors" on the signature pages hereto (each a "Guarantor" and collectively, the "Guarantors"), and EMIGRANT GB LLC, (the "Lender").

## INTRODUCTORY STATEMENT

The Borrower has requested that the Lender make available to the Borrower a term loan in an aggregate principal amount of $145,000,000, which term loan will be used by the Borrower for purposes set forth in the Purchase and Sale Agreement.

The Guarantors have agreed to guarantee all of the Obligations as set forth in Article X.

The Borrower and the Guarantors have agreed to secure all of the Obligations by granting to the Lender a security interest in and Lien upon the Collateral as set forth in the Security and Pledge Agreement.

Accordingly, the parties hereto hereby agree as follows:

## ARTICLE I.
## DEFINITIONS

Section 1.01   Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"Accrued Notional Distribution" shall mean for any Unit outstanding at the end of a fiscal period, and solely for the purpose of calculating the Threshold Equity Distribution, (i) in the case of a Class A Unit outstanding during any fiscal period, the product of (a) $77.63 multiplied by (b) the number of days such Class A Unit was outstanding during such fiscal period and (ii) in the case of a Class B Unit, the product of (a) $77.63 multiplied by (b) the number of days such Class B Unit was outstanding during such fiscal period that are on or after the day on which the Class B Participation Time occurs.

"Act" shall have the meaning specified in Section 9.14.

"Adjusted Conversion Price" shall mean, as of any date, the Conversion Price as adjusted, to the extent applicable, in accordance with Section 8.02(b).

"Affiliate" shall mean, as to any Person, any other Person which, directly or indirectly, is in Control of, is Controlled by, or is under common Control with, such Person.

"Aggregate Investment Returns" shall mean, as of any measurement date, the aggregate amount of Qualified Outflows received by Lender in respect of or in connection with its Initial Investment.

"Agreement" shall mean this Term Loan and Guaranty Agreement, as the same may be amended, restated, modified or supplemented from time to time.

"Aircraft" shall mean the Gulf Stream aircraft owned by N1JN-V, LLC as of the date of this Agreement and any replacement of such aircraft.

"Applicable Percentage" shall have the meaning specified in Section 10.09.

"Applicable Rate" shall mean 8.50% per annum.

"Approved Participants" shall mean (i) Victor Barnett and any member of the Milstein Family or Affiliates of Victor Barnett or any member of the Milstein Family and (ii) any banking, financial institution or fund which is an Affiliate of Emigrant Bank or is managed by Emigrant Bank or an Affiliate of Emigrant Bank.

"Available Operating Cash Flow" shall mean, for any fiscal period, an amount equal to Operating Cash Flow for such period less the sum of, without duplication, (i) Interest Expense on the Loan during such period, (ii) the amount of any other Indebtedness (other than the Revolving Credit Agreement) repaid or amortized in respect of such period, (iii) the amount by which repayments of principal under the Revolving Credit Agreement during such fiscal period exceeds borrowings under the Revolving Credit Agreement and (iv) the amount of Tax Distributions in respect of such period.

"Base Interest" shall mean all interest payable on the Loan, other than Contingent Interest.

"Board" shall mean the Board of the Borrower or any successor governing body.

"Board of Governors" shall mean the Board of Governors of the Federal Reserve System of the United States.

"Borrower" shall have the meaning specified in the first paragraph of this Agreement.

"Borrower Plan" shall mean the Nicklaus Companies, LLC 2007 Incentive Award Plan.

"Business Day" shall mean any day other than a Saturday, Sunday or a day on which commercial banks in New York City are authorized or obligated by law to remain closed.

"Capital Expenditures" shall mean, without duplication, any actual cash expenditure for any purchase or other acquisition of any asset which would be classified as a fixed or capital asset on a consolidated balance sheet of the Borrower and its Subsidiaries prepared in accordance with GAAP.

2

"Capital Lease" shall mean, with respect to any Person, any agreement pursuant to which such Person obtains the right to use any real or personal Property which is required to be classified and accounted for as a capital lease on the balance sheet of such Person under GAAP.

"Capital Lease Obligations" shall mean, with respect to any Person, the obligations of such Person to pay rent or other amounts under any Capital Lease and, for purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Cash Equivalents" shall mean:

(a)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within twelve months from the date of acquisition thereof;

(b)    without limiting the provisions of clause (d) below, investments in commercial paper maturing within six months from the date of acquisition thereof and having, at such date of acquisition, a rating of at least "A-2" or the equivalent thereof from Standard & Poor's or of at least "P-2" or the equivalent thereof from Moody's Investors Service, Inc.;

(c)    investments in certificates of deposit, bankers acceptances and time deposits (including Eurodollar time deposits) maturing within six months from the date of acquisition thereof issued or guaranteed by or placed with (i) any domestic office of the Lender or the bank with whom the Borrower and the Guarantors maintain their cash management system; provided that such bank shall have entered into an agreement with the Lender pursuant to which such bank shall have waived all rights of setoff and confirmed that such bank does not have, nor shall it claim, a security interest therein or (ii) any domestic office of any other commercial bank of recognized standing organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $250,000,000 and is the principal banking Subsidiary of a bank holding company having a long-term unsecured debt rating of at least "A-2" or the equivalent thereof from Standard & Poor's or at least "P-2" or the equivalent thereof from Moody's Investors Service, Inc.;

(d)    investments in commercial paper issued by any Person organized under the laws of any state of the United States and rated at least "P-1" (or the then equivalent grade) by Moody's Investors Service, Inc. or at least "A-1" (or the then equivalent grade) by Standard & Poor's in each case, with maturities of not more than 360 days from the date of acquisition thereof;

(e)    investments in repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (a) above entered into with any office of a bank or trust company meeting the qualifications specified in clause (c) above; and

(f)    investments in money market funds at least 90% of the assets of which are comprised of securities of the types described in clauses (a) through (e) above.

"Charges" shall have the meaning specified in Section 9.16.

"Class A Units" shall have the meaning specified in the LLC Agreement.

"Class B Participation Time" shall mean such time as the aggregate amount of Qualified Outflows paid or distributed by the Borrower under this Agreement and the LLC Agreement have a present value, calculated as of the Closing Date using a discount rate of 8.5%, equal to $295,918,367 million.

"Class B Units" shall have the meaning specified in the LLC Agreement.

"Closing" shall mean the funding of the Loan.

"Closing Date" shall mean the date on which this Agreement has been executed and the conditions precedent to the making of the Loan set forth in Article IV have been satisfied or waived, which date shall occur on the date requested by the Borrower, but in no event later than June 30, 2007.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"Collateral" shall mean any and all property owned, leased or operated by a Person granted as security for the Obligations pursuant to any other Loan Document and any and all other property of the Borrower or any Guarantor, now existing or hereafter acquired, that may at any time be or become subject to a security interest or Lien in favor of the Lender to secure the Obligations.

"Collateral Documents" shall mean, collectively, the Security and Pledge Agreement and any other documents granting a Lien upon the Collateral as security for payment of the Obligations.

"Commitment" shall mean the aggregate commitment of the Lender to make a Loan as set forth on Annex A - Commitment Schedule.

"Commitment Schedule" shall mean the Schedule attached as Annex A hereto and identified as the Commitment Schedule.

"Contingent Equity Distribution" shall have the meaning specified in Section 6.05.

"Contingent Interest" shall have the meaning specified in Section 2.06(f).

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to

4

exercise voting power, by contract or otherwise. "<u>Controlling</u>" and "<u>Controlled</u>" have meanings correlative thereto.

"<u>Conversion Cap</u>" shall have the meaning specified in <u>Section 8.01(c)</u>.

"<u>Conversion Percentage</u>" shall mean, at any time, the quotient of (i) the Conversion Shares, divided by (ii)(a) prior to the Class B Participation Time, the sum of (x) the Conversion Shares and (y) the aggregate number of Class A Units then outstanding or (b) on or after the Class B Participation Time, the sum of (x) the Conversion Shares and (y) the aggregate number of Class A Units and Class B Units then outstanding. Notwithstanding the foregoing, for purposes of determining the Contingent Interest payable in respect of the Loan for any Fiscal Year, if the full payment of the Excess Operating Cash Flow for such Fiscal Year would trigger the Class B Participation Time, the Conversion Percentage shall be calculated as follows: (i) in respect of the portion of such Excess Operating Cash Flow representing Qualified Outflows made or paid up to the Class B Participation Time, the Conversion Percentage will be as calculated in clause (a) of the immediately preceding sentence, and (ii) in respect of all remaining Excess Operating Cash Flow, the Conversion Percentage will be as calculated as in clause (b) of the immediately preceding sentence.

"<u>Conversion Price</u>" shall mean $328,789.19.

"<u>Conversion Shares</u>" shall mean, at any time, the quotient of (i) the principal amount of the Convertible Loan then outstanding, <u>divided by</u> (ii) the then-applicable Adjusted Conversion Price. In calculating the then-applicable Conversion Percentage, the number of Conversion Shares shall be determined without limitation by the Conversion Cap.

"<u>Convertible Loan</u>" shall mean the Loan, excluding the PIK Notes and any Replacement Loans.

"<u>Convertible Securities</u>" means indebtedness or other securities convertible into or exchangeable for Equity Interests.

"<u>Default</u>" shall mean any event or condition which constitutes an Event of Default or which upon notice, lapse of time, or both would, unless cured or waived, constitute an Event of Default.

"<u>Deposit</u>" shall have the meaning specified in the Purchase and Sale Agreement.

"<u>Designated Persons</u>" shall mean each of the (i) Jack W. Nicklaus 2002 Revocable Trust, (ii) Nicklaus 2003 GRAT Trust f/b/o Jack W. Nicklaus II, (iii) Nicklaus 2003 GRAT Trust f/b/o Steven C. Nicklaus, (iv) Nicklaus 2003 GRAT Trust f/b/o Nancy Nicklaus O'Leary, (v) Nicklaus 2003 GRAT Trust f/b/o Gary T. Nicklaus, (vi) Nicklaus 2003 GRAT Trust f/b/o Michael S. Nicklaus, (vii) The Jack Nicklaus II Trust u/a 9-23-82, as amended and restated, (viii) The Steven C. Nicklaus trust u/a 6-20-84, as amended and restated, (ix) The Nancy J. Nicklaus O'Leary Trust u/a 5-5-86, as amended and restated, (x) The Gary T. Nicklaus Trust u/a 1-15-90, as amended and restated and (xi) The Michael S. Nicklaus trust u/a 11-28-90, as amended and restated.

"Disability" shall have the meaning specified in the LLC Agreement.

"Dollars" and "$" shall mean lawful money of the United States of America.

"EBITDA" means the Borrower's consolidated earnings (or loss) from operations for the relevant period, after all expenses and other proper charges but before payment or provision for any income taxes (including foreign and state income taxes), interest expense, depreciation, amortization, gains or losses on sales of assets, and an amount equal to the greater of (a) 25% of the Policy's premium or (b), if applicable, the amount by which the Policy's premium exceeds $1.0 million, all as determined in accordance with GAAP as consistently applied by the Borrower; provided, that revenues from golf course design activities will be determined on a federal income tax revenue basis consistent with GBI's Accounting Practices and Procedures (as defined in the Purchase and Sale Agreement).

"EBITDA Event" shall have the meaning specified in the LLC Agreement.

"Environmental Laws" shall mean all applicable federal, state, local or foreign statutes, laws, regulations, ordinances, codes, rules, requirements and guidelines (including consent decrees and administrative orders to which the Borrower, any Guarantor or any of the other Subsidiaries is subject) relating to protection of the environment or imposing liability or standards of conduct concerning any Hazardous Material, as any of the foregoing may be from time to time amended or supplemented.

"Environmental Lien" shall mean a Lien in favor of any Governmental Entity for (i) any liability under Environmental Laws; or (ii) damages arising from or costs incurred by such Governmental Entity in response to a release or threatened release of a hazardous or toxic waste, substance or constituent, or other substance into the environment.

"Equity Interests" shall mean shares of capital stock in a corporation, partnership interests in a partnership, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" shall mean each person (as defined in Section 3(9) of ERISA) which together with the Borrower or any Guarantor or any other Subsidiary of the Borrower or any Guarantor would be deemed to be a single employer within the meaning of Section 414(b), (c), (m), or (o) of the Code.

"Event of Default" shall have the meaning specified in Article VII.

"Excess Operating Cash Flow" shall mean, for any fiscal period, an amount equal to, without duplication, (a) Operating Cash Flow for such fiscal period, less (b) if applicable, the amount by which repayments of principal under the Revolving Credit Agreement during such fiscal period exceed borrowings under the Revolving Credit Agreement, less (c) the aggregate the amount of Indebtedness (other than the Revolving Credit Agreement) repaid or amortized in accordance with the terms thereof during such fiscal period, less (d) the Threshold Equity

6

Distribution made in respect of such fiscal period, <u>less</u> (e) the aggregate amount of interest payable in cash due and payable on the Loan during such fiscal period without giving effect to <u>Section 2.06(e)</u> and <u>Section 2.06(f)</u>, <u>less</u> (f) the aggregate principal amount of all PIK Notes and/or Replacement Loans repaid during and outstanding as of the end of such fiscal period, <u>less</u> (g) the aggregate amount of Permitted Expenditures during such fiscal period not otherwise reflected in Operating Cash Flow for such fiscal period, and <u>less</u> (h) Tax Distributions for such fiscal period.

"<u>Excess Proceeds</u>" shall have the meaning specified in <u>Section 2.05(b)</u>.

"<u>Exempt Issuances</u>" shall mean the issuance by the Borrower of Equity Interests, Options or Convertible Securities to the management and employees of the Borrower or its Subsidiaries pursuant to customary equity incentive plans approved by the Board; <u>provided</u>, <u>however</u>, that Exempt Issuances shall not include (i) any Equity Interests that upon issuance, or Options or Convertible Securities that upon exercise, conversion or exchange, would, together with all other such issuances to management and employees of Borrower or its Subsidiaries, exceed 20% of the fully diluted Equity Interests of the Borrower, assuming full conversion of the Loan and (ii) any Equity Interests having an exercise or conversion price lower than the Adjusted Conversion Price.

"<u>Fair Market Value</u>" shall mean the price which could be negotiated in an arm's-length free market transaction between a willing seller and a willing buyer, neither of whom is under undue pressure or compulsion to complete the transaction.

"<u>Federal Funds Effective Rate</u>" shall mean, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Lender from three Federal funds brokers of recognized standing selected by it.

"<u>Financial Officer</u>" shall mean, with respect to any Person, the chief financial officer, principal accounting officer, treasurer, assistant treasurer or controller of such Person or any other Person who performs a function similar to any of the foregoing and has been identified in writing to the Lender as a "Financial Officer" hereunder.

"<u>Fiscal Quarter</u>" shall mean any of the quarterly accounting periods of the Borrower and its Subsidiaries, ending on March 31, June 30, September 30 and December 31 of each year.

"<u>Fiscal Year</u>" shall mean any of the annual accounting periods of the Borrower and its Subsidiaries ending on December 31 of each year.

"<u>GAAP</u>" shall mean generally accepted accounting principles in the United States of America as in effect from time to time applied in accordance with <u>Section 1.02</u>.

7

"GBI" shall mean Golden Bear International, Inc., a Florida corporation.

"Governmental Entity" shall mean any federal, state, local or foreign court or governmental or regulatory authority, agency, commission, body or other governmental entity, or any entity similar to any of the foregoing.

"Guarantee" shall mean, with respect to any Person (such Person, a "guarantor"), any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof; (ii) to purchase or lease property, securities or services for the primary purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof; (iii) to advance funds to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation; or (iv) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.  The amount of any Guarantee of any guarantor shall be deemed to be the lower of (x) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee is made and (y) the maximum amount for which such guarantor may be liable pursuant to the terms of the instrument embodying such Guarantee.

"Guaranteed Obligations" shall have the meaning specified in Section 10.01.

"Guarantor" shall have the meaning set forth in the first paragraph of this Agreement.

"Guaranty" shall have the meaning specified in Section 4.01(e).

"Hazardous Materials" shall mean any "hazardous substance," as defined by the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended or otherwise modified from time to time; any "hazardous waste," as defined by the Resource Conservation and Recovery Act, as amended; any petroleum product; or any pollutant or contaminant or hazardous, dangerous, or toxic chemical, material, or substance regulated under or within the meaning of any other Environmental Law.

"Immediate Family" shall mean, and is limited to, an individual Person's parents, current spouse, parents-in-law, grandparents, children, siblings, and grandchildren, whether by marriage, birth or adoption, or a trust or estate, all of the beneficiaries of which consist of such Person or members of such Person's Immediate Family.

"Indebtedness" shall mean, at any time and with respect to any Person, without duplication, (i) all indebtedness of such Person for borrowed money; (ii) all obligations of such Person for the deferred purchase price of property or services (other than accounts payable

8

arising out of the purchase of property, including inventory, and services purchased, and expense accounts and deferred compensation items in the ordinary course of business), (iii) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments; (iv) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person; (v) all Capital Lease Obligations of such Person; (vi) all reimbursement, payment or similar obligations of such Person, contingent or otherwise, under acceptance, letter of credit or similar facilities; (vii) all Swap Obligations of such Person (and the amount of Indebtedness attributable to all Swap Obligations of such Person shall be deemed to be the Net Mark-to-Market Exposure with respect thereto), except to the extent entered into to protect such Person against fluctuations in commodity prices, interest rates or currency exchange rates in respect of a then existing obligation or transaction otherwise permitted hereunder, (viii) all Guarantees by such Person of Indebtedness of others; and (ix) all Indebtedness referred to in <u>clauses (i)</u> through <u>(viii)</u> above secured by any Lien upon or in property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness, <u>provided</u> <u>that</u>, if such Person has not assumed such obligations, then the amount of Indebtedness of such Person for purposes of this <u>clause (ix)</u> shall be equal to the lesser of the amount of the obligations of the holder of such obligations and the Fair Market Value of the assets of such Person which secure such obligations.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"<u>Information</u>" shall have the meaning specified in <u>Section 9.12</u>.

"<u>Initial Investment</u>" shall mean $145.0 million.

"<u>Insurance Application Notice</u>" shall have the meaning specified in <u>Section 5.11(d)</u>.

"<u>Intercompany Subordination Agreement</u>" shall have the meaning specified in <u>Section 6.03</u>.

"<u>Interest Expense</u>" shall mean, with reference to any period, the interest expense of the Borrower and its Subsidiaries calculated on a consolidated basis in conformity with GAAP for such period.

"<u>Interest Payment Date</u>" shall mean the last day of each Fiscal Quarter.

"<u>Investments</u>" shall have the meaning specified in <u>Section 6.07</u>.

"<u>IPO</u>" shall mean the closing of a firm commitment underwritten public offering on the New York Stock Exchange, the Nasdaq National Market or any other United States national securities exchange of Equity Interests pursuant to a Registration Statement declared effective under the Securities Act (other than on a Registration Statement (i) filed on Form S-4 or Form S-8 or any successor form thereto or (ii) filed in connection with an exchange offer).

9

"IRR" shall mean, measured as of the closing of any Qualified IPO or Qualified Sale Transaction, the discount rate that makes the net present value of the Initial Investment equal the net present value of the Aggregate Investment Returns received by the Lender, assuming (i) in the case of a Qualified IPO, conversion of the Loan in full pursuant to Article VIII immediately prior to the Qualified IPO and the immediate resale of the Equity Interests so obtained at the price to the public in the Qualified IPO and (ii) in the case of a Qualified Sale Transaction, conversion of the Loan in full pursuant to Article VIII immediately prior to the Qualified Sale and the receipt by the Lender of Equity Interests or other Property or cash in connection therewith valued at the Fair Market Value thereof.  The IRR shall be computed utilizing the @XIRR function in Microsoft's Excel computer program.

"Joinder Agreement" shall have the meaning specified in Section 5.09(a).

"JWN" shall mean Jack W. Nicklaus.

"Lender" shall have the meaning specified in the first paragraph of this Agreement.

"Lender Portion" shall have the meaning specified in Section 5.11(d).

"Lien" shall mean, with respect to any asset, (i) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest of any kind whatsoever in, on or of such asset; (ii) the interest of a vendor or a lessor under any conditional sale agreement, Capital Lease or title retention agreement (or any financing having substantially the same economic effect as any of the foregoing) relating to such asset; or (iii) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Liquid Consideration" shall mean any (or any combination of) (i) cash or Cash Equivalents or (ii) equity securities that (x) are traded on the New York Stock Exchange, the Nasdaq National Market or another United States national securities exchange, (y) have been registered or qualified under all applicable securities laws and (z) may be disposed of immediately without restriction.  For purposes of this Agreement, the value of the equity securities described under clause (ii) of the immediately preceding sentence as of any date shall be (a) if publicly traded prior to the issuance thereof, the fifteen (15) day trailing average closing price of such securities on the applicable securities exchange prior to the date of measurement, (b) if issued in an IPO, the purchase price therefor under the applicable underwriting or securities purchase agreement, prior to deduction for any underwriters' discount, allowance or other underwriter or financial advisor compensation or reimbursements, or (c) if neither (a) nor (b) is applicable, then as unanimously determined by the Board.

"LLC Agreement" shall mean the Limited Liability Company Operating Agreement of the Borrower dated the date hereof without giving any effect to any amendment or modification thereof.

"Loan" shall mean, collectively, the loans made by the Lender pursuant to this Agreement, including the PIK Notes and any Replacement Loan; provided, however, that Section 2.05(b) shall be applicable only to the PIK Notes and any Replacement Loan and

<u>Article VIII</u> shall not be applicable to the PIK Notes or, after the deemed issuance thereof, any Replacement Loan.

"<u>Loan Documents</u>" shall mean this Agreement, the Security and Pledge Agreement and any other instrument or agreement (including notes) executed and delivered to the Lender in connection herewith. Any reference in the Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to the Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"<u>Material Adverse Effect</u>" shall mean a material adverse effect on (a) the business, assets, operations, prospects or financial condition, of the Borrower and the Guarantors taken as a whole, (b) the ability of the Borrower and the Guarantors taken as a whole to perform any obligations under the Loan Documents, (c) the Collateral, or the Lender's Liens on the Collateral or the priority of such Liens or (d) the rights of or benefits available to the Lender hereunder or under any other Loan Document; <u>provided</u>, <u>however</u>, that none of the following shall be deemed in themselves, either alone or in combination, to constitute, and none of the following shall be taken into account in determining whether there has been or will be, a Material Adverse Effect: (i) any adverse change, effect, event, occurrence, state of facts or development attributable to the announcement or pendency of the transactions contemplated by this Agreement; (ii) any adverse change, effect, event, occurrence, state of facts or development attributable to conditions affecting the U.S. economy or any other economy where the Borrower and the Guarantors do business (in each case, as a whole) or the capital markets in general or the markets in which the Borrower or the Guarantors operate, except to the extent that the Borrower and the Guarantors as a whole are disproportionately affected; (iii) any adverse change, effect, event, occurrence, state of facts or development arising from or relating to compliance with the terms of this Agreement; and (iv) the death or Disability of JWN.

"<u>Maturity Date</u>" shall mean the fifteenth anniversary of Closing Date; provided, that the Maturity Date shall be extended automatically for one year on each anniversary of the Closing Date unless a Default or Event of Default has occurred on or prior to such date and is continuing on such date.

"<u>Maximum Liability</u>" shall have the meaning specified in <u>Section 10.08</u>.

"<u>Maximum Rate</u>" shall have the meaning specified in <u>Section 9.16</u>.

"<u>Member</u>" shall have the meaning specified in the LLC Agreement.

"<u>Members' Agreement</u>" shall mean the Members' Agreement dated as of the Closing Date among the Borrower, GBI, NF Dynasty, LLC, the Lender and the additional members identified on the signature pages thereto.

"<u>Milstein Family</u>" shall mean PM and his Immediate Family.

"<u>Multiemployer Plan</u>" shall mean a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, which is maintained or contributed to by (or to which there is an obligation to contribute of) the Borrower or any Guarantor or a Subsidiary of the Borrower or any Guarantor or an ERISA Affiliate.

"<u>Multiple Employer Plan</u>" shall mean a Single Employer Plan, which (i) is maintained for employees of the Borrower or any Guarantor or an ERISA Affiliate and at least one person (as defined in Section 3(9) of ERISA) other than the Borrower or any Guarantor and its ERISA Affiliates or (ii) was so maintained and in respect of which the Borrower or any Guarantor or an ERISA Affiliate could have liability under Section 4064 or 4069 of ERISA in the event such Plan has been or were to be terminated.

"<u>Net Income</u>" shall mean, with reference to any period, the net income (or loss) of the Borrower and its Subsidiaries calculated on a consolidated basis for such period in accordance with GAAP.

"<u>Net Mark-to-Market Exposure</u>" shall mean, with respect to any Person, as of any date of determination, the excess (if any) of all unrealized losses over all unrealized profits of such Person arising from Swap Agreement transactions.  As used in this definition, "unrealized losses" means the fair market value of the cost to such Person of replacing such Swap Agreement transactions as of the date of determination (assuming the Swap Agreement transactions were to be terminated as of that date), and "unrealized profits" means the Fair Market Value of the gain to such Person of replacing such Swap Agreement transactions as of the date of determination (assuming such Swap Agreement transactions were to be terminated as of that date).

"<u>Net Proceeds</u>" shall mean the aggregate cash proceeds received by the Borrower or any Guarantor in respect of any Permitted Disposition (including, without limitation, any cash received upon the sale or other disposition of any non-cash consideration received in any Permitted Disposition), net of the costs relating to such Permitted Disposition, including, without limitation, legal, accounting and investment banking fees, sales commissions, any taxes or Tax Distributions paid or payable as a result of the Permitted Disposition, in each case, after taking into account any repayment of Indebtedness, other than the Loan, secured by a Lien on the asset or assets that were the subject of such Permitted Disposition, any Indebtedness otherwise required to be repaid in connection with the occurrence of such disposition (other than the Loan) and any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with GAAP.

"<u>Nicklaus Family</u>" shall mean JWN and his Immediate Family.

"<u>Non-Paying Guarantor</u>" shall have the meaning specified in <u>Section 10.09</u>.

"<u>Non-Recourse Carve-Out Agreement</u>" shall have the meaning specified in <u>Section 4.01(e)</u>.

"<u>Notice of Borrowing</u>" shall mean a Notice of Borrowing in the form of <u>Annex B</u>.

"<u>Obligated Party</u>" shall have the meaning specified in <u>Section 10.02</u>.

"<u>Obligations</u>" shall mean all unpaid principal of and accrued and unpaid interest on the Loan, all accrued and unpaid fees and all expenses, reimbursements, indemnities and other obligations of the Borrower and the Guarantors to the Lender or any indemnitee, in each case to the extent expressly required to be repaid by the Borrower or any Guarantor under any Loan Document. The Obligations include, to the fullest extend permitted by applicable law, interest (including interest that accrues or that would accrue but for the filing of a bankruptcy case by the Borrower or any Guarantor, whether or not such interest would be an allowable claim under any applicable bankruptcy or other similar proceeding) and other obligations accruing or arising after commencement of any case under any bankruptcy or similar laws by or against the Borrower or any Guarantor (or that would accrue or arise but for the commencement of any such case).

"<u>Off-Balance Sheet Liability</u>" shall mean, with respect to any Person, (i) any repurchase obligation or liability for the principal amount thereof of such Person with respect to accounts or notes receivable sold by such Person; (ii) any indebtedness, liability or obligation under any sale and leaseback transaction which is not a Capital Lease Obligation and under which such Person retains ownership of the Property so leased for Federal income tax purposes, other than any lease under which such Person is the lessor; or (iii) any indebtedness, liability or obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheets of such Person, but excluding from this clause (iii) operating leases and Capital Lease Obligations.

"<u>Operating Cash Flow</u>" shall mean, for any fiscal period, an amount equal to actual cash flow from operating activities as shown on the Borrower's Statement of Cash Flows for such period determined on a consolidated basis in accordance with GAAP, <u>plus</u>, without duplication, (i) Interest Expense on the Loan, <u>plus</u>, (ii) cash distributions or dividends received from investments in non-consolidated Persons, <u>less</u> (iii) aggregate cash capital expenses and cash reserves established up to a maximum of $2,000,000 for any Fiscal Year, and <u>less</u> (iv) any expenditure during any period in satisfaction of or pursuant to a post-Closing obligation of the Borrower or any of its Subsidiaries under the Purchase and Sale Agreement; <u>provided</u>, <u>however</u>, that cash flow from operating activities of any Person which is not a wholly owned Subsidiary of the Borrower and which is consolidated with the Borrower or accounted for by the equity method of accounting shall be included only to the extent of the amount of cash dividends or distributions paid to the Borrower or a Subsidiary of the Borrower.

"<u>Option</u>" shall mean any rights, options or warrants to subscribe for, purchase or otherwise acquire Equity Interests or Convertible Securities.

"<u>Optional Prepayment Notice</u>" shall have the meaning specified in <u>Section 2.04(b)</u>.

"<u>Participant</u>" shall have the meaning specified in <u>Section 9.04(b)(i)</u>.

"<u>Paying Guarantor</u>" shall have the meaning specified in <u>Section 10.09</u>.

"<u>Permitted Disposition</u>" shall mean any sale or disposition of assets, other than sales of merchandise in the ordinary course of business:

(a)        in a transaction that satisfies each of the following conditions: (i) at least 50.0% of the consideration received in connection with such sale or disposition shall be Liquid Consideration; (ii) such sale or disposition shall not constitute a Sale Transaction, and (iii) no Event of Default exists or would result from such sale or disposition;

(b)        constituting individual lots obtained as consideration relating to design contracts in the ordinary course of business;

(c)        that, individually (other than those described in clauses (b) above or (d) below) does not exceed $1.0 million in value and together with all other sales or dispositions of assets (other than those described in clauses (b) above or (d) below) during such Fiscal Year, would not cause the aggregate value of all such assets sold or disposed of to exceed $3.0 million during such Fiscal Year; or

(d)        in a transaction that was unanimously approved by the Board.

For the avoidance of doubt, a Permitted Disposition shall not result in a change to the Conversion Percentage.

"Permitted Expenditure" shall mean any other Investment, acquisition, loan, capital expense, bonus or compensation payment or other expenditure of any kind that is unanimously approved by the Board.

"Permitted Investments" shall mean any:

(a)        Investments in any Guarantor or wholly owned Subsidiary of the Borrower or any Guarantor, Investments of any Guarantor in the Borrower, another Guarantor or any of their wholly owned Subsidiaries;

(b)        Investments by any Subsidiary that is not a Guarantor in the Borrower, a Guarantor or a Subsidiary, provided that any such Investment which is a loan, advance, guaranty or other debt Investment shall be subordinated to the Obligations pursuant to the Intercompany Subordination Agreement, or such other form reasonably acceptable to the Lender;

(c)        Investments in Cash Equivalents;

(d)        Investments by Borrower, any Guarantor or any of their wholly owned Subsidiaries in a Person if, as a result of such Investment, such Person becomes a Guarantor of the Borrower, or such Person is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, Borrower or any Guarantor; provided, that each such Investment shall have a Fair Market Value (as determined in good faith by the Board and measured as of the date such Investment was made without giving effort to subsequent changes in value) of not more than $1.0 million and that, when taken together with all other then-outstanding Investments made pursuant to this clause (d), does not exceed $3.0 million.

14

(e)     loans or advances (up to a maximum of $2.0 million in the aggregate at any one time outstanding) made by the Borrower or a Guarantor to its employees in the ordinary course of business for travel and entertainment expenses, relocation costs and similar purposes, and loans or advances (up to a maximum of $2.0 million in the aggregate at any one time outstanding) to directors, officers or employees of the Borrower or any Guarantor the proceeds of which are concurrently used to purchase Equity Interests, Options or Convertible Securities in the Borrower or a Guarantor;

(f)     Investments made as a result of the receipt of non-cash consideration from any disposition of assets made in accordance with this Agreement;

(g)     Investments (up to a maximum of $1,000,000 in the aggregate at any one time outstanding) received in compromise or resolution of (i) obligations of trade creditors or customers that were incurred in the ordinary course of business or (ii) litigation, arbitration or other disputes with Persons who are not Affiliates;

(h)     Investments in Swap Obligations, to the extent entered into to protect such Person against fluctuations in commodity prices, interest rates or currency exchange rates;

(i)     repurchase of membership interests in the Borrower made in accordance with the LLC Agreement;

(j)     Investments in connection with Capital Expenditures contemplated by clause (iii) of the definition of Operating Cash Flow;

(k)     Investments representing in-kind fees or payments in consideration of golf course design, endorsement, licensing or other ordinary course business activities of the Borrower or its Subsidiaries;

(l)     an Investment that is a Permitted Expenditure; and

(m)     other Investments in any Subsidiary of the Borrower or any Guarantor having a Fair Market Value (as determined in good faith by the Board and measured as of the date such Investment was made without giving effect to subsequent changes in value) of not more than $1.0 million and that, when taken together with all other then-outstanding Investments made pursuant to this clause (m), does not exceed $3.0 million.

"Permitted Liens" shall mean:

(a)     Liens imposed by law for Taxes (other than Environmental Liens and any Lien imposed under ERISA) not yet delinquent or which are being contested in compliance with Section 5.04;

(b)     Liens of landlords and Liens of carriers, warehousemen, workmen, repairmen, vendors, consignors, mechanics, materialmen and other Liens (other than Environmental Liens and any Lien imposed under ERISA) imposed by law and created in the ordinary course of business;

15

(c)       Liens (other than any Lien imposed under ERISA) incurred or deposits made in the ordinary course of business (including, without limitation, surety bonds and appeal bonds) in connection with workers' compensation, unemployment insurance and other types of social security benefits or governmental insurance or to secure the performance of tenders, bids, leases, contracts (other than for the repayment of Indebtedness for borrowed money), statutory obligations and other similar obligations or arising as a result of progress payments under government contracts;

(d)       easements (including, without limitation, reciprocal easement agreements and utility agreements), rights-of-way, covenants, consents, reservations, mineral leases, encroachments, variations and zoning laws, ordinances, other restrictions and rights reserved to or vested in any municipality or government or proper authority to control or regulate any Property of the Borrower or its Subsidiaries, charges or encumbrances (whether or not recorded) and interest of ground lessors, minor defects and irregularities in the title to any Property, which do not interfere materially with the ordinary conduct of the business of the Borrower and its Subsidiaries, taken as a whole;

(e)       purchase money Liens (including Capital Leases) upon or in any property acquired or held in the ordinary course of business to secure the purchase price of such property solely for the purpose of financing the acquisition of such property to the extent such purchase money Liens secure Indebtedness incurred in accordance with Section 6.03(iii);

(f)       pledges or deposits in the ordinary course to secure leases entered into in the ordinary course of business;

(g)       any interest of a consignor in goods held by the Borrower, any Guarantor or any Subsidiary on consignment provided that such goods are held on consignment in the ordinary course of business consistent with past practices;

(h)       any attachment or judgment lien not resulting in an Event of Default;

(i)       leases, subleases or licenses of occupancy or use granted to others not interfering in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole;

(j)       Liens arising from UCC financing statements regarding leases or charges permitted by this Agreement;

(k)       Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties;

(l)       Liens incurred in the ordinary course of business encumbering deposits made to secure obligations arising from statutory, regulatory, contractual or warranty requirements of the Borrower or its Subsidiaries (excluding deposits securing the repayment of Indebtedness);

16

(m)     Liens encumbering initial deposits and margin deposits securing obligations under Swap Obligations incurred in compliance with this Agreement;

(n)     Liens securing reimbursement, payment or similar obligations of the Borrower or any of its Subsidiaries under acceptance, letter of credit or similar facilities permitted by this Agreement;

(o)     Liens in the form of title retention in connection with the acquisition of goods in the ordinary course of business;

(p)     Liens arising in countries other than the United States of America substantially comparable to the foregoing;

(q)     Liens under or in connection with the Revolving Credit Agreement, provided that such Liens are subject to an intercreditor agreement satisfactory to the Lender in its reasonable discretion;

(r)     Liens relating to Indebtedness securing the Aircraft permitted by Section 6.03(iii);

(s)     Liens relating to Permitted Expenditures; and

(t)     extensions, renewals or replacements of any Lien referred to above.

"Permitted Revolving Credit Indebtedness" shall mean the maximum amount which may be borrowed under the Revolving Credit Agreement from time to time.

"Person" shall mean any individual, partnership, corporation, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization or Governmental Entity or any department, agency or political subdivision thereof.

"PIK Notes" shall mean notes issued by the Borrower pursuant to Section 2.06(e), substantially in the form attached hereto as Exhibit A-1.

"Plan" shall mean a Single Employer Plan or a Multiple Employer Plan.

"PM" shall mean Paul Milstein.

"Policy" shall mean the Key Man Insurance Policy, as such term is defined in the Purchase and Sale Agreement.

"Preliminary Prepayment Notice" shall have the meaning specified in Section 2.04(b).

"Prepayment Percentage" shall have the meaning specified in Section 5.11(d).

"<u>Property</u>" shall mean any interest in any kind of property or asset, whether real, personal or mixed, tangible or intangible.

"<u>Purchase and Sale Agreement</u>" shall have the meaning given to it in the LLC Agreement.

"<u>Qualified Disposition</u>" shall mean a Permitted Disposition in which the consideration to be received by the Borrower or any Guarantor is at least $500,000.

"<u>Qualified IPO</u>" shall mean a transaction or series of related transactions (i) that relate to or are undertaken in connection with an IPO of Equity Interests of the Borrower, which IPO (a) includes the primary issuance or secondary sale of Equity Interests representing not less than 30% of the Equity Interests of the Borrower (calculated on a fully diluted basis immediately prior to such IPO) and (b), assuming conversion of the Loan in full pursuant to <u>Article VIII</u> immediately prior to the Qualified IPO and the immediate resale of the Equity Interests so obtained at the price to the public in the Qualified IPO, would result in the Lender obtaining the then-applicable Threshold IRR and (ii) in connection with which the Borrower shall have agreed to prepay the Loan in full, including accrued but unpaid interest thereon as of the date of prepayment.

"<u>Qualified Outflows</u>" shall mean any and all amounts of principal and interest paid in respect of the Loan, including PIK Notes and/or Replacement Loans, including any Base Interest, Contingent Interest, principal payments and prepayments, any distributions of cash, property or other assets by the Borrower made under, and in accordance with, the LLC Agreement, in each case, from the date hereof through (and including) the date of such calculation.

"<u>Qualified Sale Transaction</u>" shall mean a Sale Transaction (i) in which, assuming conversion of the Loan in full pursuant to <u>Article VIII</u> immediately prior to the Qualified Sale Transaction, the Lender would receive Equity Interests or other Property or cash having an aggregate Fair Market Value such that the Lender would obtain the then-applicable Threshold IRR and (ii) in connection with which the Borrower shall have agreed to prepay the Loan in full, including accrued but unpaid interest thereon as of the date of prepayment.

"<u>Registration Statement</u>" shall mean any registration statement, which covers any Equity Interests, and all amendments and supplements to any such registration statement, including post-effective amendments, in each case including the prospectus contained therein, all exhibits thereto and all material incorporated by reference therein.

"<u>Related Parties</u>" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"<u>Replacement Loan</u>" shall have the meaning specified in <u>Section 8.01(c)</u>.

"<u>Replacement Loan Note</u>" shall mean notes issued by the Borrower pursuant to <u>Section 8.01(c)</u>, substantially in the form attached hereto as <u>Exhibit A-2</u>.

18

"Requirement of Law" shall mean, as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Entity, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Residual Available Cash Flow" shall mean, for any fiscal period, an amount equal to (i) Available Operating Cash Flow for such period less (ii) the amount required to prepay all outstanding PIK Notes and/or Replacement Loans.

"Restricted Payment" shall have the meaning specified in Section 6.05.

"Revolving Credit Agreement" shall mean a new revolving credit facility or similar loan arrangement provided by Lender or one of its Affiliates to Borrower concurrently with or as soon as practicable after the Closing.

"Sale Transaction" shall mean the sale or transfer (including by merger or acquisition), of (i) Equity Interests representing 50% or more of the economic interests in the Equity Interests of the Borrower or (ii) assets which generated 50% or more of EBITDA for the twelve month period ending on the last day of the month immediately preceding the closing of such sale or transfer.

"Security and Pledge Agreement" shall have the meaning specified in Section 4.01(b).

"Single Employer Plan" shall mean a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (i) is maintained for employees of the Borrower, any Guarantor or an ERISA Affiliate or (ii) was so maintained and in respect of which the Borrower, any Guarantor or an ERISA Affiliate could have liability under Title IV of ERISA in the event such Plan has been or were to be terminated.

"Special EBITDA Right" shall have the meaning specified in the LLC Agreement.

"Specified Persons" shall mean each of Jack W. Nicklaus, Jack Nicklaus II, Steven Nicklaus, Nancy Nicklaus, Gary Nicklaus, Michael Nicklaus and William O'Leary.

"Subsidiary" shall mean, with respect to any Person (herein referred to as the "parent"), any corporation, association or other business entity (whether now existing or hereafter organized) of which at least a majority of the securities or other ownership interests having ordinary voting power for the election of directors is, at the time as of which any determination is being made, owned or controlled by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Swap Agreement" shall mean any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value

19

or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower, any Guarantor or any of their Subsidiaries shall be a Swap Agreement.

"Swap Obligations" shall mean, with respect to any Person, any and all obligations of such Person, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (a) any and all Swap Agreements, and (b) any and all cancellations, buybacks, reversals, terminations or assignments of any Swap Agreement transaction.

"Tax" or "Taxes" shall mean any and all federal, state, local and foreign income, profits, franchise, gross receipts, environmental, customs duty, capital stock, severances, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise, escheat, production, value added, occupancy and other taxes imposed by any Governmental Entity.

"Tax Distribution" shall mean, for any quarterly tax period, the least of (i) an amount sufficient to enable the members of the Borrower to pay, on a quarterly basis, in respect of such period, federal, state and local taxes arising from the allocations of income and gain of the Borrower and its Subsidiaries to such members, (ii) $3,251,557 and (iii) Tax Distribution Cash Flow in respect of such period.  The amount under clause (i) shall equal the product of (x) highest marginal combined federal, state and local income tax rate applicable to any of the Borrower's Members (after giving effect to income tax deductions (if allowable) for state and local income taxes) for such fiscal period and (y) the aggregate amounts of net taxable income or gain of the Borrower that were actually allocated or are estimated to be allocated to such Member for federal income tax purposes for such fiscal period, reduced, but not below zero, by any tax deduction, loss or credit previously or currently allocated to such Member and not previously taken into account for purposes of the calculation of the amount of any Tax Distribution.

"Tax Distribution Cash Flow" shall mean, for any period, an amount equal Operating Cash Flow for such period less the amount of Interest Expense on the Loan in respect of such period.

"Tax Distribution Payment Date" means, for each quarterly period, the date that is ten days after the Interest Payment Date or, if such Tax Distribution Payment Date is not a Business Day, the first Business Day thereafter.

"Tax Related Person" shall mean any Person (including, without limitation, a beneficial owner of an interest in a pass-through entity) whose income is realized through or determined by reference to the Lender, or any Participant or any Tax Related Person of any of the foregoing.

"Termination Date" shall mean the earlier to occur of (i) the Maturity Date and (ii) the acceleration of the Loan in accordance with the terms hereof.

LA\1714629.12

"Threshold Equity Distribution" shall mean, for any fiscal period, the lesser of (i) an amount equal to the aggregated Accrued Notional Distributions for all Class A and Class B Units outstanding at any time during such fiscal period less Tax Distributions for such fiscal period and (ii) the Residual Available Cash Flow for such fiscal period.

"Threshold IRR" shall mean 20% until the fifth anniversary of the Closing, and shall decrease by one-half of one percentage point (0.5%) on each subsequent anniversary of the Closing; provided, that the Threshold IRR shall in no event be less than 15%.

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York or any other state the laws of which are required to be applied in connection with the issue of perfection of security interests.

"United States" and "U.S." shall mean the United States of America.

Section 1.02  Terms Generally.  The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  All references herein to Sections, Exhibits and Schedules shall be deemed references to Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.  The words "asset" and "property" shall be construed to have the same meaning and effect and refer to any and all tangible and intangible assets and properties.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if the Borrower notifies the Lender that it requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Lender notifies the Borrower that it requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.  Terms that are defined in the Uniform Commercial Code as in effect in the State of New York from time to time shall have the same meaning herein unless otherwise defined herein.

Section 1.03  Obligations Not Affected.  The Obligations of the Borrower and the Guarantors shall not be affected by (i) the failure of the Lender to assert any claim or demand or to enforce any right or remedy against the Borrower or any Guarantor under the provisions of this Agreement or any other Loan Document or otherwise; (ii) any extension or renewal of any provision hereof or thereof; (iii) any rescission, waiver, compromise, acceleration, amendment or modification of any of the terms or provisions of any of the Loan Documents; (iv) the release, exchange, waiver or foreclosure of any security held by the Lender for the Obligations or any of them; (v) the failure of the Lender to exercise any right or remedy against any other Borrower or Guarantor; (vi) the release or substitution of the Borrower or any Guarantor; or (vii) any other circumstance that might otherwise constitute a discharge of a surety, other than, in each case, the payment in full in cash of the Obligations.

21

## ARTICLE II.
## AMOUNT AND TERMS OF CREDIT

Section 2.01    <u>Commitments</u>.  Subject to the terms and conditions set forth herein, the Lender agrees to make the Loan to the Borrower on the Closing Date, in an amount equal to such Lender's Commitment.    Amounts repaid in respect of Loan may not be reborrowed.  Unless previously terminated, the Commitments shall terminate on the Closing Date upon funding by the Lender of the Loan.  The Loan shall be denominated in Dollars.

Section 2.02    <u>Notice of Borrowing; Funding of Loan</u>.  By delivering a Notice of Borrowing to the Lender not later than 1:00 p.m., Eastern time, on a Business Day, the Borrower may irrevocably request, on not less than one (1) Business Day's notice, that the Loan as a single drawing be made on the Closing Date.  The Lender shall make the Loan on the Closing Date by wire transfer of $140,000,000 immediately available funds by 11:00 a.m., Eastern time, to the account of the Borrower designated by it for such purpose by notice to the Lender and the release of the Deposit to the Borrower.

Section 2.03    <u>Repayment and Amortization of Loan; Evidence of Debt.</u>

(a)    The Borrower hereby unconditionally promises to pay to the Lender the then unpaid principal amount of the Loan on the Termination Date.  All unpaid Obligations shall be paid in full in cash by the Borrower on the Termination Date.

(b)    The Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the Lender resulting from the Loan, including the amounts of principal and interest payable and paid to the Lender from time to time hereunder.

(c)    The entries made in the accounts maintained pursuant to <u>Section 2.03(b)</u> shall be prima facie evidence of the existence and amounts of the obligations recorded therein; <u>provided</u> <u>further</u>, that the failure of the Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loan in accordance with the terms of this Agreement.

(d)    The Lender may request that the Loan be evidenced by a promissory note.  In such event, the Borrower shall prepare, execute and deliver to the Lender a promissory note payable to the order of the Lender (or, if requested by the Lender, to the Lender and its registered and permitted assigns) and in a form approved by the Lender and reasonably acceptable to the Borrower.  Thereafter, the Loan evidenced by such promissory note and interest thereon shall at all times be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns) except to the extent that the Lender subsequently returns any such promissory note for cancellation and requests that the Loan once again be evidenced as described in <u>Section 2.03(b)</u> above.

22

Section 2.04    Optional Prepayment of Loan.

(a)    The Borrower may at any time prepay all or any portion of any PIK Notes or Replacement Loans from any source of cash, so long as no Event of Default would result from such prepayment.

(b)    At any time after the third anniversary of the Closing Date, the Borrower may prepay the Loan in whole concurrently with the closing of a Qualified IPO or a Qualified Sale Transaction.  To exercise this right, the Borrower must first deliver to the Lender, not later than concurrently with entering into a definitive underwriting or securities purchase agreement with respect to a Qualified IPO, or definitive documentation with respect to a Qualified Sale Transaction, an irrevocable undertaking, reasonably satisfactory in form and substance to the Lender, to, concurrently with the closing of the Qualified IPO or Qualified Sale Transaction, prepay the Loan in whole, together with all accrued but unpaid interest thereon as of the date of prepayment (an "Optional Prepayment Notice").  Such Optional Prepayment Notice shall be accompanied by all material documentation relating to such Qualified IPO or Qualified Sale Transaction as unanimously determined by all Board members who participate in the vote to approve or not approve the Qualified Sale Transaction or Qualified IPO.  Failure to provide all such material documentation shall render the Optional Prepayment Notice null and void.  To facilitate the foregoing, the Borrower agrees to use reasonable efforts to (i) notify the Lender of its intention to effect such Qualified IPO or Qualified Sale Transaction at least forty-five (45) days prior to the anticipated consummation of such transaction (such notice, a "Preliminary Prepayment Notice") as determined by the Board in good faith and which anticipated closing date shall be set forth in such notice, and (ii) keep the Lender (or its Affiliates or representatives on the Board) reasonably informed on a current basis as to the timing and status of such transaction.

Section 2.05    Mandatory Payment of Loan.

(a)    The Lender shall have the right to cause the Borrower to prepay the Loan in whole concurrently with the closing of an IPO or a Sale Transaction.  To exercise this right, the Lender must first deliver written notice to Borrower of its election to cause the prepayment of the Loan within three (3) Business Days of the approval by the Board of such IPO or Sale Transaction.

(b)    (i)  Notwithstanding anything to the contrary in any of the Loan Documents, at any time prior to the one-year anniversary of the closing of any Qualified Disposition, the Borrower or any Guarantor may apply the Net Proceeds received in such Qualified Disposition:

(A)    to repay, first, PIK Notes, second, Replacement Loans or, third, any Indebtedness under the Revolving Credit Agreement;

(B)    to make Permitted Investments;

(C)    to make capital expenditures; or

23

(D)    to acquire other assets that are not classified as current assets under GAAP and that are used or useful in the then-current businesses of the Borrower or any Guarantor.

(ii)    Any Net Proceeds from Qualified Dispositions that are not applied or invested as provided in accordance with the foregoing will constitute "Excess Proceeds."

(c)    The Borrower shall apply Excess Proceeds from any Qualified Disposition to prepay the PIK Notes and any Replacement Loan in whole or in part within five (5) Business Days of the determination of the amount of such Excess Proceeds.

(d)    The Borrower shall prepay the PIK Notes and any Replacement Loan in whole or in part on each Tax Distribution Payment Date, to the extent that there is Available Operating Cash Flow for any Fiscal Quarter.  Any such prepayment shall be applied, first, to the PIK Notes and, second, to any Replacement Loan.

(e)    The Borrower shall use the proceeds from the Policy to prepay all or a portion of the Loan in accordance with Section 5.11(d).

(f)    The Borrower shall notify the Lender of any prepayment pursuant to Section 2.05(b) or Section 2.05(c) not later than 12:00 noon, Eastern time, three (3) Business Days before the date of prepayment.  Such notice shall be irrevocable.  Upon the date of any prepayments hereunder, the Borrower shall pay to the Lender at the time of such prepayment, all accrued but unpaid interest due hereunder with respect to the principal amount being prepaid, and, in respect of a prepayment under Section 2.05(a), all charges, amounts and other sums then due and payable under this Agreement and the Loan Documents to the extent that they pertain to the amount being prepaid.

Section 2.06    Interest.

(a)    Except as expressly provided in Section 2.06(e), the Term Loan shall bear interest in cash at the Applicable Rate.

(b)    Notwithstanding the foregoing, during the occurrence and continuance of an Event of Default, the Lender may, at its option, by notice to the Borrower (which notice may be revoked at the option of the Lender) declare that (i) the Loan shall bear interest at 3.0% plus the rate otherwise applicable to the Loan as provided in the preceding paragraphs of this Section or (ii) in the case of any other amount outstanding hereunder, such amount shall accrue at 3.0% plus the rate applicable to such fee or other obligation as provided hereunder; provided, that this Section 2.06(b) shall not be effective during the five-year period commencing upon the date of exercise of the Special EBITDA Right under the LLC Agreement.

(c)    Accrued interest on the Loan shall be payable in arrears on each Interest Payment Date for the Loan and upon the Termination Date; provided that: (i) interest accrued pursuant to Section 2.06(b) shall be payable on demand; and (ii) in the event of any

repayment or prepayment of the Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(d)      All interest hereunder shall be computed on the basis of a year of 360 days, and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(e)      If Operating Cash Flow for any Fiscal Quarter is less than the cash interest payable on the Loan for such Fiscal Quarter, the Borrower shall issue to the Lender a PIK Note in an aggregate amount equal to such deficiency.  The issuance of such notes, to the extent, but only to the extent, of such deficiency, shall satisfy the obligation of the Borrower under Section 2.06(a).

(f)      If the Excess Operating Cash Flow for a Fiscal Year is greater than zero, the Borrower shall pay to the Lender as contingent interest ("Contingent Interest") an amount equal to such Excess Operating Cash Flow multiplied by the Conversion Percentage in effect as of the end of such Fiscal Year.  The Contingent Interest, if any, shall be payable on March 31 following such Fiscal Year.  Contingent Interest shall not be owed or payable (i) upon any dissolution or liquidation of the Borrower, (ii) if and to the extent that the Loan has been fully or partially converted into Equity Interests pursuant to Article VIII or (iii) if an Event of Default with respect to the Borrower arising under Sections 7.01(f), (g) or (h) exists at the time of, or would result from, the payment of all of the Excess Operating Cash Flow giving rise to such Contingent Interest.

Section 2.07    Payments Generally; Allocation of Proceeds.

(a)      The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, or fees or of amounts payable under Section 2.07 or 2.08 or otherwise) prior to 1:00 p.m., Eastern time, on the date when due, by wire transfer, without set-off or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be wired to the Lender pursuant to the wiring instructions in Section 9.01, except that payments pursuant to Sections 2.07, 2.08 and 9.03 shall be made directly to the Persons entitled thereto.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in Dollars.

(b)      Any proceeds of Collateral received by the Lender (i) not constituting a specific payment of principal, interest, fees or other sum payable under the Loan Documents (which shall be applied as specified by the Borrower) or (ii) after an Event of Default has occurred and is continuing and the Lender so elects such funds shall be applied ratably first, to pay any fees, indemnities, or expense reimbursements including amounts then due to the Lender from the Borrower, second, to pay interest due in respect of the Loan, third, to pay the principal of the Loan and fourth, to the payment of any other Obligation due to the Lender by the

25

Borrower.  The Lender shall have the continuing and exclusive right to apply and reverse and reapply any and all such proceeds and payments to any portion of the Obligations.

Section 2.08    <u>Indemnity for Returned Payments</u>.  If after receipt of any payment which is applied to the payment of all or any part of the Obligations, the Lender is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason, then the Obligations or part thereof intended to be satisfied shall be revived and continued and this Agreement shall continue in full force as if such payment or proceeds had not been received by the Lender and the Borrower shall be liable to pay to Lender, and the Borrower hereby indemnifies the Lender and holds the Lender harmless for the amount of such payment or proceeds surrendered.  The provisions of this <u>Section 2.9</u> shall be and remain effective notwithstanding any contrary action which may have been taken by the Lender in reliance upon such payment or application of proceeds, and any such contrary action so taken shall be without prejudice to the Lender's rights under this Agreement and the other Loan Documents and shall be deemed to have been conditioned upon such payment or application of proceeds having become final and irrevocable.  The provisions of this <u>Section 2.9</u> shall survive the termination of this Agreement.

## ARTICLE III.
## REPRESENTATIONS AND WARRANTIES

In order to induce the Lender to make the Loan hereunder and to enter into this Agreement, the Borrower and each of the Guarantors jointly and severally represent and warrant, as of the date hereof and as of the Closing Date, as follows (it being understood  that, for the avoidance of doubt, references in this <u>Article III</u> to the Borrower, the Guarantors or the Subsidiaries shall be deemed to include GBI and its Subsidiaries and NF Dynasty, LLC and its Subsidiaries prior to the date of this Agreement and the Closing Date):

Section 3.01    <u>Organization</u>.  The Borrower, each of the Guarantors and each of the Subsidiaries (i) is duly organized and validly existing under the laws of the jurisdiction of its organization and is duly qualified as a foreign organization and is in good standing in each jurisdiction in which the failure to so qualify would reasonably be expected to have a Material Adverse Effect, (ii) has the requisite organizational power and authority to effect the transactions contemplated hereby, and by the other Loan Documents to which it is a party and (iii) has all requisite organizational power and authority and the legal right to own, pledge, mortgage and operate its properties and to conduct its business as now or currently proposed to be conducted.

Section 3.02    <u>Due Execution</u>.  The execution, delivery and performance by each of the Borrower and the Guarantors of each of the Loan Documents to which such Person is a party (i) are within its organizational powers, have been duly authorized by all necessary organizational action including the consent of equity holders where required, and do not (A) contravene its charter or by-laws or other constituent documents, (B) violate any law or regulation (including, without limitation, Regulations T, U or X of the Board of Governors of the Federal Reserve System), or any order or decree of any court or Governmental Entity, (C) conflict with or result in a breach of, or constitute a default under, any material indenture,

26

mortgage or deed of trust or any material lease, agreement or other instrument binding on it or any of its respective properties, or (D) result in or require the creation or imposition of any Lien upon any of its property other than the Liens granted pursuant to this Agreement or the other Loan Documents; and (ii) do not require the consent, authorization by or approval of or notice to or filing or registration with any Governmental Entity, other than the filing and recording, of financing statements necessary to perfect Liens granted to the Lender. This Agreement has been duly executed and delivered by the Borrower and each of the Guarantors. This Agreement is, and each of the other Loan Documents to which the Borrower and each of the Guarantors is or will be a party, when delivered hereunder or thereunder, will be, a legal, valid and binding obligation of the Borrower and each Guarantor, as the case may be, enforceable against the Borrower and the Guarantors, as the case may be, in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03    Financial Statements. The Borrower has furnished the Lender with copies of the unaudited consolidated financial statements of GBI and its Subsidiaries for the most recent Fiscal Quarter ended at least forty-five (45) days prior to the date hereof and the unaudited consolidated financial statements of the Borrower and its Subsidiaries for the most recent Fiscal Year ended at least ninety (90) days prior to the date hereof. Subject to any qualifications set forth therein, (i) such financial statements present fairly the financial condition and results of operations of the Borrower and its Subsidiaries on a consolidated basis as of such dates and for such periods, (ii) such balance sheets and any notes thereto disclose all liabilities, direct or contingent, of the Borrower and its Subsidiaries as of the dates thereof required to be disclosed by GAAP, except as set forth therein, and (iii) such financial statements were prepared in a manner consistent with GAAP, except as set forth therein. No event that had, or would reasonably be expected to have, a Material Adverse Effect has occurred since December 31, 2006.

Section 3.04    Real Property. As of the Closing Date, Schedule 3.04 sets forth a correct and complete list of all material real Property owned or leased by the Borrower and each Guarantor. No material default by any Borrower under any lease or sublease related to any leased or subleased real Property set forth on Schedule 3.04 exists and, to the knowledge of the Borrower and the Guarantors, no material default by any other party to any such lease or sublease exists. Except as set forth on Schedule 3.04, the Borrower and each Guarantor has good and indefeasible title to, or valid leasehold interests in, all of its material real and personal Property, free of all Liens other than those permitted by Section 6.01.

Section 3.05    Liens. Except for Liens existing on the Closing Date as reflected on Schedule 3.05, there are no Liens of any nature whatsoever on any assets of the Borrower or any of the Guarantors other than: (i) Permitted Liens; (ii) other Liens permitted pursuant to Section 6.01; and (iii) Liens in favor of the Lender. Neither the Borrower nor any Guarantor is a party to any contract, agreement, lease or instrument the performance of which, either unconditionally or upon the happening of an event, will result in or require the creation of a Lien on any assets of the Borrower or any Guarantor or otherwise result in a violation of this Agreement other than the Liens granted to the Lender and Liens permitted pursuant to Section 6.01.

27

Section 3.06    Compliance with Law.  Except as set forth on Schedule 3.06, neither the Borrower nor any Guarantor is, to the best of their knowledge, in violation of any law, rule or regulation, or in default with respect to any judgment, writ, injunction or decree of any Governmental Entity the violation of which, or a default with respect to which, would have a Material Adverse Effect.

Section 3.07    Insurance.  Schedule 3.07 lists each material insurance policy maintained by the Borrower and its Subsidiaries.  All of such insurance policies are in full force and effect, and to the Borrower's knowledge, neither Borrower nor any of its Subsidiaries is in default with respect to its obligations under any such insurance policies, except where such default would not have a Material Adverse Effect.

Section 3.08    Litigation.  Other than as set forth on Schedule 3.08, there are no actions, suits, proceedings or investigations pending or, to the actual knowledge of the Borrower or any of the Guarantors, threatened against or affecting the Borrower or any Guarantor or any of their respective properties, before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, which would be reasonably likely to have a Material Adverse Effect.

Section 3.09    Investment and Holding Company Status.  None of the Borrower, the Guarantors nor any of their respective Subsidiaries is (a) an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940 or (b) a "holding company" as defined in, or subject to regulation under, the Public Utility Holding Company Act of 1935.

Section 3.10    Taxes.  Except as set forth on Schedule 3.10, the Borrower and each of the Guarantors have timely filed or caused to be filed all federal and all state and other material Tax returns and reports required by law to have been filed by each such Person and has paid or caused to be paid all federal and all state and other material Taxes required by law to have been paid by each such Person, except Taxes that are being contested in good faith by appropriate proceedings and for which the Borrower or such Guarantor, as applicable, has set aside on its books adequate reserves.  Except as set forth on Schedule 3.10, no Tax liens have been filed, and no claims are being asserted with respect to any such Taxes except claims that are being contested in accordance with Section 5.04.

Section 3.11    ERISA.  Neither the Borrower nor any Guarantor or ERISA Affiliate has ever maintained, established, sponsored, participated in, contributed to, or had an obligation to contribute to, any of the following:  (a) an employee pension benefit plan (within the meaning of Section 3(2) of ERISA) which is or was subject to Part 3 of Subtitle B of Title I of ERISA, Title IV of ERISA or Section 412 of the Code, (b) a Multiemployer Plan, or (c) a Multiple Employer Plan.

Section 3.12    Material Agreements.  Schedule 3.12 sets forth each of the following contracts or agreements to which the Borrower or any Guarantor is a party:  (a) each agreement for the employment of any officer, employee or independent contractor on a full-time or consulting basis with annual payments in excess of $150,000 which is not terminable on thirty (30) or fewer days' notice by the Borrower or any Guarantor without liability for any material

28

penalty or severance payment; (b) each loan agreement or indenture relating to Indebtedness of the Borrower or any Guarantor; (c) each lease or agreement which the Borrower or any Guarantor is lessee of, or holds or operates any tangible personal property owned by any other party, for which the annual rental payments exceed $150,000 and which is not terminable on thirty (30) or fewer days' notice without liability for any material penalty; (d) each lease or agreement under which it is lessor of or permits any third-party to hold or operate any tangible personal property, for which the annual rental payments exceed $150,000 and which is not terminable by on thirty (30) or fewer days' notice without liability for any material penalty; (e) each contract or group of related contracts with the same party for the purchase or sale of products or services by the Borrower or any Guarantor, involving aggregate future payments of $500,000 or annual payments in excess of $150,000 and which is not terminable on thirty (30) or fewer days' notice without liability for any material penalty; (f) each contract containing covenants materially limiting the ability of the Borrower or any Guarantor to engage in any line of business; or (g) each contract or agreement between or among the Borrower or any Guarantor, on the one hand, and any member of the Nicklaus Family or any officer, director or manager of the Borrower or any Guarantor, on the other hand, with annual payments in excess of $20,000 and which is not terminable on thirty (30) or fewer days' notice without liability for any material penalty.  Neither the Borrower nor any Guarantor is in material default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement listed on Schedule 3.12.

Section 3.13    Capitalization and Subsidiaries.  Schedule 3.13 sets forth (a) a correct and complete list of the name, entity type and relationship to the Borrower of each of the Guarantors and the other Subsidiaries, and (b) a true and complete listing of each class of each of the authorized Equity Interests of the Borrower, each of the Guarantors and the other Subsidiaries, of which all of such issued interests are validly issued, outstanding, fully paid and non-assessable and owed of record and, to the knowledge of the Borrower, beneficially by the Persons identified on Schedule 3.13.  All of the issued and outstanding Equity Interests owned by the Borrower or by any Guarantor has been (to the extent such concepts are relevant with respect to such ownership interests) duly authorized and issued and is fully paid and nonassessable.  The Borrower may amend from time to time Schedule 3.13 (by delivery of a revised Schedule 3.13 to the Lender) upon the sale of any Subsidiary which is permitted by this Agreement.

Section 3.14    Common Enterprise.  The Borrower and each Guarantor expect to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (i) successful operations of the Borrower and Guarantors and (ii) the credit extended by the Lender to the Borrower hereunder.  The Borrower and each of the Guarantors has determined that execution, delivery, and performance of this Agreement and any other Loan Documents to be executed by such Borrower or Guarantor is within its purpose, will be of direct and indirect benefit to such Borrower or Guarantor and is in its best interest.

Section 3.15    Labor Disputes.  Except as set forth on Schedule 3.15, (a) there is no collective bargaining agreement or other labor contract covering employees of the Borrower or any Guarantor, (b) no such collective bargaining agreement or other labor contract is scheduled to expire during the term of this Agreement, (c) to the knowledge of the Borrower or

29

any Guarantor, no union or other labor organization is seeking to organize, or to be recognized as, a collective bargaining unit of employees of the Borrower, any of the Guarantors or any of the other Subsidiaries or for any similar purpose, and (d) there is no pending or to the knowledge of the Borrower or any Guarantor, threatened, strike, work stoppage, material unfair labor practice claim, or other material labor dispute against or affecting the Borrower, any Guarantor or the other Subsidiaries or their employees.

Section 3.16   Environmental Matters.  (a)  Except as set forth on Schedule 3.16:

(i)      The Borrower and any Guarantors are in compliance with all applicable Environmental Laws, except for such noncompliance as would not have a Material Adverse Effect.

(ii)      The Borrower and any Guarantors have all permits and other authorizations relating to any Property owned by the Borrower and any Guarantors that are required under applicable Environmental Law, and, to the Borrower's or any Guarantor's knowledge, are in compliance with such permits and authorizations, except where the failure to obtain or comply with such permits would not have a Material Adverse Effect.

(iii)      Neither the Borrower nor any Guarantors have received any written notice from any Governmental Entity or any other Person with respect to any Property owned or previously owned by the Borrower and any Guarantors, or any other site, location or operation, that alleges that any of them is in violation of Environmental Laws or has any material liability arising under applicable Environmental Laws, including any investigatory, remedial or corrective obligation, relating to the Borrower or any Guarantors or any Property owned or previously owned by the Borrower or any Guarantors, or any other site, location or operation, the subject of which is unresolved, and which would have a Material Adverse Effect.

(b)      This Section 3.16 constitutes the sole and exclusive representations and warranties of the Borrower and any Guarantor in this Agreement with respect to any environmental matters, including without limitation any arising under Environmental Laws.

Section 3.17   Solvency.  Immediately after the consummation of the transactions to occur on the date hereof and immediately following the making of the Loan and after giving effect to the application of the proceeds of the Loan, based on the asset values established under the Purchase and Sale Agreement, (i) the fair value of the assets of the Borrower and each Guarantor, will exceed the debts and liabilities, subordinated, contingent or otherwise, of the Borrower and each Guarantor, (ii) each of the Borrower and the Guarantors will be able to pay its debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (iii) each of the Borrower and the Guarantors will not have unreasonably small capital with which to conduct the businesses in which such Person is engaged as such businesses are now conducted and are proposed to be conducted after the date hereof.  The amount of contingent liabilities at any time shall be computed as the amount that, in light of all facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

30

Section 3.18   <u>Security Interest in Collateral</u>.  Upon execution and delivery of the Security and Pledge Agreement, the provisions of the Security and Pledge Agreement and the other Loan Documents will create legal and valid Liens on all the Collateral in favor of the Lender, and upon filing the appropriate financing statements in the appropriate filing offices, such Liens will constitute perfected and continuing Liens on the Collateral to the extent that a lien may be perfected by the filing of a financing statement under the UCC in such office, securing the Obligations, enforceable against the Borrower and the Guarantors and having priority over all other Liens on such Collateral the priority of which can only be determined under the UCC by the filing of such financing statement in such office (except for Liens permitted under <u>Section 6.01</u> of the Loan Agreement, to the extent any such permitted Liens would have priority over the Liens in favor of the Lender).

## ARTICLE IV.
## CONDITIONS OF LENDING

Section 4.01   <u>Conditions of Lending</u>.  The obligation of the Lender to make the Loan on the Closing Date is subject to the satisfaction (or waiver in accordance with <u>Section 9.02</u>) of the following conditions precedent:

(a)   <u>Supporting Documents</u>.  The Lender shall have received from the Borrower and each of the Guarantors:

(i)   a copy of such entity's certificate of incorporation or formation, as amended, certified as of a recent date by the Secretary of State of the state of its incorporation or formation;

(ii)   a certificate of such Secretary of State, dated as of a recent date, as to the good standing of and payment of taxes by that entity and as to the charter documents on file in the office of such Secretary of State; and

(iii)   a certificate of the Secretary or an Assistant Secretary of that entity dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of the by-laws or limited liability company agreement of that entity as in effect on the date of such certification, (B) that attached thereto is a true and complete copy of resolutions adopted by the Board of Directors or managers of that entity authorizing the Loan hereunder, the execution, delivery and performance in accordance with their respective terms of this Agreement, the Loan Documents and any other documents required or contemplated hereunder or thereunder and the granting of the Liens contemplated hereby, (C) that the certificate of incorporation or formation of that entity has not been amended since the date of the last amendment thereto indicated on the certificate of the Secretary of State furnished pursuant to <u>clause (i)</u> above and (D) as to the incumbency and specimen signature of each officer or manager of that entity executing this Agreement and the Loan Documents or any other document delivered by it in connection herewith or therewith (such certificate to contain a certification by another officer or manager of that entity as to the incumbency and signature of the officer signing the certificate referred to in this <u>clause (iii)</u>).

31

(b)     Security and Pledge Agreement.  The Borrower and each of the Guarantors shall have duly executed and delivered to the Lender a Security and Pledge Agreement in substantially the form of Exhibit B (the "Security and Pledge Agreement"), and shall have delivered to the Lender appropriately completed Uniform Commercial Code financing statements for filing.

(c)     Intellectual Property.  The Borrower and each of the Guarantors shall have executed and delivered the Copyright Security Agreement, the Patent Security Agreement, and the Trademark Security Agreement.

(d)     Policy.  The Policy shall be in full force and effect.

(e)     Guaranty.  Each of the Designated Persons shall have duly executed and delivered to the Lender a Guaranty of Collection in the form of Exhibit C.

(f)     Specified Person Agreements.  Each Specified Person shall have duly executed and delivered to the Lender an Agreement substantially in the form of Exhibit D.

(g)     Opinion of Counsel.  The Lender shall have received the favorable written opinions of counsel (which may be from local counsel) to the Borrower and the Guarantors reasonably acceptable to the Lender, dated the Closing Date substantially in the form of Exhibit E-1 and E-2.

(h)     Certificates of Insurance.  The Borrower and the Guarantors shall have delivered to the Lender certificates of insurance reasonably satisfactory to the Lender in all respects evidencing the existence of all insurance required to be maintained by the Borrower and the Guarantors pursuant to Section 5.03 of this Agreement.

(i)     Material Consents.  The Borrower and the Guarantors shall have delivered to the Lender all material consents listed on Schedule 4.01(j).

(j)     UCC Searches.  The Lender shall have received UCC searches (including tax liens and judgments) and patent and trademark searches conducted in the jurisdictions in which the Borrower and the Guarantors are organized and conduct business (dated as of a date reasonably satisfactory to the Lender), reflecting the absence of Liens and encumbrances on the assets of the Borrower and the Guarantors other than such Liens permitted under the Loan Documents and other Liens as may be satisfactory to the Lender.

(k)     Representations and Warranties.  The representations and warranties contained in this Agreement and the Security Agreement shall be true and correct, without giving effect to any materiality or Material Adverse Effect qualifications therein, on and as of the Closing Date as if made on and as of such date (except to the extent that such representations and warranties shall have been made as of an earlier date, in which case such representations and warranties shall have been true and correct, without giving effect to any materiality or Material Adverse Effect qualifications therein, as of such date), except to the extent that the failure of such representations or warranties to be true and correct would not, individually or in the aggregate, have a Material Adverse Effect.

32

(l)    <u>No Material Adverse Effect</u>.  Since the date of this Agreement, there shall not have occurred and be continuing any Material Adverse Effect.

## ARTICLE V.
## AFFIRMATIVE COVENANTS

From the date hereof and for so long as the Loan shall remain outstanding or any amount shall remain outstanding or unpaid under this Agreement or any other Loan Document, the Borrower and each of the Guarantors agree, jointly and severally with the Borrower and each other Guarantor, that the Borrower and each of the Guarantors will:

Section 5.01    <u>Financial Statements, Reports, etc</u>.  In the case of the Borrower and the Guarantors, deliver to the Lender:

(a)    on or before one hundred twenty (120) days after the end of each Fiscal Year, the Borrower's (i) balance sheet and related statements of income, member's equity and cash flows, showing the financial condition of the Borrower and its Subsidiaries on a consolidated basis as of the close of such Fiscal Year and the results of their operations during such year, and (ii) beginning in the first full year of operations after the Closing, a comparison between (x) the actual amounts as of and for such Fiscal Year and (y) the comparable amounts for the prior year, with an explanation of any material differences between such amounts, and (iii) unaudited consolidating balance sheet and related statements of income, as of the close of the fourth Fiscal Quarter and as of the close of such Fiscal Year, showing separately the financial condition of the Borrower and its Subsidiaries; <u>provided</u> that all financial statements required by clauses (i) and (ii) above are prepared in accordance with GAAP and audited for the Borrower and its Subsidiaries by independent public accountants of recognized national standing selected by the Board and accompanied by an audit opinion of such accountants;

(b)    on or before sixty (60) days after the end of each of the first three Fiscal Quarters of the Borrower), the Borrower's (i) unaudited consolidated balance sheets and related unaudited statements of income, members' equity and cash flows, showing the financial condition of the Borrower and its Subsidiaries on a consolidated basis as of the close of such Fiscal Quarter and the results of their operations during such Fiscal Quarter and the then-elapsed portion of the Fiscal Year, and (ii) unaudited consolidating balance sheet and related unaudited consolidating statements of income, as of the close of the such Fiscal Quarter, showing separately the financial condition of the Borrower and its Subsidiaries; <u>provided</u> that all financial statements required by clauses (i) and (ii) above are prepared in accordance with GAAP (except that such financial statements may (i) be subject to normal year-end audit adjustments and (ii) not contain all notes thereto that may be required in accordance with GAAP);

(c)    concurrently with any delivery of financial statements under <u>paragraph (a)</u> above, a certificate of a Financial Officer certifying that such financial statements fairly present the financial condition and results of operations of the Borrower and its Subsidiaries in accordance with GAAP;

(d)    on or before sixty (60) days after the end of each of the first three Fiscal Quarters of the Borrower, a statement showing the Borrower's (i) number of each class

and series of membership interests and derivative securities outstanding at the end of the period, (ii) membership interests issuable upon conversion or exercise of any outstanding derivative securities and the exchange ratio or exercise price applicable thereto, and (iii) number of membership interests subject to issued options and options not yet issued but reserved for issuance, if any;

(e)     as soon as available, but not less than thirty (30) days before the end of each Fiscal Year, commencing with the Fiscal Year ending December 31, 2007, a copy of the plan and forecast (including a projected consolidated balance sheet, income statement and funds flow statement) of the Borrower, as approved by the Board and prepared on a consolidated basis for each month of the following Fiscal Year and, promptly after prepared, any other budgets or revised budgets approved by the Board;

(f)     promptly upon obtaining knowledge thereof, notice that any event of default exists with respect to any Indebtedness of the Borrower or any Guarantor in excess of $500,000;

(g)     promptly upon receipt thereof, any notice of any governmental investigation or any litigation commenced or threatened against the Borrower or any Guarantor that would reasonably be expected to have a Material Adverse Effect;

(h)     promptly upon the Borrower or any Guarantor obtaining knowledge thereof, notice of any Lien (other than Permitted Liens and other Liens permitted under the Loan Documents) or any claim made or asserted against the Collateral having a value in excess of $500,000;

(i)     promptly upon the commencement thereof, notice of any proceedings with respect to any Tax, fee, assessment, or other governmental charge in excess of $500,000;

(j)     promptly upon obtaining knowledge thereof, notice of any loss, damage, or destruction to Collateral having a book value of $500,000 or more, net of any loss covered by insurance; and

(k)     promptly upon obtaining knowledge thereof, notice of any other development that results in, or would reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under clauses (f) through (l) of this Section shall be accompanied by a reasonably detailed description of the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

Section 5.02   Existence.  Preserve and maintain in full force and effect all governmental rights, privileges, qualifications, permits, licenses and franchises necessary or desirable in the normal conduct of its business except (i) for such failures to preserve the same as would not, in the aggregate, reasonably be expected to have a Material Adverse Effect and (ii) as otherwise permitted in connection with sales of assets permitted by Section 6.08.

34

Section 5.03    <u>Insurance</u>.  Maintain with financially sound and reputable carriers acceptable to the Lender (including, consistent with past practice, insurance companies affiliated with the Borrower), insurance with respect to their Properties and business (including business interruption insurance, fire insurance and public liability insurance) in such amounts, of such character and against such risks as are consistent with the past practice of Borrower and the Guarantors or otherwise reasonably acceptable to the Lender and as are usually maintained by companies engaged in the same or similar business or having comparable properties, and the Lender agrees that the insurance policies maintained by the Borrower and the Guarantors at the Closing satisfies this <u>Section 5.03</u> as of the Closing Date.  All property insurance covering Collateral maintained by the Borrower and the Guarantors shall name the Lender as loss payee, as its interest may appear.  All liability insurance maintained by the Borrower and the Guarantors with respect to occurrences arising out of or relating to the Collateral shall name the Lender as additional insured.  All such property and liability insurance shall further provide for at least thirty (30) days' prior written notice (ten (10) days' prior written notice with respect to cancellation for non-payment of premium or at the request of the insured) to the Lender of the cancellation or substantial modification thereof, unless otherwise approved by the Lender (which approval shall not be unreasonably withheld or delayed).

Section 5.04    <u>Obligations and Taxes</u>.  With respect to the Borrower and each Guarantor, pay all material obligations imposed on the Borrower or the Guarantor promptly and in accordance with their terms and pay and discharge promptly all material Taxes imposed upon the Borrower or the Guarantor, as applicable, before the same shall become delinquent, as well as all material lawful claims for labor, materials and supplies or otherwise which, if unpaid, would become a Lien or charge upon such properties or any part thereof (other than a Permitted Lien); <u>provided</u>, <u>however</u>, that neither the Borrower nor any Guarantor shall be required to pay and discharge or to cause to be paid and discharged any such obligation, Tax or claim to the extent that (i) it is being contested in good faith by appropriate proceedings, (ii) adequate reserves for which have been set aside on the books of the Borrower and the Guarantors, and (iii) the failure to make payment pending such contest would not reasonably be expected to result in a Material Adverse Effect.

Section 5.05    <u>Notice of Event of Default, etc</u>.  Promptly but no later than five (5) Business Days after the Borrower has knowledge of a Default or an Event of Default, give to the Lender notice in writing of such Default or Event of Default.

Section 5.06    <u>Access to Books and Records</u>.  Maintain or cause to be maintained at all times true and complete books and records in accordance with GAAP of the financial operations of the Borrower and the Guarantors; and provide the Lender and its representatives and advisors access to all such books and records during regular business hours upon reasonable prior notice, in order that the Lender may upon reasonable prior notice examine and make abstracts from such books, accounts, records, appraisals and other papers for the purpose of verifying the accuracy of the various reports delivered by the Borrower or the Guarantors to the Lender pursuant to this Agreement or for otherwise ascertaining compliance with this Agreement; and at any reasonable time and from time to time during regular business hours, upon reasonable prior notice and with reasonable frequency, permit the Lender and any agents or representatives (including, without limitation, appraisers) thereof to visit the properties of the

35

Borrower and the Guarantors and to conduct examinations of and to monitor the Collateral held by the Lender, in each case at the expense of the Borrower.

Section 5.07    <u>Maintenance of Properties and Intellectual Property Rights</u>.  (a) Keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and (b) to the extent commercially reasonable, obtain and maintain in effect at all times all material intellectual property rights, licenses and permits, which (in the determination of Borrower or applicable Guarantor) are necessary for it to own its property or conduct its business as currently conducted and, except for ordinary course licensing activities, not dispose of, grant, or permit to lapse any rights to any material intellectual property except as otherwise expressly permitted hereunder or in the Security and Pledge Agreement.

Section 5.08    <u>Compliance with Laws</u>.  Comply in all material respects with all laws, rules, regulations and orders of any Governmental Entity applicable to it or its property.

Section 5.09    <u>Additional Collateral; Further Assurances</u>.  (a)  Unless the Lender otherwise consents and subject to the requirements of applicable law, cause each of its wholly owned Subsidiaries formed or acquired after the Closing Date in accordance with the terms of this Agreement to (i) become a Guarantor by executing a Joinder Agreement substantially in the form of <u>Exhibit F</u> hereto (the "<u>Joinder Agreement</u>") and (ii) grant Liens to the Lender in any Property of such new Guarantor which constitutes Collateral; <u>provided</u>; <u>however</u>, that this <u>Section 5.09(a)</u> shall not apply to Subsidiary having a Fair Market Value (as determined in good faith by the Board and measured as of the date such Subsidiary was formed or acquired, without giving effect to subsequent changes in value) of not more than $1.0 million and that, when taken together with all other Subsidiaries excluded pursuant to this proviso, does not exceed a Fair Market Value of $3.0 million.

(b)    Cause (i) 100% of the issued and outstanding Equity Interests of each of the Borrower's and each Guarantor's domestic Subsidiaries (other than Equity Interests not owned by Borrower or any of its wholly owned Subsidiaries) and (ii) 65% of the issued and outstanding Equity Interests in each foreign wholly owned Subsidiary directly owned by the Borrower or any Guarantor to be subject at all times to a first priority Lien in favor of the Lender pursuant to the terms and conditions of the Loan Documents or other security documents as the Lender shall reasonably request; <u>provided</u>; <u>however</u>, that perfection of a Lien in respect of a foreign wholly owned Subsidiary shall only be required if the net assets of such Subsidiary exceed $2.0 million; <u>provided</u>, <u>further</u>, <u>however</u>, that the aggregate net assets of all foreign wholly-owned Subsidiaries (as determined in good faith by the Board and measured as of the date hereof for existing foreign wholly-owned Subsidiaries or as of the date such Subsidiary was formed or acquired in the case of future wholly-owned Subsidiaries, without giving effect to subsequent changes in value) excluded pursuant to this provision does not exceed $10.0 million.

(c)    Execute and deliver, or cause to be executed and delivered, to the Lender such documents and agreements, and take or cause to be taken such actions as the Lender may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents, including but not limited to all items of the type required by <u>Section 4.01</u> (as applicable).

36

(d)    If any assets with a value in excess of $2.0 million (including any real Property or improvements thereto or any interest therein) are acquired by the Borrower or any Guarantor after the Closing Date (other than assets constituting Collateral under the Security and Pledge Agreement that become subject to a Lien in favor of the Lender upon acquisition thereof), notify the Lender thereof, and, if requested by the Lender after consultation with the Borrower, the Borrower will cause such assets to be subjected to a Lien securing the Obligations and will take, or cause the Guarantors to take, such actions as shall be necessary or reasonably requested by the Lender, to grant and perfect such Lien, including actions described in <u>Section 5.11(c)</u>.

Section 5.10    <u>Environmental Covenant</u>.  The Borrower and the Guarantors will, and will cause each of the other Subsidiaries to:

(a)    use and operate all of their respective facilities and properties in material compliance with all Environmental Laws, keep all necessary permits, approvals, certificates, licenses, and other authorizations required by applicable Environmental Laws relating to environmental matters in effect and remain in material compliance therewith, and handle all Hazardous Materials in material compliance with all applicable Environmental Laws;

(b)    (i)  as soon as possible and in any event not later than fifteen (15) Business Days after the Borrower becomes aware of the receipt thereof, notify the Lender and provide copies of all written material claims, complaints, notices, or inquiries by a Governmental Entity, or any Person which has commenced a material legal proceeding against the Borrower, any of the Guarantors, or any of the other Subsidiaries, relating to compliance by the Borrower, any of the Guarantors or any of the other Subsidiaries with, or potential material liability of the Borrower, any of the Guarantors or any of the other Subsidiaries under, Environmental Laws; and

(ii)    with reasonable diligence cure all environmental defects and conditions which are the subject of any actions and proceedings against the Borrower, any of the Guarantors or any of the other Subsidiaries relating to compliance with Environmental Laws, except to the extent such actions and proceedings (or the obligation of the Borrower, any of the Guarantors or any of their Subsidiaries to cure such defects and conditions) are stayed or are being contested by the Borrower, any of the Guarantors or any of the other Subsidiaries in good faith by appropriate proceedings; and

Section 5.11    Key Man Life Insurance.

(a)    Maintain the Policy or a replacement policy with substantially identical policy coverage, term and premium with financially sound and reputable carriers reasonably acceptable to the Lender.

(b)    If at any time the Borrower fails to comply with the requirements of clause (a) immediately above, and such failure continues for more than five (5) Business Days, the Lender shall have the following options which may be exercised in its sole discretion:

(i)    pay such additional amounts as premium required to cause the Borrower to obtain a replacement policy that complies with the requirements of clause (a) above;

(ii)    approve a replacement policy with coverage less than that contained in the Policy; or

(iii)    take no action.

For the avoidance of doubt, (i) the Lender has no obligation to fund any premium payments on a Policy and (ii) the failure to pay the premium on a Policy in accordance with the terms of Section 5.11 is an Event of Default.

(c)    Assign the Policy to the Lender as Collateral.

(d)    Notify the Lender in writing promptly upon receipt of proceeds of the Policy or any replacement policy.  Within ten (10) Business Days of delivery of such notice, Borrower will apply 100% of such proceeds to the prepayment of the Loan (first to any PIK Notes and Replacement Loans then outstanding, and next to the remainder of the Loan), unless, on or prior to such 10th Business Day, the Borrower shall have received a notice (an "Insurance Application Notice") from the Lender directing it to apply such proceeds as follows:

(i)    First, the Borrower shall use such proceeds to prepay any PIK Notes or Replacement Loans then outstanding;

(ii)    Next, the Borrower will apply the Prepayment Percentage of the Lender Portion of any remaining proceeds to the prepayment of the Loan, and the amount of any remaining Lender Portion will be paid to the Lender as Contingent Interest.  For purposes of the foregoing sentence:

(A)    "Lender Portion" shall mean an amount of such remaining proceeds equal to (x) the then-applicable Conversion Percentage multiplied by (y) the amount of such remaining proceeds.

(B)    "Prepayment Percentage" shall mean, during the periods set forth in the schedule below, the percentage of the Lender Portion set forth in the schedule below:

| Period | Percentage of Lender Portion Applied to Prepayment |
|---|---|
| May 31, 2007–May 30, 2008 | 90% |
| May 31, 2008–May 30, 2009 | 80% |
| May 31, 2009–May 30, 2010 | 70% |
| May 31, 2010–May 30, 2011 | 60% |
| May 31, 2011–May 30, 2012 | 50% |

38

| Period | Percentage of Lender Portion Applied to Prepayment |
|---|---|
| May 31, 2012–May 30, 2013 | 40% |
| May 31, 2013–May 30, 2014 | 30% |
| May 31, 2014–May 30, 2015 | 20% |
| May 31, 2015–May 30, 2016 | 10% |
| May 31, 2016–May 30, 2017 | 0 |

(iii)    Lastly, any remaining proceeds will be applied to the redemption of Class A Units and/or the payment of Contingent Equity Distributions in accordance with Section 4.1(c) of the LLC Agreement.

Section 5.12    EBITDA Event.  The provisions of this Article V, other than Section 5.11, shall cease to be effective during the five-year period commencing upon the date of exercise of the Special EBITDA Right under the LLC Agreement.

## ARTICLE VI.
## NEGATIVE COVENANTS

From the date hereof and for so long as any amount shall remain outstanding or unpaid under this Agreement, the Borrower and each Guarantor covenants and agrees that it will not, nor will it permit any of their respective Subsidiaries to:

Section 6.01    Liens.  Incur, create, assume or suffer to exist any Lien on any asset of the Borrower or any Guarantor, now owned or hereafter acquired by the Borrower or any Guarantor, other than (i) Liens described in Schedule 3.05; (ii) Permitted Liens; (iii) Liens in favor of the Lender securing the Obligations; (iv) Liens securing purchase money Indebtedness or Capital Leases permitted by Section 6.03(iv); provided that (y) such security interests and the Indebtedness secured thereby are incurred prior to or within one-hundred-eighty (180) days after acquisition, construction or improvement of the financed Property or assets (including real property); and (z) such security interests shall not apply to any property or assets of the Borrower, any Guarantor or any other Subsidiaries other than assets or property financed by such Indebtedness or subject to such Capital Leases; (v) Liens securing judgments for the payment of money not constituting an Event of Default under Section 7.01(i); (vi) Liens on property (including after acquired property) of a Person created prior to the time such Person is merged into or consolidated with a Borrower or Guarantor or an other Subsidiary or becomes a Borrower or Guarantor or an other Subsidiary or on any acquired property, in each case, in connection with an Investment or acquisition; provided that (x) such Liens were not created in contemplation of or in connection with such acquisition or such Person becoming a Borrower or Guarantor or other Subsidiary, as the case may be, and (y) such Lien shall secure only those obligations which it secures on the date of such Investment or acquisition or the date such Person becomes a Borrower or Guarantor or another Subsidiary, as the case may be, and extensions, renewals and replacements thereof that do not increase the outstanding principal amount of the obligations secured by such Lien and that are otherwise permitted hereunder; and (vii) precautionary UCC filings by lessors under operating leases covering the Property subject to such leases and UCC filings in respect of Liens permitted under this Section 6.01.

39

Section 6.02   Merger, etc.  Consolidate or merge with or into another Person; provided that (i) any Guarantor may consolidate or merge into the Borrower so long as the Borrower is the entity surviving such consolidation or merger; (ii) any Guarantor may consolidate or merge with or into any other Guarantor; (iii) any Subsidiary of the Borrower or a Guarantor may consolidate or merge with or into the Borrower or a Guarantor so long as the Borrower or Guarantor is the entity surviving any such consolidation or merger; (iv) any Subsidiary of the Borrower or a Guarantor that is not the Borrower or a Guarantor may consolidate or merge with or into any other Subsidiary of the Borrower or a Guarantor; (v) any Subsidiary of the Borrower may undertake a merger or consolidation that could have been effected as a Permitted Investment; (vi) the Borrower or any of its Subsidiaries may undertake any merger or consolidation unanimously approved by the Board; and (vii) on or after the third anniversary of the Closing Date, the Borrower or any of its Subsidiaries may undertake any merger or consolidation that constitutes a Qualified Sale Transaction if the Borrower complies with Section 2.04(b).

Section 6.03   Indebtedness.  Contract, create, incur, assume or suffer to exist any Indebtedness, except for (i) the Obligations and Guarantees thereof; (ii) Indebtedness owed to the Lender or an Affiliate of the Lender in an amount equal to the Permitted Revolving Credit Indebtedness, (iii) Indebtedness with respect to the Aircraft and extensions, refinancings, or renewals of such Indebtedness, provided that (a) the principal amount of such Indebtedness is not materially increased, (b) any Liens securing such Indebtedness are not extended to any additional property of the Borrower or any Guarantor, (c) the Borrower or any Guarantor that is not obligated with respect to repayment of such Indebtedness at the time of such refinancing is not required to become obligated with respect thereto, (d) such extension, refinancing, replacement or renewal does not result in a shortening of the average weighted maturity of the Indebtedness so extended, refinanced, replaced or renewed, unless the maturity of all such Indebtedness is after the Maturity Date, (e) the terms of any such extension, refinancing, replacement or renewal are not materially less favorable in the aggregate to the obligor thereunder than the original terms of such Indebtedness, and (f) the terms and conditions of the refinancing, renewal, replacement or extension Indebtedness include subordination terms and conditions that are at least as favorable in the aggregate to the Lender as those that were applicable to the refinanced, renewed, replaced or extended Indebtedness, (iv) Indebtedness with respect to existing or new Capital Lease Obligations for fixed or capital assets used in the ordinary course of business in an amount not to exceed $2.0 million at any time outstanding; (v) intercompany Indebtedness of the Borrower or any Guarantor to the Borrower or any Guarantor; provided such intercompany Indebtedness is subordinated to the Obligations pursuant to an Intercompany Subordination Agreement substantially in the form of Exhibit G hereto (the "Intercompany Subordination Agreement") or otherwise in a manner satisfactory to the Lender; (vi) Indebtedness incurred by the Borrower or any Guarantor under Swap Agreements entered into in the ordinary course of financial management and not for speculative purposes; (vii) Indebtedness in respect of performance, surety and appeal bonds arising in the ordinary course of business; (viii) Guarantees by the Borrower of Indebtedness of any Guarantor and by any Guarantor of Indebtedness of the Borrower or any other Subsidiary, provided that (a) the Indebtedness so Guaranteed is permitted by this Section 6.03, and (b) Guarantees permitted under this clause (viii) shall be subordinated to the Obligations of the Borrower or applicable Guarantor on the same terms as the Indebtedness so Guaranteed is subordinated to the Obligations;

(ix) Indebtedness in respect of advance payments by customers under purchase contracts in the ordinary course of business of the Borrower or applicable Guarantor; (x) Indebtedness incurred that represents an extension, refinancing, or renewal of any of the Indebtedness described in clause (iv) hereof; provided that (u) the principal amount of such Indebtedness is not increased, (v) any Liens securing such Indebtedness are not extended to any additional property of the Borrower or any Guarantor, (w) the Borrower or any Guarantor that is not obligated with respect to repayment of such Indebtedness at the time of such refinancing is not required to become obligated with respect thereto, (x) such extension, refinancing, replacement or renewal does not result in a shortening of the average weighted maturity of the Indebtedness so extended, refinanced, replaced or renewed, (y) the terms of any such extension, refinancing, replacement or renewal are not less favorable to the obligor thereunder than the original terms of such Indebtedness, and (z) the terms and conditions of the refinancing, renewal, replacement or extension Indebtedness include subordination terms and conditions that are at least as favorable to the Lender as those that were applicable to the refinanced, renewed, replaced or extended Indebtedness.

Section 6.04   Guarantees and Other Liabilities.  Purchase or repurchase (or agree, contingently or otherwise, so to do) the Indebtedness of, or assume, Guarantee (directly or indirectly or by an instrument having the effect of assuring another's payment or performance of any obligation or capability of so doing, or otherwise), endorse or otherwise become liable, directly or indirectly, in connection with the obligations, stock or dividends of any Person, except (i) for any guaranty of Indebtedness or other obligations of the Borrower or any Guarantor if such Person could have incurred such Indebtedness or obligations under this Agreement; (ii) by endorsement of negotiable instruments for deposit or collection in the ordinary course of business; (iii) with respect to Guarantees of Indebtedness pursuant to clauses (i), (iii) or (viii) of Section 6.03; (iv) in respect of customary indemnification and purchase price adjustment obligations incurred in connection with asset dispositions, investments, mergers, acquisitions or consolidations permitted by this Agreement; (v) Guarantees in the ordinary course of business of the obligations of suppliers, customers, franchisees and licensees of the Borrower or any of its Subsidiaries; and (vi) other Guarantees not to exceed $500,000.

Section 6.05   Dividends.  Declare or pay, directly or indirectly, any dividends or make any other distribution or payment, whether in cash, property, securities or a combination thereof, with respect to (whether by reduction of capital or otherwise) any shares of capital stock or membership interests (or any options, warrants, rights or other equity securities or agreements relating to any capital stock or membership interests), or set apart any sum for the aforesaid purposes (all of the foregoing, "Restricted Payments"); provided that (i) any Guarantor may pay dividends and distributions to the Borrower and to any other Guarantor that is its direct parent; (ii) any Borrower or Guarantor may make any Restricted Payment that is a Permitted Expenditure; and (iii) unless an Event of Default with respect to the Borrower arising under Sections 7.01(f), (g) or (h) exists at the time of, or would result from, any of the following Restricted Payments, (A) on any Tax Distribution Payment Date the Borrower may make Tax Distributions with respect to the Fiscal Quarter then ending after payment of all Base Interest due and payable on such Interest Payment Date, (B) on or after the earlier to occur of (i) the date that the Company has placed in escrow for the benefit of the Investor with a third party financial institution actual cash reserves equal to all Base Interest (increased to the extent required to reflect the operation of Section 2.06(b) after and during the continuance of any Event of Default)

41

payable on the Loan in a Fiscal Year and (ii) January 10 of the following Fiscal Year, the Borrower may make distributions of any remaining Operating Cash Flow not to exceed the Threshold Equity Distribution for the Fiscal Quarters then ended within such Fiscal Year, as applicable, after prepayment of all PIK Notes and any Replacement Loan in accordance with Section 2.05(c), provided, that if, at the end of a Fiscal Year, (x) the Threshold Equity Distribution calculated for the whole Fiscal Year exceeds (y) the sum of the quarterly Threshold Equity Distributions actually made for such Fiscal Year, then an additional distribution equal to the difference between (x) and (y) shall be permitted hereunder, and (C) concurrently with the payment of Contingent Interest to the Lender with respect to any Fiscal Year the Borrower may distribute any remaining Excess Operating Cash Flow relating to such Fiscal Year (such distribution, a "Contingent Equity Distribution").  For the avoidance of doubt, no provision of this Agreement or any Loan Document will in any way restrict or prohibit the Borrower's or any of its Subsidiaries' right or ability to make any expenditure during any period in satisfaction of or pursuant to a post-Closing obligation of the Borrower or any of its Subsidiaries under the Purchase and Sale Agreement.

Section 6.06   Transactions with Affiliates.  Sell or transfer any property or assets to, or otherwise engage in any other material transactions with, any of its Affiliates (other than the Borrower, the Guarantors or any wholly owned Subsidiary), other than (i) any transaction (or, in the case of a series of related transactions, any series of related transactions taken as a whole) in the ordinary course of business at prices and on terms and conditions not less favorable in the aggregate to the Borrower or such Guarantor than could be obtained on an arm's-length basis from unrelated third parties; (ii) dividends, distributions or payments permitted under Section 6.05; (iii) the payment of operating, maintenance and Capital Expenditures in respect of the Aircraft consistent with prior practices; (iv) the use by the Nicklaus Family of the Aircraft consistent with prior practices; (v) issuances of securities pursuant to employee stock benefit plans approved by the board of directors of such person; (vi) pursuant to the Borrower Plan; (vii) loans or advances to employees up to a maximum of $500,000 in the case of any individual employee and up to a maximum of $2.0 million in the aggregate at any one time outstanding; (viii) any employment agreement, employee benefit plan, officer or Board member indemnification agreement or any similar arrangement unanimously approved by the Board and any payment with respect thereto; (ix) Exempt Issuances; and (x) reimbursement of out-of-pocket expenses incurred by officers or employees in the ordinary course of carrying out their duties as such.

Section 6.07   Investments.  Purchase, hold or acquire (including pursuant to a merger with any Person that was not the Borrower, a Guarantor or a wholly owned Subsidiary of the Borrower or a Guarantor prior to such merger) any capital stock, evidences of indebtedness or other securities of (including any option, warrant or other right to acquire any of the foregoing), make or permit to exist any loans or advances to Guarantee any obligations of, or make or permit to exist any investment in, any other Person or purchase or otherwise acquire (in one transaction or series of transactions) any assets of any other Person constituting a business unit (whether through purchase of assets, merger or otherwise) (all of the foregoing, "Investments"), except for (i) Permitted Investments and (ii) Investments described on Schedule 6.07 hereto and modifications, extensions, and renewals of such Investments.

Section 6.08    Disposition of Assets.  Sell or otherwise dispose of any assets (including, without limitation, the Equity Interests of any Subsidiary), except for (i) sales of Permitted Investments; (ii) sales of inventory in the ordinary course of business; (iii) dispositions of surplus, obsolete or damaged assets; (iv) Permitted Dispositions; (v) sales of assets (including, without limitation, the Equity Interests of any Subsidiary) constituting a Qualified Sale Transaction if the Borrower complies with Section 2.04(b); (vi) dispositions of property by (A) the Borrower to any Guarantor, (B) any Subsidiary to the Borrower or any other Guarantor, and (C) any Subsidiary that is not a Guarantor to any other Subsidiary that is not a Guarantor; and (vii) the grant of any Liens permitted under Section 6.01.

Section 6.09    Nature of Business.  Except to the extent unanimously approved by the Board, modify or alter in any material manner the nature and type of its business as conducted on the Closing Date or the manner in which such business is conducted (except such activities as may be incidental or related thereto or reasonably related extensions thereof).

Section 6.10    Restrictive Agreements.  Enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower or any Guarantor to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary of the Borrower or any Guarantor to pay dividends or other distributions with respect to any shares of its capital stock or other Equity Interests or to make or repay loans or advances to the Borrower or any Subsidiary of the Borrower or to guarantee Indebtedness of the Borrower or any Subsidiary of the Borrower; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by this Agreement, the other Loan Documents, the LLC Agreement or the Revolving Credit Agreement, (ii) the foregoing shall not apply to restrictions and conditions existing on the Closing Date which are identified on Schedule 6.10 (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition); (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder; (iv) the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement; and (v) the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof.

Section 6.11    Prepayment of Indebtedness; Subordinated Indebtedness.  (a) Directly or indirectly, voluntarily purchase, redeem, defease or prepay any principal of, premium, if any, interest on or other amount payable in respect of any Indebtedness prior to its scheduled maturity, other than (i) the Obligations; (ii) Capital Lease Obligations permitted by Section 6.03(iv) not to exceed $500,000 in the aggregate in any Fiscal Year; (iii) prepayment of Indebtedness in connection with the cancellation, termination or unwinding of Swap Obligations described in Section 6.03(vi); (iv) prepayments in respect of Indebtedness in respect of advanced payments permitted by Section 6.03(ix); and (v) in connection with any Permitted Expenditure.

(b)    Make any amendment or modification to any indenture, note or other agreement evidencing or governing any Indebtedness of such Person the payment of which is subordinated to payment of the Obligations, which amendment or modification has the effect of (i) shortening the maturity thereof or accelerating the date of any payment of principal or

43

interest thereunder, (ii) increasing the interest rate or fees payable thereunder or converting any interest payable in kind to current cash pay interest, (iii) amending, modifying, supplementing or otherwise modifying the subordination provisions of such indenture, note or other agreement in a manner which, in the aggregate, is less favorable to the Lender or (iv) making any provision of such indenture, note or other agreement more restrictive or burdensome on the Borrower, any Guarantor or any Subsidiary of the Borrower or any Guarantor.

Section 6.12    EBITDA Event. The provisions of this Article VI shall cease to be effective during the five-year period commencing upon the date of exercise of the Special EBITDA Right under the LLC Agreement.

# ARTICLE VII.
# EVENTS OF DEFAULT

Section 7.01    Events of Default. If any of the following events ("Events of Default") shall occur:

(a)    the Borrower shall fail to pay any principal of the Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise, and such failure shall continue unremedied for a period five (5) Business Days after Lender has provided Borrower with written notice thereof; or

(b)    the Borrower shall fail to pay any interest on the Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Section 7.01) payable under this Agreement, when and as the same shall become due and payable, and such failure shall continue unremedied for a period ten (10) days after Lender has provided Borrower written notice thereof; or

(c)    the Borrower or any Guarantor shall fail to observe or perform any covenant, condition or agreement contained in Section 5.02 (with respect to the Borrower's or any Guarantor's existence) or in Article VI and such failure shall continue unremedied for a period twenty (20) days after Lender has provided Borrower written notice thereof; or

(d)    the Borrower or any Guarantor shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those which constitute a default under another clause of this Section 7.01 and except as provided in Section 5.11(b)), and such failure shall continue unremedied for a period of thirty (30) days after Lender has provided Borrower written notice thereof; provided that, if such remedy cannot reasonably be completed within such period, no Event of Default shall occur if the Borrower or the applicable Guarantor has begun to diligently to pursue those actions reasonably necessary to remedy such failure; provided that, an Event of Default shall occur if such failure shall continue unremedied for a period of ninety (90) days after the Lender has provided Borrower with written notice thereof.

(e)    any event or condition occurs that results in, or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of Indebtedness of the Borrower and/or any Guarantor for borrowed money, or any trustee or agent

44

on its or their behalf, to cause more than $10.0 million of Indebtedness of the Borrower and/or any Guarantor for borrowed money that is actually outstanding to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, in each case, prior to its scheduled maturity; or

(f)　　an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of the Borrower or any Guarantor or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Guarantor or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for sixty (60) days or an order or decree approving or ordering any of the foregoing shall be entered; or

(g)　　the Borrower or any Guarantor shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in <u>clause (f)</u> of this <u>Section 7.01</u>, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower or any Guarantor or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing; or

(h)　　the Borrower or any Guarantor shall become unable, admit in writing its inability or fail generally to pay its debts as they become due; or

(i)　　one or more final, non-appealable judgments for the payment of money in an aggregate amount in excess of $10.0 million shall be rendered against the Borrower or any Guarantor or any combination thereof (to the extent not covered by insurance as to which the relevant insurance company does not dispute coverage) and the same shall remain undischarged for a period of thirty (30) consecutive days, or the Borrower or any Guarantor shall fail within thirty (30) days to discharge one or more final, non-appealable non-monetary judgments or orders, which, individually or in the aggregate, have or will have a Material Adverse Effect; or

(j)　　The Borrower, any Guarantor or any ERISA Affiliate maintains, establishes, sponsors, participates in, contributes to, or has an obligation to contribute to, an employee pension benefit plan (within the meaning of Section 3(2) of ERISA) which is subject to Part 3 of Subtitle B of Title I of ERISA, Title IV of ERISA or Section 412 of the Code or a Multiemployer Plan or a Multiple Employer Plan, and with respect thereto there exists any fact or circumstance that reasonably could be expected to result in (1) any unfunded benefit liability (as described in Section 4001(a)(18) of ERISA) or withdrawal liability in excess of $500,000 or (2) in the imposition of a Lien or security interest under Section 401(a)(29) or 412 of the Code or under ERISA; or

45

(k)        any material provision of any Loan Document shall, for any reason, cease to be valid and binding on the Borrower or any Guarantor, or the Borrower, any Guarantor, or any Affiliate of the Borrower or any Guarantor shall so assert in any pleading filed in any court or any material portion of the Liens (as reasonably determined by the Lender) intended to be created by the Loan Documents shall cease to be or shall not be valid and perfected Liens having the priorities contemplated hereby or thereby;

then, and in every such event (other than an event with respect to the Borrower or a Guarantor or any other Subsidiary described in clause (f), (g) or (h) of this Section 7.01), and at any time thereafter during the continuance of such Event of Default, at the same or different times, the Lender may terminate the Commitment, and thereupon the Commitment shall terminate immediately, and by notice to the Borrower declare the Loan then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loan so declared to be due and payable, together with accrued and unpaid interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event with respect to the Borrower or a Guarantor described in clause (f), (g) or (h) of this Section 7.01, the Commitment shall automatically terminate and the unpaid principal of the Loan then outstanding, together with accrued and unpaid interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.  Upon the occurrence and the continuance of an Event of Default, the Lender may increase the rate of interest applicable to the Loan and other Obligations to the extent set forth in Section 2.06(b) and exercise any rights and remedies provided to the Lender under the Loan Documents or at law or equity, including all remedies provided under the UCC.

## ARTICLE VIII.
## CONVERSION

Section 8.01    Right of Conversion.

(a)        The Lender shall have the right, at any time upon written notice to the Borrower, to convert the Convertible Loan in whole at any time into Common Equity representing the Conversion Percentage of the Borrower's then outstanding Equity Interests; provided, however, that after delivery by the Borrower to the Lender of an Optional Prepayment Notice, in the case of a Qualified Sale Transaction, or a Preliminary Prepayment Notice, in the case of a Qualified IPO, the Lender will have the greater of (i) fifteen (15) days from the date of such Optional Prepayment Notice or Preliminary Prepayment Notice, as applicable, or (ii) the period ending (a) in the case of a Qualified IPO, fifteen (15) days prior to the scheduled closing date of such Qualified IPO as determined by the Board in good faith and set forth in the Preliminary Prepayment Notice or (b) in the case of a Qualified Sale Transaction, fifteen (15) days prior to the scheduled closing date of the such Qualified Sale Transaction as determined by the Board in good faith and set forth in the applicable Optional Prepayment Notice, in each case, to elect, by written notice to the Borrower, to convert the Convertible Loan in whole immediately prior to, and conditioned upon, the consummation of the applicable Qualified IPO

46

or Qualified Sale Transaction, and if the Lender shall not have so elected before 5:00 p.m., New York Time, on such 15th day or the last day of such period, as applicable, it shall have no right to convert any portion of the Loan until the earlier to occur of (i) the consummation of such Qualified IPO or Qualified Sale Transaction or (ii) notice from the Borrower that such Qualified IPO or Qualified Sale Transaction has been terminated or abandoned, which notice the Borrower agrees to provide in writing promptly upon any such termination or abandonment.  For the avoidance of doubt, a notice given by the Lender under this Section 8.01(a) shall be effective notwithstanding that the Borrower shall have given a notice pursuant to Section 2.05(d).  Within two (2) Business Days from the date of any conversion hereunder, the Borrower shall pay to the Lender at the time of such conversion, all accrued but unpaid interest due hereunder with respect to the principal amount being converted, and all charges and other amounts/sums (other than interest), then due and payable under this Agreement and the Loan Documents.  The Borrower shall not issue any fraction of a Class A Unit in connection with any conversion of the Convertible Loan.  If any full conversion of the Convertible Loan that does not trigger the Conversion Cap otherwise would result in the issuance of a fraction of a Class A Unit, then on the applicable conversion date the Borrower will pay to the Lender an amount in cash, or add an amount to any PIK Note issued in accordance with this Section 8.01(a), equal to the portion of the Loan remaining after converting the Loan into the maximum possible number of whole Class A Units.

(b)     The Lender shall have the right, exercisable upon not less than ten (10) days' written notice to the Borrower, to convert the Convertible Loan in part into Common Equity to the extent necessary to enable the Lender to exercise its rights upon conversion under Section 4.1 or Section 4.2 of the Members' Agreement (a "Partial Conversion").  Within two (2) Business Days from the date of any conversion hereunder, the Borrower shall pay to the Lender at the time of such conversion, all accrued but unpaid interest due hereunder with respect to the principal amount being converted, and all charges and other amounts / sums (other than interest), then due and payable under this Agreement and the Loan Documents either in cash or through the insurance of a PIK Note to the Lender in an amount equal to the amount so payable.

(c)     If any conversion pursuant to this Section 8.01, either alone or together with one or more prior conversions pursuant to this Section 8.01, would result in Lender owning more than forty-nine percent (49%) of the Borrower's then-outstanding Equity Interests (the "Conversion Cap"), then, notwithstanding any provision of this Agreement or any Loan Document to the contrary, the Lender shall be deemed to have (i) converted the Convertible Loan into one less than the number of whole Class A Units that would result in Lender owning Equity Interests in excess of the Conversion Cap and (ii) made a Loan (the "Replacement Loan") to the Borrower in a principal amount equal to principal amount of the Convertible Loan outstanding immediately prior to such conversion, less the product of (A) the then-applicable Adjusted Conversion Price and (B) the number of Class A Units deemed issued upon the conversion contemplated by clause (i), such Replacement Loan to be evidenced by a Replacement Loan Note.

Section 8.02   Adjustments to Conversion Percentage.  The Conversion Price will be adjusted from time (without duplication) as follows:

(a)    If the Borrower shall subdivide its outstanding Equity Interests into a greater number of Equity Interests, or combine its outstanding Equity Interests into a smaller number of Equity Interests, the Conversion Price in effect immediately prior to the day upon which such subdivision or combination becomes effective shall be, in the case of a subdivision of Equity Interests, proportionately decreased and, in the case of a combination of Equity Interests, proportionately increased. Such adjustment shall be made successively whenever any such subdivision or combination of Equity Interests occurs and shall become effective immediately after the date upon which such subdivision or combination becomes effective.

(b)    If the Borrower shall issue for cash or other consideration Equity Interests (other than Class B Units), Convertible Securities or Options at a price per Equity Interest, calculated by including the aggregate proceeds to the Borrower upon issuance and any additional consideration payable to the Borrower upon any such conversion, exchange or exercise (in each case before deduction of any discounts, commissions, fees and other expenses of issuance and marketing), that is less than the Conversion Price immediately prior to the issuance, then the Conversion Price in effect immediately prior thereto shall be adjusted so that the same shall equal the price determined by multiplying (A) the Conversion Price in effect immediately prior to such issuance by (B) a fraction, of which the numerator shall be the sum of (1) the number of Equity Interests outstanding immediately prior to such issuance assuming full conversion of the Convertible Loan in accordance with Section 8.01(a) plus (2) the number of Equity Interests that the aggregate proceeds to the Borrower from such issuance (including any additional consideration per Equity Interest payable to the Borrower upon any such conversion, exchange or exercise) would purchase at the Conversion Price on the date of such issuance, and of which the denominator shall be the sum of (x) the number of Equity Interests outstanding immediately prior to such issuance assuming full conversion of the Convertible Loan in accordance with Section 8.01(a)  plus (y) the number of additional Equity Interests issued or subject to issuance upon the conversion, exchange or exercise of such securities issued. Such adjustment shall be made successively whenever any such Equity Interests, Convertible Securities or Options are issued, and shall become effective upon such issuance.  For purposes of this Section 8.02(b), the issuance by the Borrower of Convertible Securities or Options shall be deemed to involve the immediate issuance of the number of Equity Interests issuable upon the conversion, exchange or exercise of such Convertible Securities or Options for a consideration equal to the aggregate consideration receivable by the Borrower upon such conversion, exchange or exercise.  If Convertible Securities or Options are issued by the Borrower that result in an adjustment to the Conversion Price pursuant to this Section 8.02(b) and such Convertible Securities or Options are not converted, exchanged or exercised prior to the expiration of the right of the holders of such Convertible Securities or Options to effect any such action, then immediately upon such expiration the Conversion Price shall be readjusted to the Conversion Price that would then be in effect had the adjustments made upon the issuance of such Convertible Securities or Options been made on the basis of delivery of only the number of Equity Interests actually issued. In determining whether any Convertible Securities or Options entitle the holders to subscribe for or purchase Equity Interests at a price less than the Conversion Price and in determining the aggregate offering price of the total number of Equity Interests so offered, there shall be taken into account any consideration received by the Borrower for such Convertible Securities or Options and any amount payable on conversion, exercise or

48

exchange thereof, and the value of such consideration, if other than cash, shall be the Fair Market Value thereof as determined unanimously by the Board.

(c)    Whenever the Conversion Price shall be adjusted as provided in this <u>Section 8.02</u>, the Borrower shall promptly deliver written notice thereof to Lender showing in detail the facts requiring such adjustment and the Conversion Price that shall be in effect after such adjustment.

## ARTICLE IX.
## MISCELLANEOUS

Section 9.01    <u>Notices</u>.  (a)  Except in the case of notices and other communications expressly permitted to be given by telephone or by other electronic communication (and subject to <u>Section 9.01(b)</u>), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows:

(i)    if to the Borrower or any Guarantor, c/o the Borrower at:

c/o Golden Bear International, Inc.
11780 U.S. Highway One, Suite 500
North Palm Beach, Florida 33408
Attention: Thomas E. Severson, Jr.
Telephone No: (561) 227-0300
Facsimile No: (561) 227-0302

with a copy to:

Latham & Watkins LLP
633 West Fifth Avenue, Suite 4000
Los Angeles, California 90071
Attention: Paul D. Tosetti, Esq.
Telephone No: (213) 485-1234
Facsimile No.: (213) 891-6763

(ii)  if to the Lender:

Emigrant GB LLC
c/o Emigrant Bank
6 East 43rd Street
New York, New York  10017
Attention:  Howard P. Milstein
Telephone No: (212) 850-4905
Facsimile No: (212) 850-4392

with a copy to:

LA\1714629.12

Emigrant GB LLC
c/o Emigrant Bank
6 East 43rd Street
New York, New York  10017
Attention:  Daniel Hickey
Telephone No: (212) 850-4851
Facsimile No: (212) 850-4424

All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received or (ii) sent by facsimile shall be deemed to have been given when sent, provided that if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient.

(b)     Notices and other communications to the Lender hereunder may be delivered or furnished by electronic communications (including e-mail and internet or intranet websites) pursuant to procedures approved by the Lender; provided that the foregoing shall not apply to notices pursuant to Article II or to compliance and no Event of Default certificates delivered pursuant to Section 5.01 unless expressly provided for therein or otherwise agreed to by the Lender.  The Lender and the Borrower (on behalf of the Borrower and each Guarantor) may, in their discretion, agree to accept notices and other communications hereunder by electronic communications pursuant to procedures approved by them; provided that approval of such procedures may be limited to particular notices or communications. All such notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient.

(c)     Any party hereto may change its address or facsimile number for notices and other communications hereunder by notice to the other parties hereto.

(d)     Wiring instructions for all payments to the Lender are:

Emigrant Bank
ABA# 226070403
For credit to g/1#

Section 9.02    Waivers; Amendments.  (a)  No failure or delay by the Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Lender hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any

50

Loan Document or consent to any departure by the Borrower or any Guarantor therefrom shall in any event be effective unless the same shall be permitted by Section 9.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of the Loan shall not be construed as a waiver of any Default, regardless of whether the Lender may have had notice or knowledge of such Default at the time.

(b)     Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and each Guarantor and the Lender or (ii) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Lender and the Borrower and/or Guarantor(s) that are parties thereto.

Section 9.03     Expenses.  In any suit for the enforcement of any right or remedy under any Loan Document, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.

Section 9.04     Successors and Assigns.  (a)  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby except that (i) neither the Borrower nor any Guarantor may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender (and any attempted assignment or transfer by the Borrower or any Guarantor without such consent shall be null and void) and (ii) the Lender may not may assign or otherwise transfer any of its rights or obligations hereunder except in accordance with this Section 9.04 (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors, Participants (to the extent provided in Section 9.04(b)) and, to the extent expressly contemplated hereby, the Related Parties of the Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     (i)  The Lender may, without the consent of the Borrower, sell participations to the Approved Participants, and with the prior written consent (not to be unreasonably withheld or delayed) to one or more banks or other entities (each, a "Participant") in all or a portion of the Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loan owing to it); provided that (A) the Lender's obligations under this Agreement shall remain unchanged, including its obligation to fully fund its Commitment at the Closing (even if any Participant breaches its agreement or obligation to fund any portion thereof), (B) the Lender shall remain solely responsible to the other parties hereto for the full and timely performance of such obligations, including its obligation to fully fund its Commitment at the Closing (even if any Participant breaches its agreement or obligation to fund any portion thereof), (C) the Borrower shall continue to deal solely and directly with the Lender in connection with the Lender's rights and obligations under this Agreement, (D) the Lender and the Approved Participants shall retain more than 70.0% of the economic benefits and risks of the

51

Loan and control over any consensual rights under the Loan Documents, (E) Participants, other than the Approved Participants, shall be provided only such information as to the Borrower as may be agreed to by the Borrower and the Lender, (F) Participants, other than the Approved Participants, shall be required to sign a confidentiality agreement acceptable to the Borrower and the Lender and (G) Participants, other than the Approved Participants, shall agree in writing to have no contact with the Nicklaus Family.  Any agreement or instrument pursuant to which the Lender sells such a participation shall provide that (i) the Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of any Loan Document and (ii) the Participant shall be irrevocably required to fund any portion of the Commitment sold to it and otherwise take such actions as required to close the transactions contemplated by the Loan Documents once the conditions in Article IV are satisfied or waived by the Lender in its sole and absolute discretion.

(ii)      A Participant shall not be entitled to receive any greater payment under Section 2.06 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant.

(c)      The Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of the Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release the Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 9.05    Survival.  All representations and warranties made by the Borrower, any Guarantor or any of the other Subsidiaries party thereto in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall expire and not survive the Closing.  All covenants and agreements made by the Borrower, any Guarantor or any of the other Subsidiaries party thereto in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall survive the execution and delivery of the Loan Documents and the making of the Loan, and shall continue in full force and effect (subject to Sections 5.12 and 6.12) as long as the principal of or any accrued interest on the Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid.  The provisions of 2.08 and 9.03 shall survive and remain in full force and effect regardless of the repayment of the Loan.

Section 9.06    Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Article IV, this Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and

52

inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 9.07    Severability.  Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 9.08    Right of Setoff.  If an Event of Default shall have occurred and be continuing, the Lender and each of its respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Person to or for the credit or the account of the Borrower or any Guarantor against any of and all the Obligations held by the Lender, irrespective of whether or not such Person shall have made any demand under the Loan Documents and although such obligations may be unmatured.  The Lender shall notify the Borrower of such set-off or application, provided that any failure to give or delay in giving such notice shall not effect the validity of any such set-off or application under this Section 9.08.  The rights of the Lender under this Section 9.08 are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

Section 9.09    Governing Law; Jurisdiction; Consent to Service of Process.  (a) The Loan Documents (other than those containing a contrary express choice of law provision) shall be governed by and construed in accordance with the laws of the State of New York, without regard to its principles of conflicts of law.

(b)    The Borrower and each Guarantor hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any United States Federal or New York State court sitting in New York, New York in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement or any other Loan Document shall affect any right that the Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Borrower or any Guarantor or its properties in the courts of any jurisdiction.

(c)    The Borrower and each Guarantor hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section 9.09.  Each of the parties hereto hereby irrevocably waives, to the

fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 9.10   WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY (INCLUDING, WITHOUT LIMITATION, THE LENDER) HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.10.

Section 9.11   Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.12   Confidentiality.  The Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential, and the parties agree that Lender shall be liable for any failure by any such Persons to keep such Information confidential to the extent that they would be so required were they parties hereto), (b) to the extent required by Requirement of Law or by any subpoena or similar legal process or any regulatory process, provided that the Lender provides Borrower with prior notice thereof as soon as practicable after becoming aware thereof and, if requested by Borrower, will work in good faith with Borrower to limit the disclosure of Information in accordance therewith, (c) to any other party to this Agreement, (d) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (e) subject to an agreement containing provisions substantially the same as those of this Section, to any assignee of or Participant in, or to the extent consented to in writing by the Borrower, any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (f) with the consent of the Borrower, or (g) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Lender on a nonconfidential basis from a source other than the Borrower, any of its Subsidiaries or agents or

54

any other source that, to Lender's actual knowledge after reasonable inquiry, is not otherwise prohibited from making such Information available to Lender. For the purposes of this <u>Section</u>, "<u>Information</u>" means all information received from the Borrower or the Guarantors relating to the Borrower, its Subsidiaries, the Nicklaus Family or, as applicable, their respective businesses, operations, assets, liabilities, financial condition or position, results or operations, prospects, or, in the case of the Nicklaus Family, personal, family, financial, health or other similar non-public information, regardless of its materiality, in each case, other than any such information that is made available to the Lender on a nonconfidential basis, prior to disclosure by the Borrower or the Guarantors, by a source that, to Lender's actual knowledge after reasonable inquiry, is not otherwise prohibited from making such Information available to Lender.

Section 9.13   <u>Violation of Law</u>. Anything contained in this Agreement to the contrary notwithstanding, the Lender shall not be obligated to extend credit to the Borrower in violation of any Requirement of Law.

Section 9.14   <u>USA PATRIOT Act</u>. The Lender is subject to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Act</u>") and hereby notifies the Borrower and the Guarantors that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies the Borrower and the Guarantors, which information includes the name and address of the Borrower and the Guarantors and other information that will allow the Lender to identify the Borrower and the Guarantors in accordance with the Act.

Section 9.15   <u>Disclosure</u>. The Borrower, each Guarantor and the Lender hereby acknowledge and agree that the Lender and/or its Affiliates from time to time may hold investments in, make other loans to or have other relationships with the Borrower or any of the Guarantors and their respective Affiliates.

Section 9.16   <u>Interest Rate Limitation</u>. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to the Loan, together with all fees, charges and other amounts which are treated as interest on the Loan under applicable law (collectively the "<u>Charges</u>"), shall exceed the maximum lawful rate (the "<u>Maximum Rate</u>") which may be contracted for, charged, taken, received or reserved by the Lender in accordance with applicable law, the rate of interest payable in respect of the Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of the Loan but were not payable as a result of the operation of this <u>Section 9.16</u> shall be cumulated and the interest and Charges payable to the Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by the Lender.

## ARTICLE X.
## LOAN GUARANTY

Section 10.01   <u>Guaranty</u>. Each Guarantor hereby agrees that it is jointly and severally liable for, and, as primary obligor and not merely as surety, absolutely and unconditionally guarantees to the Lender the prompt payment when due, whether at stated

maturity, upon acceleration or otherwise, and at all times thereafter, of the Obligations (collectively the "Guaranteed Obligations"). Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal.

Section 10.02  Guaranty of Payment.  This Guaranty is a guaranty of payment and not of collection. Each Guarantor waives any right to require the Lender to sue the Borrower, any Guarantor, any other guarantor, or any other person obligated for all or any part of the Guaranteed Obligations (each, an "Obligated Party"), or otherwise to enforce its payment against any Collateral securing all or any part of the Guaranteed Obligations.

Section 10.03  No Discharge or Diminishment of Guaranty.  (a)  Except as otherwise provided for herein, the obligations of each Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Guaranteed Obligations), including: (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of the Borrower, any Guarantor or any other guarantor of or other person liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting any Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which any Guarantor may have at any time against any Obligated Party, the Lender or any other person, whether in connection herewith or in any unrelated transactions.

(b)     The obligations of each Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party.

(c)     The obligations of any Guarantor hereunder are not discharged or impaired or otherwise affected by:  (i) the failure of the Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection, or invalidity of any indirect or direct security for the obligations of the Borrower for all or any part of the Guaranteed Obligations or any obligations of any other guarantor of or other person liable for any of the Guaranteed Obligations; (iv) any action or failure to act by the Lender with respect to any Collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Guarantor or that would otherwise operate as a discharge of any Guarantor as a matter of law or equity (other than the indefeasible payment in full in cash of the Guaranteed Obligations).

56

Section 10.04  <u>Defenses Waived</u>.  To the fullest extent permitted by applicable law, each Guarantor hereby waives any defense based on or arising out of any defense of the Borrower or any Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of the Borrower or any Guarantor, other than the indefeasible payment in full in cash of the Guaranteed Obligations. Without limiting the generality of the foregoing, each Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any person against any Obligated Party, or any other Person.  The Lender may, at its election, foreclose on any Collateral held by it by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any Collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Guarantor under this Guaranty except to the extent the Guaranteed Obligations have been fully and indefeasibly paid in cash. To the fullest extent permitted by applicable law, each Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any Obligated Party or any security.

Section 10.05  <u>Rights of Subrogation</u>.  No Guarantor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification that it has against any Obligated Party, or any Collateral, until the Borrower and the Guarantors have fully performed all their obligations to the Lender.

Section 10.06  <u>Reinstatement; Stay of Acceleration</u>.  If at any time any payment of any portion of the Guaranteed Obligations is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, each Guarantor's obligations under this Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not the Lender is in possession of this Guaranty. If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of the Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Guarantors forthwith on demand by the Lender.

Section 10.07  <u>Information</u>.  Each Guarantor assumes all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Guarantor assumes and incurs under this Guaranty, and agrees that the Lender shall not have any duty to advise any Guarantor of information known to it regarding those circumstances or risks.

Section 10.08  <u>Maximum Liability</u>.  In any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under this

57

Guaranty would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Guarantor's liability under this Guaranty, then, notwithstanding any other provision of this Guaranty to the contrary, the amount of such liability shall, without any further action by the Guarantors or the Lender, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Guarantor's "Maximum Liability"). This Section with respect to the Maximum Liability of each Guarantor is intended solely to preserve the rights of the Lender to the maximum extent not subject to avoidance under applicable law, and no Guarantor nor any other person or entity shall have any right or claim under this Section with respect to such Maximum Liability, except to the extent necessary so that the obligations of any Guarantor hereunder shall not be rendered voidable under applicable law. Each Guarantor agrees that the Guaranteed Obligations may at any time and from time to time exceed the Maximum Liability of each Guarantor without impairing this Guaranty or affecting the rights and remedies of the Lender hereunder, provided that, nothing in this sentence shall be construed to increase any Guarantor's obligations hereunder beyond its Maximum Liability.

Section 10.09  Contribution.  In the event any Guarantor (a "Paying Guarantor") shall make any payment or payments under this Guaranty or shall suffer any loss as a result of any realization upon any collateral granted by it to secure its obligations under this Guaranty, each other Guarantor (each a "Non-Paying Guarantor") shall contribute to such Paying Guarantor an amount equal to such Non-Paying Guarantor's "Applicable Percentage" of such payment or payments made, or losses suffered, by such Paying Guarantor.  For purposes of this Article X, each Non-Paying Guarantor's "Applicable Percentage" with respect to any such payment or loss by a Paying Guarantor shall be determined as of the date on which such payment or loss was made by reference to the ratio of (i) such Non-Paying Guarantor's Maximum Liability as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder) or, if such Non-Paying Guarantor's Maximum Liability has not been determined, the aggregate amount of all monies received by such Non-Paying Guarantor from the Borrower after the date hereof (whether by loan, capital infusion or by other means) to (ii) the aggregate Maximum Liability of all Guarantors hereunder (including such Paying Guarantor) as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder), or to the extent that a Maximum Liability has not been determined for any Guarantor, the aggregate amount of all monies received by such Guarantors from the Borrower after the date hereof (whether by loan, capital infusion or by other means).  Nothing in this provision shall affect any Guarantor's several liability for the entire amount of the Guaranteed Obligations (up to such Guarantor's Maximum Liability).  Each of the Guarantors covenants and agrees that its right to receive any contribution under this Guaranty from a Non-Paying Guarantor shall be subordinate and junior in right of payment to the payment in full in cash of the Guaranteed Obligations.  This provision is for the benefit of the Lender and the Guarantors and may be enforced by any one, or more, or all of them in accordance with the terms hereof.

Section 10.10  Liability Cumulative.  The liability of each Guarantor as a Guarantor under this Article X is in addition to and shall be cumulative with all liabilities of each Guarantor to the Lender under this Agreement and the other Loan Documents to which such Guarantor is a party or in respect of any obligations or liabilities of the Borrower and the other

58

Guarantors, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

[Remainder of Page Intentionally Left Blank]

LA\1714629.12

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the day and the year first above written.

**LENDER:**

**EMIGRANT GB LLC**

By: Emigrant Bank, as Manager

By: _____
     Name:
     Title:

**BORROWER:**

**NICKLAUS COMPANIES, LLC**

By: GOLDEN BEAR INTERNATIONAL, INC.,
a Florida corporation, its Sole Member

By: _____
     Name:
     Title:

**GUARANTORS:**

**NICKLAUS GOLF EQUIPMENT COMPANY, L.C.**

By: GOLDEN BEAR INTERNATIONAL, INC.,
a Florida corporation, its Sole Member

By: _____
     Name:
     Title:

**NICKLAUS MARKETING, INC.**

By: _____
     Name:
     Title:

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the day and the year first above written.

**LENDER:**

**EMIGRANT GB LLC**

By:  Emigrant Bank, as Manager

By: _____

     Name:
     Title:

**BORROWER:**

**NICKLAUS COMPANIES, LLC**

By: GOLDEN BEAR INTERNATIONAL, INC.,
a Florida corporation, its Sole Member

By: _____

     Name: STEVEN C. NICKLAUS
     Title: SENIOR VICE PRESIDENT

**GUARANTORS:**

**NICKLAUS GOLF EQUIPMENT COMPANY, L.C.**

By: GOLDEN BEAR INTERNATIONAL, INC.,
a Florida corporation, its Sole Member

By: _____

     Name: STEVEN C. NICKLAUS
     Title: SENIOR VICE PRESIDENT

**NICKLAUS MARKETING, INC.**

By: _____

     Name: STEVEN C. NICKLAUS
     Title: SENIOR VICE PRESIDENT

**NICKLAUS DESIGN, LLC**

By: THE NICKLAUS GROUP, INC.,
a Florida Corporation, its Sole Member

By: _____
    Name: James H. Schnare II
    Title: Vice President


**N1JN-V, LLC**

By: GOLDEN BEAR INTERNATIONAL, INC.,
A Florida Corporation, its Sole Member

By: _____
    Name:  James H. Schnare II
    Title: Vice President


**GBI SERVICES, LLC**

By: GOLDEN BEAR INTERNATIONAL, INC.,
A Florida Corporation, its Sole Member

By: _____
    Name:  James H. Schnare II
    Title:  Vice President


**JACK NICKLAUS GOLF CLUB, LLC**

By: NF DYNASTY, LLC, a Florida limited
liability company, its Sole Member

By: _____
    Name:  Thomas E. Severson Jr.
    Title:  Manager

ANNEX A

## COMMITMENT SCHEDULE

| Lender | Commitment |
|---|---|
| Emigrant GB LLC | $145,000,000 |
| Total | $<u>145,000,000</u> |

**ANNEX B**

<u>NOTICE OF BORROWING</u>

_____ __, 2007

To:     Emigrant GB LLC
        c/o Emigrant Bank
        6 East 43 Street
        New York, NY 10017
        Attention:  [ ___ ]
        Telecopy:  [ ___ ]
        Telephone:  [ ___ ]

       Reference is hereby made to the Term Loan and Guaranty Agreement, dated as of May 25, 2007 (as amended, supplemented or otherwise modified from time to time, the "<u>Loan Agreement</u>"), among Nicklaus Companies, LLC, a Delaware limited liability company (the "<u>Borrower</u>"), certain of the direct or indirect subsidiaries of the Borrower listed as "Guarantors" on the signature pages thereto and Emigrant GB LLC (the "<u>Lender</u>").  Terms defined in the Loan Agreement and not otherwise defined herein are used herein with the meanings so defined.

       The Borrower hereby gives irrevocable notice, pursuant to <u>Section 2.02</u> of the Loan Agreement, of a request hereby for the Loan to be made as follows:

       (i)     The requested date of the proposed Loan (which date is a Business Day) is _____ __, 2007.

       (ii)    The aggregate amount of the proposed Loan is $145,000,000.

       The Borrower hereby requests that the proceeds of the proposed Loan be made available to it as follows:

    [Insert Transmittal Instructions]

<u>NOTICE OF BORROWING</u>

May 30, 2007

To:     Emigrant GB LLC
        c/o Emigrant Bank
        6 East 43 Street
        New York, NY 10017
        Attention:  Howard P. Milstein
        Telecopy:  (212) 850-4392
        Telephone:  (212) 850-4905

   Reference is hereby made to the Term Loan and Guaranty Agreement, dated as of May 25, 2007 (as amended, supplemented or otherwise modified from time to time, the "<u>Loan Agreement</u>"), among Nicklaus Companies, LLC, a Delaware limited liability company (the "<u>Borrower</u>"), certain of the direct or indirect subsidiaries of the Borrower listed as "Guarantors" on the signature pages thereto and Emigrant GB LLC (the "<u>Lender</u>").  Terms defined in the Loan Agreement and not otherwise defined herein are used herein with the meanings so defined.

   The Borrower hereby gives irrevocable notice, pursuant to <u>Section 2.02</u> of the Loan Agreement, of a request hereby for the Loan to be made as follows:

   (i)  The requested date of the proposed Loan (which date is a Business Day) is May 31, 2007.

   (ii)  The aggregate amount of the proposed Loan is $145,000,000 (which includes the amount of the Deposit).

   The Borrower hereby requests that the proceeds of the proposed Loan be made available to it as follows:

   Bank:   Northern Trust Bank
   Address:  11301 U.S. Highway One, North Palm Beach, FL  33408
   ABA No.:  066009650
   Account No.: 1710257032

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the proposed Loan:

(A)      The representations and warranties contained in the Loan Agreement and the Security and Pledge Agreement are true and correct, without giving effect to any materiality or Material Adverse Effect qualifications therein, on and as of the Closing Date as if made on and as of such date (except to the extent that such representations or warranties were made as of an earlier date, in which case such representations and warranties were true and correct, without giving effect to any materiality or Material Adverse Effect qualifications therein, as of such date), except to the extent that the failure of such representations or warranties to be true and correct would not, individually or in the aggregate, have a Material Adverse Effect.

(B)      Since the date of the Loan Agreement, no Material Adverse Effect has occurred and is continuing.

[Signature page follows]

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Notice as of the day and year first above written.

NICKLAUS COMPANIES, LLC

By: Golden Bear International, Inc., its Member

By: _____
Name: THOMAS E SEVERSON
Title: VICE PRESIDENT

**EXHIBIT A-1**

### Form of PIK Note

THE SECURITIES REPRESENTED BY THIS 8.5% PAY-IN-KIND NOTE ("NOTE") HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), NOR QUALIFIED UNDER APPLICABLE STATE SECURITIES LAWS IN RELIANCE ON EXEMPTIONS THEREFROM. THESE SECURITIES MAY NOT BE SOLD, MORTGAGED, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT FOR SUCH SECURITIES UNDER THE SECURITIES ACT AND THE REGULATIONS PROMULGATED PURSUANT THERETO (UNLESS EXEMPT THEREFROM) AND COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES LAWS AND REGULATIONS.

NICKLAUS COMPANIES, LLC

8.50% Pay-In-Kind Note

$[_____]                                         Number A-[___]

As of [_____]

NICKLAUS COMPANIES, LLC, a Delaware limited liability company (the "Company"), for value received, hereby promises to pay to the order of EMIGRANT GB LLC ("Emigrant"), or registered assigns (Emigrant or any such assignee, as applicable, the "Holder"), the principal sum of [_____] Dollars ($[_____]) plus any Capitalized PIK Interest (as defined in Section 1 below), and any accrued but unpaid PIK Interest (as defined in Section 1 below) not then capitalized, on the Maturity Date (or earlier prepayment date as applicable) in such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts, at the last address of the Holder of this Note as recorded on the books of the Company or, if no such address is noted, at the principal office of the Company, c/o Golden Bear International, Inc., 11780 U.S. Highway One, Suite 500, North Palm Beach, FL 33408 (as such address may be changed from time to time pursuant to Section 5(a) herein). This Note is one of a series of Notes designated the 8.5% Pay-In-Kind Notes due on the Maturity Date pursuant to Section 2.06(e) of that certain Term Loan and Guaranty Agreement, dated as of May 24, 2007, among the Company, as Borrower, Emigrant, as Lender, and the Guarantors named therein (the "Loan Agreement"). Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed thereto in the Loan Agreement.

1.  Interest. The Company promises to pay interest on the unpaid principal balance of this Note (including any Capitalized PIK Interest (as defined below)) until payment in full at the rate of 8.5% per annum ("PIK Interest"). PIK Interest shall be payable on each Interest Payment Date (as defined below) through the capitalization of such PIK Interest as additional principal hereof ("Capitalized PIK Interest") and shall be recorded through an appropriate notation on Schedule A attached hereto. The Company will pay interest quarterly in arrears on March 31, June 30, September 30 and December 31 of each year (each, an "Interest Payment Date"), commencing on the first such date after the date hereof, and on the Maturity Date (or

earlier prepayment date as applicable). Interest will be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). Within ten days following each Interest Payment Date, the Company shall deliver or cause to be delivered a revised copy of <u>Schedule A</u> to this Note to the Holder of this Note (at the address set forth in the register of Holders) reflecting the capitalization of PIK Interest; provided, however, that the failure of the Company to deliver such revised Schedule A shall not affect the obligation of the Company to pay all Capitalized PIK Interest hereon.

The Company shall pay interest on principal that is not paid on the Maturity Date or any applicable earlier date on which payment is required pursuant to Section 3 below at a rate of 3.0% per annum ("<u>Default Interest</u>") in excess of the rate otherwise provided and on overdue installments of interest (without regard to any applicable grace periods) at such higher rate to the extent lawful; provided, however, that any such Default Interest shall be paid as PIK Interest in accordance with the procedures provided in this Note; provided, further, that this paragraph shall not be effective during the five-year period commencing upon the date of exercise of the Special EBITDA Right under the LLC Agreement.

2.  <u>Optional Prepayment</u>. In accordance with Section 2.04(a) of the Loan Agreement, the Company, without the prior written consent of the Holder, may prepay this Note in whole or in part at any time at a redemption price equal to the principal amount redeemed plus interest accrued thereon so long as no Event of Default would result from such prepayment.

3.  <u>Mandatory Prepayment</u>. The Company shall prepay this Note in whole or in part in accordance with the requirements applicable to the repayment and/or prepayment of PIK Notes under Section 2.05 of the Loan Agreement at a redemption price equal to the principal amount so required to be redeemed plus interest accrued thereon.

4.  <u>Registry</u>. Books for the registry of this Note shall be kept at the current principal office of the Company, c/o Golden Bear International, Inc., 11780 U.S. Highway One, Suite 500, North Palm Beach, FL 33408 (as such address may be changed from time to time pursuant to Section 5(a) herein). No transfer of this Note shall be valid unless made (i) in accordance with the terms and conditions of the Loan Agreement and (ii) on the Company's books at such office of the Company, by the registered Holder hereof in person or by an attorney duly authorized in writing.

5.  <u>Miscellaneous</u>.

    (a)    All notices, demands, requests and other communications to be given or delivered under or by reason of the provisions of this Note shall be make in accordance with the Loan Agreement.

    (b)    This Note and its validity, construction and performance shall be governed by and construed in accordance with the laws of the State of New York without regard to its principles of conflicts of laws.

(c)     This Note shall not be modified or amended except by a writing signed by the Holder and the Company and this Note may not be discharged except by performance in accordance with its terms.

(d)     If any provisions of this Note shall be held to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provisions of this Note, and this Note shall be construed as if any invalid, illegal or unenforceable provisions had not been contained herein; provided, however, that default in the performance or observance by the Company of any provision of this Note, which has been held to be invalid, illegal or unenforceable shall, notwithstanding such invalidity, illegality or unenforceability, constitute an Event of Default, if such default would have constituted an Event of Default without regard to such invalidity, illegality or unenforceability.

(e)     The headings of this Note are for convenience only and shall not control or affect the meaning or construction of any provisions hereof.

(f)     If this Note is mutilated, lost, stolen or destroyed, the Company, at its sole expense, shall issue a new Note of like form and maturity to the Holder hereof upon presentment and surrender of the mutilated Note, in the case of mutilation, and upon receipt of evidence of loss, theft or destruction and of indemnity in all other cases, each in form satisfactory to the Company.

(g)     If any payment of principal or interest or any notice hereunder is required to be made on any date which is a Saturday, Sunday or federal or New York State bank holiday, such payment or notice shall be made on the next succeeding day on which banks in New York City are open for business, with the same force and effect as if made on the date as originally required.

(h)     For purposes of clarity, the Company acknowledges and agrees that its obligations under this Note constitute Obligations under the Loan Agreement.

(i)     In the event of any inconsistency between the terms of this Note and the terms of the Loan Agreement, the terms of the Loan Agreement shall prevail.

[ADD OID LEGEND WHEN AND IF ISSUED]

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Company has caused this Note to be signed manually or by facsimile by its duly authorized officer.

**NICKLAUS COMPANIES, LLC**

By:  GOLDEN BEAR INTERNATIONAL, INC., a Florida corporation, its Member

By: _____
     Name:
     Title:

Dated:  [_____]

-4-

<u>SCHEDULE A</u>

**SCHEDULE OF CAPITALIZED PIK INTEREST**

**The following amounts of PIK Interest have been capitalized:**

| Date | Holder Name | Amount of Capitalized PIK Interest | New Aggregate Principal Amount of Note |
|------|-------------|------------------------------------|----------------------------------------|
|      |             |                                    |                                        |

-5-

**EXHIBIT A-2**

## Form of Replacement Loan Note

THE SECURITIES REPRESENTED BY THIS 8.5% REPLACEMENT LOAN NOTE ("NOTE") HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), NOR QUALIFIED UNDER APPLICABLE STATE SECURITIES LAWS IN RELIANCE ON EXEMPTIONS THEREFROM. THESE SECURITIES MAY NOT BE SOLD, MORTGAGED, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT FOR SUCH SECURITIES UNDER THE SECURITIES ACT AND THE REGULATIONS PROMULGATED PURSUANT THERETO (UNLESS EXEMPT THEREFROM) AND COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES LAWS AND REGULATIONS.

NICKLAUS COMPANIES, LLC

8.50% Replacement Loan Note

$[_____]                                    Number B-[___]
As of [_____]

        NICKLAUS COMPANIES, LLC, a Delaware limited liability company (the "Company"), for value received, hereby promises to pay to the order of EMIGRANT GB LLC ("Emigrant"), or registered assigns (Emigrant or any such assignee, as applicable, the "Holder"), the principal sum of [_____] Dollars ($_____]) plus any Interest (as defined in Section 1 below) on the Maturity Date (or earlier prepayment date as applicable) in such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts, at the last address of the Holder of this Note as recorded on the books of the Company or, if no such address is noted, at the principal office of the Company, c/o Golden Bear International, Inc., 11780 U.S. Highway One, Suite 500, North Palm Beach, FL 33408 (as such address may be changed from time to time pursuant to Section 5(a) herein). This Note is one of a series of Notes designated the 8.5% Replacement Loan Notes due on the Maturity Date pursuant to Section 8.01(c) of that certain Term Loan and Guaranty Agreement, dated as of May 24, 2007, among the Company, as Borrower, Emigrant, as Lender, and the Guarantors named therein (the "Loan Agreement"). Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed thereto in the Loan Agreement.

1.   Interest. Subject to Section 2.06(e) of the Loan Agreement, the Company promises to pay interest ("Interest") on the unpaid principal balance of this Note until payment in full, in cash, at the rate of 8.5% per annum. Interest shall be payable quarterly in arrears on March 31, June 30, September 30 and December 31 of each year, commencing on the first such date after the date hereof, and on the Maturity Date (or earlier prepayment date as applicable). Interest will be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

    The Company shall pay interest on principal that is not paid on the Maturity Date or any applicable earlier date on which payment is required pursuant to Section 3 below at a rate of

3.0% per annum ("Default Interest") in excess of the rate otherwise provided and on overdue installments of interest (without regard to any applicable grace periods) at such higher rate to the extent lawful; provided, that this paragraph shall not be effective during the five-year period commencing upon the date of exercise of the Special EBITDA Right under the LLC Agreement..

2.  Optional Prepayment.  In accordance with Section 2.04(a) of the Loan Agreement, the Company, without the prior written consent of the Holder, may prepay this Note in whole or in part at any time at a redemption price equal to the principal amount redeemed plus interest accrued thereon so long as no Event of Default would result from such prepayment.

3.  Mandatory Prepayment.  The Company shall prepay this Note in whole or in part in accordance with the requirements applicable to the repayment and/or prepayment of Replacement Loans under Section 2.05 of the Loan Agreement at a redemption price equal to the principal amount so required to be redeemed plus interest accrued thereon..

4.  Registry.  Books for the registry of this Note shall be kept at the current principal office of the Company, c/o Golden Bear International, Inc., 11780 U.S. Highway One, Suite 500, North Palm Beach, FL 33408 (as such address may be changed from time to time pursuant to Section 5(a) herein).  No transfer of this Note shall be valid unless made (i) in accordance with the terms and conditions of the Loan Agreement and (ii) on the Company's books at such office of the Company, by the registered Holder hereof in person or by an attorney duly authorized in writing.

5.  Miscellaneous.

(a)      All notices, demands, requests and other communications to be given or delivered under or by reason of the provisions of this Note shall be make in accordance with the Loan Agreement.

(b)      This Note and its validity, construction and performance shall be governed by and construed in accordance with the laws of the State of New York without regard to its principles of conflicts of laws.

(c)      This Note shall not be modified or amended except by a writing signed by the Holder and the Company and this Note may not be discharged except by performance in accordance with its terms.

(d)      If any provisions of this Note shall be held to be invalid, illegal or unenforceable, such invalidity, illegality or unenforceability shall not affect any other provisions of this Note, and this Note shall be construed as if any invalid, illegal or unenforceable provisions had not been contained herein; provided, however, that default in the performance or observance by the Company of any provision of this Note, which has been held to be invalid, illegal or unenforceable shall, notwithstanding such invalidity, illegality or unenforceability, constitute an Event of Default, if such default would have constituted an Event of Default without regard to such invalidity, illegality or unenforceability.

-2-

(e)      The headings of this Note are for convenience only and shall not control or affect the meaning or construction of any provisions hereof.

(f)      If this Note is mutilated, lost, stolen or destroyed, the Company shall issue a new Note of like form and maturity to the Holder hereof upon presentment and surrender of the mutilated Note, in the case of mutilation, and upon receipt of evidence of loss, theft or destruction and of indemnity in all other cases, each in form satisfactory to the Company.

(g)      If any payment of principal or interest or any notice hereunder is required to be made on any date which is a Saturday, Sunday or federal or New York State bank holiday, such payment or notice shall be made on the next succeeding day on which banks in New York City are open for business, with the same force and effect as if made on the date as originally required.

(h)      For purposes of clarity, the Company acknowledges and agrees that its obligations under this Note constitute Obligations under the Loan Agreement.

(i)      In the event of any inconsistency between the terms of this Note and the terms of the Loan Agreement, the terms of the Loan Agreement shall prevail.

[ADD OID LEGEND WHEN AND IF ISSUED]

*[Signature Page Follows]*

-3-

      **IN WITNESS WHEREOF**, the Company has caused this Note to be signed manually or by facsimile by its duly authorized officer.

**NICKLAUS COMPANIES, LLC**

By:  GOLDEN BEAR INTERNATIONAL, INC., a
Florida corporation, its Member

By: _____
     Name:
     Title:

Dated:  [_____]

LA\1728156.2