## **EXHBIT B**

**SECURITY AND PLEDGE AGREEMENT**

**AMONG**

**NICKLAUS COMPANIES, LLC,**
**as Borrower,**

**THE SUBSIDIARIES OF THE BORROWER LISTED AS GRANTORS ON THE**
**SIGNATURE PAGES HERETO,**

**AND**

**EMIGRANT GB LLC,**
**as Lender**

**DATED AS OF MAY 31, 2007**

## TABLE OF CONTENTS

Page

SECTION 1    DEFINITIONS................................................................................1

1.1    General Definitions...........................................................................1

1.2    Definitions; Interpretation...............................................................9

SECTION 2   GRANT OF SECURITY ............................................................9

2.1    Grant of Security...............................................................................9

2.2    Excluded Property............................................................................10

2.3    Release of Collateral .......................................................................10

SECTION 3    SECURITY FOR OBLIGATIONS .........................................11

3.1    Security for Obligations..................................................................11

3.2    Continuing Liability under Collateral............................................11

SECTION 4    REPRESENTATIONS AND WARRANTIES AND COVENANTS...................11

4.1    Generally............................................................................................11

4.2    Equipment and Inventory................................................................13

4.3    Receivables. ......................................................................................15

4.4    Investment Related Property...........................................................17

4.5    Material Contracts............................................................................23

4.6    Letter of Credit Rights. ...................................................................24

4.7    Intellectual Property.........................................................................25

4.8    Commercial Tort Claims..................................................................29

SECTION 5    FURTHER ASSURANCES .....................................................29

SECTION 6    LENDER APPOINTED ATTORNEY-IN-FACT.................31

6.1    Power of Attorney.............................................................................31

6.2    Discretionary Use.............................................................................32

i

SECTION 7    REMEDIES ............................................................................................32

    7.1    Generally .................................................................................................32

    7.2    Application of Proceeds ...........................................................................34

    7.3    Sales on Credit .......................................................................................34

    7.4    Investment Related Property ....................................................................34

    7.5    Intellectual Property ...............................................................................35

SECTION 8    LENDER MAY PERFORM ...............................................................37

SECTION 9    LENDER'S DUTIES .........................................................................37

SECTION 10   INDEMNITY AND EXPENSES. .......................................................37

SECTION 11   SECURITY INTEREST ABSOLUTE ................................................38

SECTION 12   AMENDMENTS ...............................................................................38

SECTION 13   ADDRESSES FOR NOTICES ...........................................................38

SECTION 14   CONTINUING SECURITY INTEREST .............................................38

SECTION 15   GOVERNING LAW ..........................................................................38

SECTION 16   INCONSISTENCY ............................................................................39

SECTION 17   HEADINGS .....................................................................................39

**ANNEXES**

Annex I              Pledge Supplement

Annex II             Patent Security Agreement

Annex III            Trademark Security Agreement

Annex IV             Copyright Security Agreement

Annex V              Collateral Access Agreement

Annex VI             Deposit Account Control Agreement

## SCHEDULES

Schedule I          Grantor Information

Schedule II         Locations of Equipment and Inventory

Schedule III        Pledged Debt, Pledged LLC Interests, Pledged Partnership Interests, Pledged Stock and Pledged Trust Interests

Schedule IV         Letters of Credit

Schedule V          Copyrights and Copyright Licenses, Patents and Patent Licenses, Trade Secret Licenses, Trademarks and Trademark Licenses

Schedule VI         Commercial Tort Claims

Schedule VII        Commodities Accounts, Deposit Accounts and Securities Accounts

LA\1729098.1

# SECURITY AND PLEDGE AGREEMENT

**SECURITY AND PLEDGE AGREEMENT** (the "**Agreement**"), dated as of May 31, 2007, by and among **Nicklaus Companies, LLC**, a Delaware limited liability company (the "**Borrower**"), and each of its direct or indirect subsidiaries party to the Loan Agreement (as hereinafter defined) (collectively, the "**Grantors**") and **Emigrant GB LLC**, a Delaware limited liability company, as lender (the "**Lender**").

## <u>WITNESSETH:</u>

**WHEREAS**, the Borrower, the Lender and the Grantors have previously entered into that certain Term Loan and Guaranty Agreement dated as of May 25, 2007 (as amended, modified, restated or otherwise supplemented from time to time, the "**<u>Loan Agreement</u>**");

**WHEREAS**, unless otherwise defined herein, terms defined in the Loan Agreement are used herein as therein defined;

**WHEREAS**, it is a condition precedent to the making of the Loan that the Grantors shall have granted a security interest, pledge and lien on certain of the Grantors' assets and properties and the proceeds thereof; and

**WHEREAS**, the parties hereto desire to more fully set forth their respective rights in connection with such security interest, pledge and lien.

**NOW, THEREFORE**, in consideration of the premises and in order to induce the Lender to make the Loan, the Grantors hereby agree with the Lender as follows:

## SECTION 1    DEFINITIONS

**1.1**    General Definitions.  In this Agreement, the following terms shall have the following meanings:

"**Account Debtor**" shall mean each Person who is obligated on a Receivable or any Supporting Obligation related thereto.

"**Accounts**" shall mean all "accounts" as defined in Article 9 of the UCC, including Health-Care Insurance Receivables.

"**Agreement**" shall have the meaning set forth in the preamble.

"**Aircraft Mortgage and Security Agreement**" shall mean the Aircraft Mortgage and Security Agreement, dated as of May 3, 2006, between NJNV-V, LLC and NorLease, Inc.

"**Authenticate**" shall mean "authenticate" as defined in Article 9 of the UCC.

"**Board**" shall mean the Board of the Borrower or any successor governing body.

"**Cash Proceeds**" shall mean all proceeds of any Collateral consisting of cash, checks and other near-cash items.

"**Certificates of Deposit**" shall mean an instrument containing an acknowledgment by a bank and a promise by the bank to repay the sum of money.

"**Chattel Paper**" shall mean all "chattel paper" as defined in Article 9 of the UCC, including, without limitation, "electronic chattel paper" or "tangible chattel paper," as each term is defined in the UCC.

"**Collateral**" shall have the meaning set forth in <u>Section 2.1</u>. For the avoidance of doubt, the Collateral shall not include Excluded Property.

"**Collateral Access Agreement**" shall mean a Collateral Access Agreement substantially in the form of <u>Annex V</u> or otherwise reasonably acceptable to the Lender.

"**Collateral Deposit Account**" shall have the meaning set forth in <u>Section 4.4.4(a)</u>.

"**Collateral Records**" shall mean books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks and other electronic storage media and related data processing software and similar items that at any time evidence or contain information relating to any of the Collateral or are otherwise necessary or helpful in the collection thereof or realization thereupon.

"**Collateral Support**" shall mean all property (real or personal) assigned, hypothecated or otherwise securing any Collateral and shall include any security agreement or other agreement granting a Lien or security interest in such real or personal property.

"**Commercial Tort Claims**" shall mean all "commercial tort claims" as defined in Article 9 of the UCC, including, without limitation, all commercial tort claims listed and described with specification in <u>Schedule VI</u> (as such schedule may be amended, supplemented or restated from time to time).

"**Commodities Accounts**" (i) shall mean all "commodity accounts" as defined in Article 9 of the UCC and (ii) shall include, without limitation, all of the accounts listed in <u>Schedule VII</u> under the heading "Commodities Accounts" (as such schedule may be amended, supplemented or restated from time to time).

"**Copyrights**" shall mean all United States, state and foreign copyrights, including but not limited to copyrights in software and databases, whether registered or unregistered, now or hereafter in force, and, with respect to any and all of the foregoing: (i) all registrations and applications therefor including, without limitation, the registrations and applications referred to in <u>Schedule V</u> (as such schedule may be amended, supplemented or restated from time to time), (ii) all extensions and renewals thereof, (iii) all rights corresponding thereto throughout the world, (iv) all rights to sue for past, present and future infringements thereof, (v) all licenses, claims, damages and proceeds of suit arising therefrom, and (vi) all payments and royalties and

2

rights to payments and royalties arising out of the sale, lease, license, assignment, or other disposition thereof.

"**Copyright Licenses**" shall mean any and all agreements granting any right in, to or under Copyrights (whether such Grantor is licensee or licensor thereunder) including, without limitation, each agreement referred to in Schedule V (as such schedule may be amended, supplemented or restated from time to time).

"**Copyright Security Agreement**" shall mean the agreement substantially in the form of Annex IV.

"**Deposit Accounts**" (i) shall mean all "deposit accounts" as defined in Article 9 of the UCC and (ii) shall include, without limitation, all of the accounts listed in Schedule VII under the heading "Deposit Accounts" (as such schedule may be amended, supplemented or restated from time to time).

"**Documents**" shall mean all "documents" as defined in Article 9 of the UCC.

"**Documents Evidencing Goods**" shall mean all Documents evidencing, representing or issued in connection with Goods.

"**Equipment**" shall mean: (i) all "equipment" as defined in Article 9 of the UCC, (ii) all machinery, manufacturing equipment, data processing equipment, computers, office equipment, furnishings, furniture, appliances, and tools (in each case, regardless of whether characterized as equipment under the UCC), (iii) all Fixtures and (iv) all accessions or additions thereto, all parts thereof, whether or not at any time of determination incorporated or installed therein or attached thereto, and all replacements therefor, wherever located, now or hereafter existing.

"**Excluded Equity Interests**" shall mean any Equity Interests of any Foreign Subsidiary in excess of 65% of the total combined voting power of all classes of stock entitled to vote of such Foreign Subsidiary.

"**Excluded Property**" shall have the meaning set forth in Section 2.2.

"**Fixtures**" shall mean all "fixtures" as defined in Article 9 of the UCC.

"**Foreign Subsidiary**" shall mean, with respect to any Grantor, any Subsidiary which is organized under the laws of a jurisdiction other than a state of the United States or the District of Columbia.

"**General Intangibles**" (i) shall mean all "general intangibles" as defined in Article 9 of the UCC, including "payment intangibles" also as defined in Article 9 of the UCC and (ii) shall include, without limitation, all Swap Agreements, all tax refunds and all licenses, permits, concessions and authorizations, (in each case, regardless of whether characterized as general intangibles under the UCC).

"**Goods**" (i) shall mean all "goods" as defined in Article 9 of the UCC and (ii) shall include, without limitation, all Inventory, Equipment, Documents Evidencing Goods and Software Embedded In Goods.

"**Health-Care-Insurance Receivable**" shall have the meaning specified in Article 9 of the UCC.

"**Instruments**" shall mean all "instruments" as defined in Article 9 of the UCC.

"**Insurance**" shall mean (i) all insurance policies covering any or all of the Collateral (regardless of whether the Lender is the loss payee thereof) and (ii) any key man life insurance policies.

"**Intellectual Property**" shall mean, collectively, the Copyrights, the Copyright Licenses, the Patents, the Patent Licenses, the Trademarks, the Trademark Licenses, the Trade Secrets, and the Trade Secret Licenses.

"**Intellectual Property Licenses**" shall mean, collectively, the Copyright Licenses, Patent Licenses, Trademark Licenses, and Trade Secret Licenses.

"**Inventory**" shall mean: (i) all "inventory" as defined in Article 9 of the UCC and (ii) all goods held for sale or lease or to be furnished under contracts of service or so leased or famished, all raw materials, work in process, finished goods, and materials used or consumed in the manufacture, packing, shipping, advertising, selling, leasing, furnishing or production of such inventory or otherwise used or consumed in any Grantor's business; all goods in which any Grantor has an interest in mass or a joint or other interest or right of any kind; and all goods which are returned to or repossessed by any Grantor, and all accessions thereto and products thereof (in each case, regardless of whether characterized as inventory under the UCC).

"**Investment Accounts**" shall mean the Securities Accounts, Commodities Accounts and Deposit Accounts.

"**Investment Related Property**" shall mean: (a) all "investment property" (as such term is defined in Article 9 of the UCC) and (b) all of the following (regardless of whether classified as investment property under the UCC): all (i) Pledged Equity Interests, (ii) Pledged Debt, (iii) the Investment Accounts, and (iv) Certificates of Deposit; provided, however, that Investment Related Property shall not include any (A) Receivables or (B) any Excluded Equity Interests.

"**Letter of Credit Right**" shall mean "letter-of-credit right" as defined in the UCC.

"**Loan Agreement**" shall have the meaning set forth in the recitals.

"**Material Contract**" shall mean any contract or other arrangement to which any Grantor is a party for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect.

LA\1729098.1

"**Money**" shall mean "money" as defined in the UCC.

"**Non-Assignable Contract**" shall mean any agreement, contract or license to which any Grantor is a party that by its terms purports to restrict or prevent or penalize the assignment or granting of a security interest therein (either by its terms or by any federal or state statutory prohibition or otherwise irrespective of whether such prohibition or restriction is enforceable under Sections 9-406 through 9-409 of the UCC).

"**Non-payment Contract**" means any contract or agreement to which any Grantor is a party other than any contract where the account debtor's principal obligation is a monetary obligation; <u>provided</u> that Non-payment Contracts shall not include any Receivables.

"**Patents**" shall mean all United States and foreign patents and certificates of invention, or similar industrial property rights, now or hereafter in force, including, but not limited to each patent referred to in <u>Schedule V</u> (as such schedule may be amended, supplemented or restated from time to time), and with respect to any and all of the foregoing, (i) all applications therefore including, without limitations, the patent applications referred to in <u>Schedule V</u> (as such schedule may be amended, supplemented or restated from time to time), (ii) all reissues, divisions, continuations, continuations-in part, extensions, renewals, and reexaminations thereof, (iii) all rights corresponding thereto throughout the world, (iv) all inventions and improvements described therein, (v) all rights to sue for past, present and future infringements thereof, (vi) all licenses, claims, damages, and proceeds of suit arising therefrom, and (vii) all payments and royalties and rights to payments and royalties arising out of the sale, lease, license, assignment, or other disposition thereof.

"**Patent Licenses**" shall mean all agreements granting any right in, to, or under Patents (whether such Grantor is licensee or licensor thereunder) including without limitation, each agreement referred to in <u>Schedule V</u> (as such schedule may be amended, supplemented or restated from time to time).

"**Patent Security Agreement**" shall mean the agreement substantially in the form of <u>Annex II</u>.

"**Payment Intangible**" shall have the meaning specified in Article 9 of the UCC.

"**Pledged Alternative Equity Interests**" shall mean all participation or other interests in any equity or profits of any business entity owned by any Grantor (other than any Excluded Equity Interests) and the certificates, if any, representing such interests, all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such interests and any other warrant, right or option to acquire any of the foregoing; <u>provided</u> that Pledged Alternative Equity Interests shall not include any Pledged Stock, Pledged Partnership Interests, Pledged LLC Interests and Pledged Trust Interests.

"**Pledged Debt**" shall mean all indebtedness for borrowed money owed to any Grantor, whether or not evidenced by any instrument or promissory note, including, without limitation, all indebtedness described on <u>Schedule III</u> under the heading "Pledged Debt" (as such schedule may be amended, supplemented or restated from time to time), all monetary obligations

owing to any Grantor from any other Grantor the instruments evidencing any of the foregoing, and all interest, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the foregoing.

"**Pledged Equity Interests**" shall mean all Pledged Stock, Pledged LLC Interests, Pledged Partnership Interests, Pledged Trust Interests and Pledged Alternative Equity Interests; provided, however, that Pledged Equity Interests shall not include any Excluded Equity Interests.

"**Pledged LLC Interests**" shall mean all interests in any limited liability company owned by any Grantor (other than any Excluded Equity Interests) including, without limitation, all limited liability company interests listed on Schedule III under the heading "Pledged LLC Interests" (as such schedule may be amended, supplemented or restated from time to time) and the certificates, if any, representing such limited liability company interests and any interest of such Grantor on the books and records of such limited liability company or on the books and records of any securities intermediary pertaining to such interest and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such limited liability company interests and any other warrant, right or option to acquire any of the foregoing.

"**Pledged Partnership Interests**" shall mean all interests in any general partnership, limited partnership, limited liability partnership or other partnership owned by any Grantor (other than any Excluded Equity Interests) including, without limitation, all partnership interests listed on Schedule III under the heading "Pledged Partnership Interests" (as such schedule may be amended, supplemented or restated from time to time) and the certificates, if any, representing such partnership interests and any interest of such Grantor on the books and records of such partnership or on the books and records of any securities intermediary pertaining to such interest and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such partnership interests and any other warrant, right or option to acquire any of the foregoing.

"**Pledged Stock**" shall mean all shares of capital stock owned by any Grantor (other than any Excluded Equity Interests), including, without limitation, all shares of capital stock described on Schedule III under the heading "Pledged Stock" (as such schedule may be amended, supplemented or restated from time to time), and the certificates, if any, representing such shares and any interest of such Grantor in the entries on the books of the issuer of such shares or on the books of any securities intermediary pertaining to such shares, and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares and any other warrant, right or option to acquire any of the foregoing.

"**Pledged Trust Interests**" shall mean all interests in a Delaware business trust or other trust owned by any Grantor (other than any Excluded Equity Interests) including, without limitation, all trust interests listed on Schedule III under the heading "Pledged Trust Interests" (as such schedule may be amended, supplemented or restated from time to time) and the

LA\1729098.1

certificates, if any, representing such trust interests and any interest of such Grantor on the books and records of such trust or on the books and records of any securities intermediary pertaining to such interest and all dividends, distributions, cash, warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such trust interests and any other warrant, right or option to acquire any of the foregoing.

"**Proceeds**" shall mean: (i) all "proceeds" as defined in Article 9 of the UCC, (ii) payments or distributions made with respect to any Investment Related Property and (iii) whatever is receivable or received when Collateral or proceeds are sold, leased, licensed, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary.

"**Receivables**" shall mean all (i) Accounts, (ii) Chattel Paper, (iii) Payment Intangibles, (iv) Instruments and (v) to the extent not otherwise covered above, all other rights to payment, whether or not earned by performance, for goods or other property sold, leased, licensed, assigned or otherwise disposed of, or services rendered or to be rendered, regardless of how classified under the UCC together with all of Grantors' rights, if any, in any goods or other property giving rise to such right to payment and all Collateral Support and Supporting Obligations related thereto and all Receivables Records; provided that Receivables shall not include any Investment Related Property.

"**Receivables Records**" shall mean (i) all original copies of all documents, instruments or other writings or electronic records or other Records evidencing the Receivables, (ii) all books, correspondence, credit or other files, Records, ledger sheets or cards, invoices, and other papers relating to Receivables, including, without limitation, all tapes, cards, computer tapes, computer discs, computer runs, record keeping systems and other papers and documents relating to the Receivables, whether in the possession or under the control of any Grantor or any computer bureau or agent from time to time acting for such Grantor or otherwise, (iii) all evidences of the filing of financing statements and the registration of other instruments in connection therewith, and amendments, supplements or other modifications thereto, notices to other creditors or agents thereof, and certificates, acknowledgments, or other writings, including, without limitation, lien search reports, from filing or other registration officers, (iv) all credit information, reports and memoranda relating thereto and (v) all other written or nonwritten forms of information related in any way to the foregoing or any Receivable.

"**Record**" shall have the meaning specified in Article 9 of the UCC.

"**Secured Obligations**" shall mean "Obligations" as defined in the Loan Agreement.

"**Secured Parties**" shall mean the Lender and any other permitted holder of any Secured Obligation.

"**Securities**" shall mean any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness,

secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Accounts**" (i) shall mean all "securities. accounts" as defined in Article 8 of the UCC and (ii) shall include, without limitation, all of the accounts listed on <u>Schedule VII</u> under the heading "Securities Accounts" (as such schedule may be amended, supplemented or restated from time to time).

"**Software Embedded in Goods**" means, with respect to any Goods, any computer program embedded in Goods and any supporting information or documentation provided in connection with the program if (i) the program is associated with the Goods in such a manner that it customarily is considered part of the Goods or (ii) by becoming the owner of the Goods a person acquires a right to use the program in connection with the Goods.

"**State**" shall mean a State of the United States, the District of Columbia, Puerto Rico, the United States Virgin Islands, or any territory or insular possession subject to the jurisdiction of the United States.

"**Supporting Obligation**" shall mean all "supporting obligations" as defined in Article 9 of the UCC.

"**Trade Secret Licenses**" shall mean any and all agreements granting any right in or to Trade Secrets (whether such Grantor is licensee or licensor thereunder) including, without limitation, each agreement referred to in <u>Schedule V</u> (as such schedule may be amended, supplemented or restated from time to time).

"**Trade Secrets**" shall mean all trade secrets and all other confidential or proprietary information and know-how, whether or not reduced to a writing or other tangible form, now or hereafter in force, owned or used in, or contemplated at any time for use in, the business of any Grantor (all of the foregoing being collectively called a "Trade Secret"), including with respect to any and all of the foregoing: (i) all documents and things embodying, incorporating, or referring in any way thereto, (ii) all rights to sue for past, present and future infringement thereof, and (iii) all licenses, claims, damages, and proceeds of suit arising therefrom, and (iv) all payments and royalties and rights to payments and royalties arising out of the sale, lease, license, assignment, or other dispositions thereof.

"**Trademarks**" shall mean all United States, state and foreign trademarks, service marks, certification marks, collective marks, trade names, corporate names, d/b/as, business names, fictitious business names, Internet domain names, trade styles, logos, other source or business identifiers, designs and general intangibles of a like nature, rights of publicity and privacy pertaining to the names, likeness, signature and biographical data of natural persons, now or hereafter in force, and, with respect to any and all of the foregoing: (i) all registrations and applications therefor including, but not limited to, the registrations and applications referred to in <u>Schedule V</u> (as such schedule may be amended, supplemented or restated from time to time), (ii) the goodwill of the business symbolized thereby, (iii) all rights corresponding thereto throughout

8

the world, (iv) all rights to sue for past, present and future infringement or dilution thereof or for any injury to goodwill, (v) all licenses, claims, damages, and proceeds of suit arising therefrom, and (vi) all payments and royalties and rights to payments and royalties arising out of the sale, lease, license assignment or other disposition thereof.

"**Trademark Licenses**" shall mean any and all agreements granting any right in or to Trademarks (whether such Grantor is licensee or licensor thereunder) including, without limitation, each agreement referred to in <u>Schedule V</u> (as such schedule may be amended, supplemented or restated from time to time).

"**Trademark Security Agreement**" shall mean the agreement set forth in <u>Annex III</u>.

"**UCC**" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York.

"**USPTO**" shall mean the U.S. Patent and Trademark Office.

**1.2    Definitions; Interpretation**. All capitalized terms used herein (including the preamble and recitals hereto) and not otherwise defined herein. shall have the meanings ascribed thereto in the Loan Agreement or, if not defined therein, in the UCC. References to "Sections," "Annexes" and "Schedules" shall be to Sections, Annexes and Schedules, as the case may be, of this Agreement unless otherwise specifically provided. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect. Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference. The use herein of the word "include" or "including," when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. If any conflict or inconsistency exists between this Agreement and the Loan Agreement, the Loan Agreement shall govern. All references herein to provisions of the UCC shall include all successor provisions under any subsequent version or amendment to any Article of the UCC.

**SECTION 2    GRANT OF SECURITY**

**2.1    Grant of Security**. Each of the Grantors hereby grants to the Lender, a pledge and security interest in (and continuing lien on) all of such Grantor's right, title and interest in and to the following, (other than Excluded Property) (the "<u>**Collateral**</u>"):

(i.)    Documents;

(ii.)    Goods (including Documents Evidencing Goods and Software Embedded in Goods);

(iii.)     Insurance;

(iv.)     Intellectual Property;

(v.)      Investment Related Property;

(vi.)     Letter of Credit Rights;

(vii.)    Money;

(viii.)   Non-payment Contracts;

(ix.)     Receivables and Receivable Records;

(x.)      Commercial Tort Claims;

(xi.)     to the extent not otherwise included above, all General Intangibles, Material Contracts, motor vehicles and other personal property of any kind and all Collateral Records, Collateral Support and Supporting Obligations relating to any of the foregoing; and

(xii.)    to the extent not otherwise included above, all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing.

2.2     **Excluded Property.**  Notwithstanding anything to the contrary herein, the security interest granted under Section 2.1 hereof shall not attach to any of the following (collectively, "**Excluded Property**"): (a) any lease, license, contract, property right or agreement to which any Grantor is a party or any of its rights or interests thereunder if the grant of such security interest shall constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of any Grantor therein or (ii) in a breach or termination pursuant to the terms of, or a default under, any such lease license, contract, property rights or agreement (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity) provided, however, that such security interest shall attach immediately at such time as the condition causing such abandonment, invalidation or unenforceability is removed; (b) applications filed in the USPTO to register trademarks or service marks on the basis any Grantor's "intent to use" such marks unless and until the filing of a "Statement of Use" or "Amendment to Allege Use" has been filed and accepted, whereupon such applications shall be automatically subject to the lien granted herein and deemed included in the Collateral; (c) any causes of action, or monies or properties received or receivable therefrom, relating to claims under Sections 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code; (d) any Excluded Equity Interests; or (e) any of the collateral described in the Aircraft Mortgage and Security Agreement securing the Aircraft Mortgage (as defined in the Purchase and Sale Agreement).

2.3     **Release of Collateral.**  The Lender agrees that if any of the Collateral shall be sold or otherwise disposed of by any Grantor to a Person other than the Borrower or a

Guarantor in a transaction permitted under the Loan Agreement, then such Collateral shall be released from the Lien created hereby. In connection with any such sale or disposition, the Lender shall promptly, upon the request of any Grantor, and at the sole expense and risk of, such Grantor, execute and deliver to the applicable Grantor all releases and other documents necessary to evidence the release of the Lien created hereby on such Collateral.

**SECTION 3      SECURITY FOR OBLIGATIONS**

      **3.1      Security for Obligations**.  This Agreement and the Collateral secure the payment of all Secured Obligations of each of the Grantors now or hereafter existing.

      **3.2      Continuing Liability Under Collateral**.  Notwithstanding anything herein to the contrary, (i) each Grantor shall remain liable for all obligations under the Collateral and nothing contained herein is intended or shall be a delegation of duties to the Lender or any Secured Party, (ii) each Grantor shall remain liable under each of the agreements included in the Collateral, including, without limitation, any agreements relating to Pledged Partnership Interests or Pledged LLC Interests, to perform all of the obligations undertaken by it thereunder all in accordance with and pursuant to the terms and provisions thereof and neither the Lender nor any other Secured Party shall have any obligation or liability under any of such agreements by reason of or arising out of this Agreement or any other document related thereto nor shall the Lender nor any other Secured Party have any obligation to make any inquiry as to the nature or sufficiency of any payment received by it or have any obligation to take any action to collect or enforce any rights under any agreement included in the Collateral, including, without limitation, any agreements relating to Pledged Partnership Interests or Pledged LLC Interests, and (iii) the exercise by the Lender of any of its rights hereunder shall not release any Grantor from any of its duties or obligations under the contracts, licenses and agreements included in the Collateral.

**SECTION 4      REPRESENTATIONS AND WARRANTIES AND COVENANTS**

      **4.1      Generally.**

          (a)      <u>Representations and Warranties</u>.  Each Grantor hereby represents and warrants, as of the date hereof, that:

            (i) it owns the Collateral purported to be owned by it or otherwise has the rights it purports to have in each item of Collateral and, as to all Collateral whether now existing or hereafter acquired, will continue to own or have such rights in each item of the Collateral except to the extent that disposition of such Collateral is permitted pursuant to the Loan Agreement, in each case free and clear of any and all Liens, rights or claims of all other Persons other than the security interests and Liens created by this Agreement and Liens permitted by the Loan Agreement;

            (ii) such Grantor has not filed any certificates of domestication, transfer or continuance in any jurisdiction other than its jurisdiction of organization or formation;

            (iii) such Grantor is duly authorized to execute and deliver this Agreement to the Lender, and this Agreement constitutes the legal, valid and binding

obligation of such Grantor, enforceable against such Grantor in accordance with its terms, except as enforceability may be limited by bankruptcy laws, other similar laws affecting creditors' rights and general principles of equity affecting the availability of specific performance and other equitable remedies;

(iv)  upon the proper filing of the UCC Financing Statements naming such Grantor as debtor and the Lender as Secured Party and describing the Collateral in the appropriate filing offices, the security interests granted to the Lender hereunder will constitute a valid and perfected Lien to the extent that a Lien in such Collateral may be perfected by the filing of a financing statement under the UCC in such office, having priority over all other Liens the priority of which can only be determined by the filing of a financing statement in such filing office (except for Liens permitted under Section 6.01 of the Loan Agreement to the extent such permitted Liens would have priority over the Liens in favor of the Lender);

(v)  other than any financing statements, Trademark Security Agreement, Patent Security Agreement and Copyright Security Agreement filed in favor of the Lender, no effective UCC financing statement, fixture filing or other instrument similar in effect under any applicable law covering all or any part of the Collateral is on file in any filing or recording office except for (x) financing statements for which proper termination statements have been delivered to the Lender for filing and (y) financing statements, fixture filings, or intellectual property security agreements filed in connection with Liens permitted by the Loan Agreement;

(vi)  it has indicated on Schedule I(A) (as such schedule may be amended, supplemented or restated from time to time): (w) the type of organization of such Grantor, (x) the jurisdiction of organization of such Grantor, (y) its organizational identification number and (z) the jurisdiction where the chief executive office or its sole place of business is (or if such Grantor is a natural person principal residence and principal place of business), and for the one-year period preceding the date hereof has been, located;

(vii)  the full legal name of such Grantor is as set forth on Schedule I(A) and it has not done in the last five (5) years, and does not do, business under any other name (including any trade-name or fictitious business name) except for those names set forth on Schedule I(A) (as such schedule may be amended, supplemented or restated from time to time);

(viii)  except as provided on Schedule I(B), it has not changed its name, jurisdiction of organization, chief executive office or sole place of business or its corporate structure in any way (e.g. by merger, consolidation, change in corporate form or otherwise) within the past five (5) years;

(ix)  such Grantor has not within the last five (5) years become bound (whether as a result of merger or otherwise) as debtor under a security agreement entered into by another Person, which has not heretofore been terminated other than the

12

agreements identified on Schedule I(C) (as such schedule may be amended, supplemented or restated from time to time);

       (x)  with respect to each agreement identified on Schedule I(C), it has indicated on Schedule I(A) and Schedule I(B) the information required pursuant to clauses (vi) and (vii) of Section 4.1(a) with respect to such Grantor under each such agreement;

       (xi)  none of the Collateral constitutes, or is the Proceeds of, "farm products" (as defined in the UCC); and

       (xii)  none of the Collateral constitutes, or is the Proceeds of, "as-extracted collateral" (as defined in the UCC).

       (b)  Covenants and Agreements.  Each Grantor hereby covenants and agrees that:

       (i)  except for the security interest created by this Agreement, it shall not create or suffer to exist any Lien upon or with respect to any of the Collateral, except the Liens permitted by the Loan Agreement, and such Grantor shall defend the Collateral against all other Persons at any time claiming any interest therein;

       (ii)  it shall not produce, use or knowingly permit any Collateral to be used unlawfully or in violation of (x) any provision of this Agreement, (y) any applicable statute, regulation or ordinance such that a Material Adverse Effect results or (z) any policy of Insurance covering the Collateral; and

       (iii)  except in connection with a transaction permitted by the Loan Agreement (in which case such Grantor shall take all actions reasonably necessary to continue the Lender's security interest in all Collateral owned by it immediately following the applicable transaction), it shall not change such Grantor's name, identity, corporate structure (e.g. by merger, consolidation, change in corporate form or otherwise), sole place of business, chief executive office (except as indicated on Schedule I), type of organization or jurisdiction of organization in each case, without first having provided 15 days' prior notice to the Lender of such change.

### 4.2   Equipment and Inventory.

       (a)  Representations and Warranties.  Each Grantor represents and warrants, as of the date hereof, that:

       (i)  all of the Equipment and Inventory owned by such Grantor (other than Inventory in transit and Inventory or Equipment, in each case, having a value of less than $500,000 at any one location and $1,000,000 in the aggregate for all such locations for all Grantors) included in the Collateral is or has been kept for the past two (2) years only at the locations specified in Schedule II (as such schedule may be amended, supplemented or restated from time to time);

(ii) any Inventory now or hereafter produced by any Grantor included in the Collateral has been and will be produced in material compliance with the requirements of the Fair Labor Standards Act, as amended; and

(iii) except as set forth in <u>Schedule II</u>, none of the Inventory or Equipment included in the Collateral is in the possession of an issuer of a negotiable document (as defined in Section 7-104 of the UCC) therefor or otherwise in the possession of a bailee or warehouseman.

(b)     <u>Covenants and Agreements</u>. Each Grantor covenants and agrees that:

(i) it shall keep all Equipment and Inventory owned by such Grantor (other than Inventory in transit and Inventory or Equipment, in each case, having a value of less than $500,000 at any one location and $1,000,000 in the aggregate for all such locations for all Grantors) in the locations specified in <u>Schedule II</u> (as such schedule may be amended, supplemented or restated from time to time) unless it shall have notified the Lender, within fifteen (15) days of the end of any calendar month in which any such Equipment or Inventory is located to a location not in <u>Schedule II</u> (as such schedule may be amended, supplemented or restated from time to time), identifying such new locations;

(ii) it will take all actions necessary or, at the reasonable request of the Lender, advisable to maintain the continuous validity, perfection and the same or better priority of the Lender's security interest in the Collateral intended to be granted and agreed to hereby, or to enable the Lender to exercise and enforce its rights and remedies hereunder, with respect to such Equipment and Inventory; <u>provided</u> that it shall not be required to obtain any Collateral Access Agreements with respect to any location unless the value of such Equipment and/or Inventory at such location exceeds $500,000;

(iii) it shall keep substantially complete and accurate records of the Inventory consistent with past practice;

(iv) it shall not deliver any Document Evidencing Goods to any Person other than the issuer of such Document to claim the Goods evidenced thereby or the Lender;

(v) if any Equipment and/or Inventory owned by such Grantor is in possession or control of any third party, including, without limitation, any warehouseman, bailee or agent, the relevant Grantor shall join with the Lender in notifying such third party of the Lender's security interest in such Equipment or Inventory, as the case may be, and use its commercially reasonable efforts to obtain a Collateral Access Agreement or other Authenticated acknowledgment from such third party that it is holding such Equipment or Inventory, as the case may be, for the benefit of the Lender; and

(vi) with respect to any item of Equipment which is covered by a certificate of title under a statute of any jurisdiction under the law of which indication of

a security interest on such certificate is required as a condition of perfection thereof, upon the reasonable request of the Lender, it shall (A) identify to the Lender any such Equipment, (B) execute and file with the registrar of motor vehicles or other appropriate authority in such jurisdiction an application or other document requesting the notation or other indication of the security interest created hereunder on such certificate of title and (C) deliver to the Lender copies of all such applications or other documents filed during such calendar quarter, if any, and copies of all such certificates of title issued during such calendar quarter, if any, indicating the security interest created hereunder in such items of Equipment covered thereby.  This provision shall not apply to Equipment having a value of less than $500,000.

### 4.3    Receivables.

(a)    <u>Representations and Warranties</u>.   Each Grantor represents and warrants, as of the date hereof, that:

(i)  each Receivable that is an Account: (a) arises from the sale of goods or performance of services in the ordinary course of the applicable Grantor's business and in accordance with the terms and conditions of all purchase orders, contracts or other documents related thereto and forming part of the contract between the applicable Grantor and the applicable Account Debtor and (b) to such Grantor's knowledge, is and will be enforceable against the applicable Account Debtor;

(ii)  no Receivable in excess of $100,000 individually or $1,000,000 in the aggregate requires the consent of the Account Debtor in respect thereof in connection with the pledge hereunder, except any consent which has been obtained; and

(iii)  no Receivable is evidenced by, or constitutes, an Instrument or Chattel Paper which has not been delivered to, or otherwise subjected to the control of, the Lender to the extent required by, and in accordance with, <u>Section 4.3(c)</u>.

(b)    <u>Covenants and Agreements</u>:  Each Grantor hereby covenants and agrees that:

(i)  it shall keep and maintain at its own cost and expense complete and accurate records of the Receivables substantially consistent with past practice;

(ii)  it shall perform in all material respects all of its obligations arising after the applicable filing date with respect to material Receivables except to the extent that such obligations are being contested in good faith by appropriate proceedings so long as adequate reserves have been set aside on the books of the applicable Grantor;

(iii)  it shall not amend, modify, terminate or waive any provision of (a) any Receivable with a value in excess of $1,000,000 individually in any manner which could reasonably be expected to have a Material Adverse Effect or (b) any other Receivable in any manner which could reasonably be expected, individually or in the aggregate for all such Receivables, to have a Material Adverse Effect;

15

(iv) other than in the ordinary course of business as generally conducted by it and except as otherwise provided in subsection (vi) below, if any Event of Default shall have occurred and be continuing, such Grantor shall not (w) grant any extension or renewal of the time of payment of any Receivable, (x) compromise or settle any dispute, claim or legal proceeding with respect to any Receivable for less than the total unpaid balance thereof, (y) release, wholly or partially, any Person liable for the payment thereof, or (z) allow any credit or discount thereon;

(v) at the reasonable request of the Lender, it shall mark conspicuously, in form and manner reasonably satisfactory to the Lender, all material Chattel Paper, Instruments and other evidence of Receivables (other than any delivered to the Lender as provided herein), as well as the Receivables Records with an appropriate reference to the fact that the Lender has a security interest therein;

(vi) except as otherwise provided in this subsection and to the extent that such Grantor has not determined that collection of such Receivable is not commercially practicable, such Grantor shall continue to collect all amounts due or to become due to such Grantor under the Receivables and any Supporting Obligation related to such Receivables and diligently exercise each material right it may have under any such Receivable, any Supporting Obligation related to such Receivables or Collateral Support related to such Receivables, in each case, at its own expense, and in connection with such collections and exercise such Grantor shall take such action as such Grantor or the Lender may reasonably deem necessary or advisable. Notwithstanding the foregoing, the Lender shall have the right, if any Event of Default shall have occurred and be continuing, to notify, or require any Grantor to notify, any Account Debtor of the Lender's security interest in the Receivables and any Supporting Obligation related to such Receivables and, in addition, if any Event of Default shall have occurred and be continuing, the Lender may: (1) direct the Account Debtors under any Receivables to make payment of all amounts due or to become due to such Grantor thereunder directly to the Lender; (2) notify, or require any Grantor to notify, each Person maintaining a lockbox or similar arrangement to which Account Debtors under any Receivables have been directed to make payment to remit all amounts representing collections on checks and other payment items from time to time sent to or deposited in such lockbox or other arrangement directly to the Lender; and (3) enforce, at the expense of such Grantor, collection of any such Receivables and to adjust, settle or compromise the amount or payment thereof, in the same mariner and to the same extent as such Grantor might have done. If the Lender notifies any Grantor that it has elected to collect the Receivables in accordance with the preceding sentence, any payments of Receivables received by such Grantor shall be forthwith (and in any event within two (2) Business Days) deposited by such Grantor in the exact form received, duly indorsed by such Grantor to the Lender if required, in the account designated by the Lender pursuant to the Credit Agreement and maintained under the control of the Lender, and until so turned over, all amounts and Proceeds (including checks and other instruments) received by such Grantor in respect of the Receivables, any Supporting Obligation related to such Receivables or Collateral Support related to such Receivables shall be received in trust for the benefit of the Lender hereunder and shall be segregated from other funds of such Grantor and such Grantor shall not adjust, settle or compromise the amount or payment of any Receivable, or

16

release wholly or partly any Account Debtor or obligor thereof, or allow any credit or discount thereon; and

(vii)  it shall use all commercially reasonable efforts to keep in full force and effect any Supporting Obligation or Collateral Support, in each case, relating to any Receivable.

(c)  <u>Delivery and Control of Receivables</u>.  With respect to any Receivables in excess of $500,000 individually or $1,000,000 in the aggregate at any one time for all account debtors, that is evidenced by, or constitutes, Chattel Paper or Instruments, each Grantor shall cause each originally executed copy thereof to be delivered to the Lender (or its agent or designee) appropriately indorsed to the Lender or indorsed in blank: (i) with respect to any such Receivables in existence on the date hereof, on or prior to the date hereof and (ii) with respect to any such Receivables hereafter arising, within ten (10) days of such Grantor acquiring rights therein. With respect to any Receivables in excess of $500,000 individually or $1,000,000 in the aggregate which would constitute "electronic chattel paper" under the UCC, each Grantor shall take all steps necessary to give the Lender control over such Receivables (within the meaning of Section 9-105 of the UCC): (i) with respect to any such Receivables in existence on the date hereof, on or prior to the date hereof and (ii) with respect to any such Receivables hereafter arising, within ten (10) days of such Grantor acquiring rights therein. Any Receivable not otherwise required to be delivered or subjected to the control of the Lender in accordance with this subsection (c) shall be delivered or subjected to such control upon request of the Lender if any Event of Default shall have occurred and be continuing.

### 4.4    Investment Related Property.

#### 4.4.1    Pledged Equity Interests.

(a)  <u>Representations and Warranties</u>.  Each Grantor hereby represents and warrants, as of the date hereof, that:

(i)  <u>Schedule III</u> (as such schedule may be amended, supplemented or restated from time to time) sets forth under the headings "Pledged Stock," "Pledged LLC Interests," "Pledged Partnership Interests," and "Pledged Trust Interests," respectively, all of the Pledged Stock, Pledged LLC Interests, Pledged Partnership Interests and Pledged Trust Interests owned by such Grantor and such Pledged Equity Interests constitute the percentage of issued and outstanding shares of stock, percentage of membership interests, percentage of partnership interests or percentage of beneficial interest of the respective issuers thereof indicated on such Schedule;

(ii)  Except as set forth on <u>Schedule III(B)</u> it has not acquired any Equity Interests of another entity within the past five (5) years.

(iii)  it is the record and beneficial owner of the Pledged Equity Interests free of all Liens, rights or claims of other Persons other than the security interests and Liens created by this Agreement and Liens permitted by the Loan Agreement and there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property

17

that is convertible into, or that requires the issuance or sale of, any Pledged Equity Interests, other than the rights of the Lender under any Loan Document, the LLC Agreement and/or the Members' Agreement;

(iv)  without limiting the generality of clause (iv) of <u>Section 4.1(a)</u>, no consent of any Person including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary in connection with the creation, perfection or first priority status of the security interest of the Lender in any Pledged Equity Interests or the exercise by the Lender of the voting or other rights provided for in this Agreement or the exercise of remedies in respect thereof; and

(v)  None of the Pledged LLC Interests nor Pledged Partnership Interests are or represent interests in issuers that: (a) are registered as investment companies, (b) are dealt in or traded on securities exchanges or markets or (c) have opted to be treated as securities under the Uniform Commercial Code of any jurisdiction.

(b)      Covenants and Agreements. Each Grantor hereby covenants and agrees that:

(i)  other than as permitted under the Loan Agreement, without the unanimous approval of the Board, it shall not vote to enable or take any other action to: (a) amend or terminate any partnership agreement, limited liability company agreement, certificate of incorporation, by-laws or other organizational documents in any way that materially adversely changes the rights of such Grantor with respect to any Pledged Equity Interests or adversely affects the validity, perfection or priority of the Lender's security interest therein, (b) permit any issuer of any Pledged Equity Interest to issue any additional stock, partnership interests, limited liability company interests or other equity interests of any nature or to issue securities convertible into or granting the right of purchase or exchange for any stock or other equity interest of any nature of such issuer, unless such interests are pledged to the Lender hereunder, (c) waive any default under or breach of any terms of any organizational document relating to the issuer of any Pledged Equity Interest or the terms of any Pledged Debt having a principal amount in excess of $1,000,000 individually or $2,000,000 in the aggregate for all Grantors, or (d) cause any issuer of any Pledged Partnership Interests or Pledged LLC Interests which are not securities (for purposes of the UCC) on the date hereof to elect or otherwise take any action to cause such Pledged Partnership Interests or Pledged LLC Interests to be treated as securities for purposes of the UCC; <u>provided </u>that, if any issuer of any Pledged Partnership Interests or Pledged LLC Interests takes any such action to cause such Pledged Partnership Interests or Pledged LLC Interests to be treated as securities (for purposes of the UCC), such Grantor shall promptly notify the Lender of any such election or action after becoming aware thereof and, in such event, shall take all steps reasonably necessary or advisable to establish the Lender's "control" thereof;

(ii)  it shall comply in all material respects with all of its obligations under any partnership agreement or limited liability company agreement

relating to Pledged Partnership Interests or Pledged LLC Interests and shall enforce all of its material rights with respect to any Pledged Equity Interests;

(iii) other than as may be permitted by the Loan Agreement, without the unanimous approval of the Board, it shall not permit any issuer of any Pledged Equity Interest, which issuer is under such Grantor's Control, to merge or consolidate with any other Person, and with respect to any other issuer of any Pledged Equity Interest, shall not vote in favor of any merger or consolidation by such issuer with any other Person, unless (a) such issuer creates a security interest that is perfected by a filed financing statement (that is not effective solely under Section 9-508 of the UCC) in collateral in which such new debtor has or acquires rights, and (b) all of the outstanding capital stock or other equity interests owned by it (other than Excluded Equity Interest) of the surviving or resulting corporation, limited liability company, partnership or other entity is, upon such merger or consolidation, pledged hereunder; and

(iv) each Grantor consents to the grant by each other Grantor of a security interest in all Pledged Equity Interests to the Lender and, without limiting the foregoing, consents (x) to the transfer of any Pledged Partnership Interest and any Pledged LLC Interest to the Lender or its nominee if any Event of Default shall have occurred and be continuing, and (y) to the substitution of the Lender or its nominee as a partner in any partnership or as a member in any limited liability company with all the rights and powers related thereto if any Event of Default shall have occurred and be continuing.

**4.4.2   Pledged Debt**.  Each Grantor hereby represents and warrants as of the date hereof that: (i) Schedule III (as such schedule may be amended, supplemented or restated from time to time) sets forth under the heading "Pledged Debt" all of the Pledged Debt owned by such Grantor in excess of $100,000 individually or $500,000 in the aggregate for all issuers of such Pledged Debt; (ii) to the knowledge of such Grantor, all of such Pledged Debt has been duly authorized, authenticated or issued, and delivered and is the legal, valid and binding obligation of the issuers thereof; and (iii) to the knowledge of such Grantor, the issuer of such Pledged Debt is not in default of its obligations thereunder in any material respect..

### 4.4.3   Investment Accounts.

(a)   Representations and Warranties.  Each Grantor hereby represents and warrants, as of the date hereof, that:

(i) Schedule VII (as such schedule may be amended, supplemented or restated from time to time) sets forth under the headings "Securities Accounts" and "Commodities Accounts," respectively, all of the Securities Accounts and Commodities Accounts in which such Grantor has an interest; and

(ii) such Grantor is the sole entitlement holder of each such Securities Account and Commodities Account, and such Grantor has not consented to, and is not otherwise aware of, any Person (other than the Lender pursuant hereto) having "control" (within the meanings of Sections 8-106 and 9-106 of the UCC) over, or any

other interest in, any such Securities Account or Commodity Account or any securities or other property credited thereto, other than the Lender.

(b)    Delivery and Control.  With respect to any Investment Related Property consisting of Securities Accounts or Securities Entitlements in excess of $250,000 individually or $500,000 in the aggregate, it shall use commercially reasonable efforts to cause the securities intermediary maintaining such Securities Account or Securities Entitlement to enter into an agreement in form and substance reasonably satisfactory to the Lender pursuant to which it shall agree to comply with the Lender's "entitlement orders" without further consent by such Grantor, provided that such securities intermediary may also comply with "entitlement orders" of such Grantor until it receives a notice from the Lender that it is no longer to comply with "entitlement orders" of such Grantor.    Each Grantor shall have used commercially reasonable efforts to cause the securities intermediary maintaining any such Securities Accounts or Securities Entitlements that are created or acquired after the date hereof, as of or prior to the deposit or transfer of any such Securities Entitlements or funds, whether constituting moneys or investments, into such Securities Accounts or Deposit Accounts.

### 4.4.4    Deposit Accounts.

(a)    Representations and Warranties. Each Grantor hereby represents and warrants, as of the date hereof, that:

(i) Schedule VII (as such schedule may be amended, supplemented or restated from time to time) sets forth under the heading "Deposit Accounts," all of the Deposit Accounts maintained by such Grantor in which all cash, checks or similar payments relating to or constituting payments made in respect of Receivables will be deposited (each, a "Collateral Deposit Account"); and

(ii) such Grantor is the sole account holder of each such Collateral Deposit Account and such Grantor has not consented to, and is not otherwise aware of, any Person (other than the Lender pursuant hereto) having "control" (within the meaning of Section 9-104 of the UCC) over, or any other interest in, any such Collateral Deposit Account or any money or other property deposited therein.

(b)    Covenants and Agreements. Each Grantor hereby covenants and agrees that on or before the date hereof, each Grantor has executed and delivered to the Lender, for each Collateral Deposit Account consisting of in excess of $250,000 individually or $500,000 in the aggregate, an agreement substantially in the form of Annex VI or such other agreement in form and substance reasonably satisfactory to the Lender, pursuant to which the Lender shall have "control" (within the meaning of Section 9-104 of the UCC) over such Collateral Deposit Account.

### 4.4.5    Investment Related Property Generally.

(a)    Covenants and Agreements.  Each Grantor hereby covenants and agrees that:

(i) in the event it acquires rights in any Investment Related Property with a value in excess of $1,000,000 after the date hereof, it shall deliver to the Lender a completed Pledge Supplement, substantially in the form of <u>Annex I</u>, together with all Supplements to Schedules thereto, reflecting such new Investment Related Property. Notwithstanding the foregoing, it is understood and agreed that the security interest of the Lender shall attach to all Investment Related Property immediately upon any Grantor's acquisition of rights therein and shall not be affected by the failure of any Grantor to deliver a supplement to <u>Schedule III</u> as required hereby;

(ii) except as provided in the next sentence, in the event such Grantor receives any dividends, interest or distributions on any Investment Related Property, or any securities or other property upon the merger, consolidation, liquidation or dissolution of any issuer of any Investment Related Property, then (a) such dividends, interest or distributions and securities or other property shall be included in the definition of Collateral without further action and (b) such Grantor shall to the extent otherwise required herein immediately take all reasonable steps, if any, necessary or advisable to ensure the validity, perfection, priority and, if applicable, control of the Lender over such Investment Related Property (including, without limitation, delivery thereof to the Lender) and pending any such action such Grantor shall be deemed to hold such dividends, interest, distributions, securities or other property in trust for the benefit of the Lender and shall be segregated from all other property of such Grantor. Notwithstanding the foregoing, unless an Event of Default shall have occurred and be continuing or a mandatory prepayment is required pursuant to the terms of the Loan Agreement, the Lender authorizes each Grantor to retain all ordinary cash dividends and distributions paid and all payments of principal and interest paid by or on behalf of the issuer; and

(iii) if any issuer of any Investment Related Property is located in a jurisdiction outside of the United States, and the value of such Investment Related Property is greater than $1,000,000, such Grantor shall take such additional commercially reasonable actions, including, without limitation, causing the issuer to register the pledge on its books and records or making such filings or recordings, in each case as may be necessary, under the laws of such issuer's jurisdiction to insure the validity, perfection and priority of the security interest of the Lender (but in the case of a Foreign Subsidiary, in no event for more than 65% of the total combined voting power of all classes of stock entitled to vote of such subsidiary); <u>provided</u>; <u>however</u>, that, with respect to any issuer of Pledged Equity Interest that is organized outside of the United States, Canada, or Bermuda or is not a Subsidiary, no Grantor shall be required to take any action under the laws of the such issuer's jurisdiction of organization to perfect or register the pledge of such Pledged Equity Interest or to take such other action in any foreign jurisdiction unless the net assets of such issuer (as determined in good faith by the Board and measured as of the date hereof for existing issuers or as of the date such issuer was formed or acquired in the case of future issuers, without giving effect to subsequent changes in value) exceeds $2.0 million and such action otherwise would not be unduly burdensome in relation to the value of the Collateral with respect to which such action is proposed to be taken; <u>provided</u>, <u>further</u>, <u>however</u>, that the aggregate net assets of all such issuers (as determined in good faith by the Board and measured as of the date hereof for existing issuers or as of the date such issuer was formed or acquired in the case of future issuers, without giving

21

effect to subsequent changes in value) excluded pursuant to this provision does not exceed $10.0 million. If any Event of Default shall have occurred and be continuing, the Lender shall have the right, without notice to any Grantor, to (x) transfer all or any portion of the Investment Related Property to its name or the name of its nominee or agent and (y) exchange any certificates or instruments representing any Investment Related Property for certificates or instruments of smaller or larger denominations.

(b)       Delivery and Control. Each Grantor agrees that with respect to any Investment Related Property in which it currently has rights it shall comply with the provisions of this Section 4.4.5(b) on or before the date hereof, except as otherwise expressly provided in this Section 4.4.5(b), and with respect to any Investment Related Property hereafter acquired by such Grantor it shall comply with the provisions of this Section 4.4.5(b) promptly upon acquiring rights therein, in each case in form and substance reasonably satisfactory to the Lender. With respect to any Investment Related Property that is represented by a certificate or that is an "instrument" (other than any Investment Related Property credited to a Securities Account) it shall cause such certificate or instrument to be delivered to the Lender, indorsed in blank by an "effective indorsement" (as defined in Section 8-107 of the UCC), regardless of whether such certificate constitutes a "certified security" for purposes of the UCC; provided, that, the applicable Grantor shall have until the date that is the 30th day after the date hereof to deliver to the Lender, indorsed in blank by an "effective indorsement" (as defined in Section 8-107 of the UCC), such certificated Investment Related Property issued by a Subsidiary that is organized outside of the United States; it being understood that no certificates issued by an issuer located in a jurisdiction outside of the United States shall be required to be delivered under this Section 4.4.5(b) to the extent that such certificates are not required to be delivered pursuant to Section 4.4.5(a)(iii).   With respect to any Investment Related Property, that is an "uncertificated security" for purposes of the UCC (other than any "uncertificated securities" credited to a Securities Account), it shall cause the issuer of such uncertificated security, which issuer is under Grantor's Control, to either (i) register the Lender as the registered owner thereof on the books and records of the issuer or (ii) execute an agreement in form and substance reasonably satisfactory to Lender pursuant to which such issuer agrees to comply with the Lender's instructions with respect to such uncertificated security without further consent by such Grantor, provided that such issuer may also comply with instructions of such Grantor with respect to such uncertificated security until it receives a notice from the Lender that it is no longer to comply with instructions of such Grantor; it being understood that no issuer located in a jurisdiction outside of the United States shall be required to (i) register the Lender as the registered owner thereof on the books and records of the issuer or (ii) execute an agreement in form and substance reasonably satisfactory to Lender under this Section 4.4.5(b), in each case, to the extent that such actions are excused from being taken pursuant to Section 4.4.5(a)(iii).

(c)       Voting and Distributions.

(i) Unless an Event of Default shall have occurred and be continuing:

(1)       except as otherwise provided under the covenants and agreements relating to Investment Related Property in this Agreement or elsewhere herein or in the Loan Agreement, each Grantor shall be entitled to exercise or refrain

22

from exercising any and all voting and other consensual rights pertaining to the Investment Related Property or any part thereof for any purpose not inconsistent with the terms of this Agreement or the Loan Agreement; and

(2)    the Lender shall promptly execute and deliver (or cause to be executed and delivered) to each Grantor all proxies, and other instruments as such Grantor may from time to time reasonably request for the purpose of enabling such Grantor to exercise the voting and other consensual rights when and to the extent which it is entitled to exercise pursuant to clause (A) above; and

(ii)  If any Event of Default shall have occurred and be continuing:

(1)    all rights of each Grantor to exercise or refrain from exercising the voting and other consensual rights which it would otherwise be entitled to exercise pursuant hereto shall cease and all such rights shall thereupon become vested in the Lender who shall thereupon have the sole right to exercise such voting and other consensual rights; and

(2)    in order to permit the Lender to exercise the voting and other consensual rights which it may be entitled to exercise pursuant hereto and to receive all dividends and other distributions which it may be entitled to receive hereunder: (1) each Grantor shall promptly execute and deliver (or cause to be executed and delivered) to the Lender all proxies, dividend payment orders and other instruments as the Lender may from time to time reasonably request and (2) each Grantor acknowledges that the Lender may utilize the power of attorney set forth in Section 6.

### 4.5    Material Contracts.

(a)    Representations and Warranties. Each Grantor hereby represents and warrants, as of the date hereof, that:

(i)  each Material Contract to which such Grantor is a party has been duly authorized, executed and delivered by such Grantor and, to the knowledge of such Grantor, has been duly authorized, executed and delivered by each other party thereto;

(ii)  each Material Contract to which such Grantor is a party is in full force and effect and is binding upon and enforceable against such Grantor, and to its knowledge, all other parties thereto, in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other laws affecting creditors' rights generally;

(iii)  as of the date hereof, no party to any Material Contract to which such Grantor is a party has to its knowledge failed to perform its obligations thereunder in any material respect and neither such Grantor, nor to its knowledge, any other Person party thereto is likely to become in default in the performance of its obligations thereunder in any material respect;

LA\1729098.1

(iv) as of the date hereof, no party to any Material Contract to which such Grantor is a party has asserted or to such Grantor's knowledge, threatened to assert any defenses, counterclaims or right of set-off with respect to such Material Contract; and

(v) no Material Contract to which such Grantor is a party prohibits assignment of such Grantor's right to payment or requires consent of or notice to any Person in connection with the assignment to the Lender hereunder of Grantor's right to payment, except such as has been given or made or is currently sought pursuant to clause (iv) of Section 4.5(b).

(b)     Covenants and Agreements.   Each Grantor hereby covenants and agrees that:

(i) the Lender may at any time notify, or require any Grantor to so notify, the counterparty on any Material Contract of the security interest of the Lender therein. In addition, if any Event of Default shall have occurred and be continuing, the Lender may upon written notice to the applicable Grantor, notify, or require any Grantor to notify, the counterparty to make all payments under the Material Contracts directly to the Lender;

(ii) it shall promptly and diligently exercise each material right (except the right of termination) it may have under any Material Contract, any Supporting Obligation related to such Material Contract or Collateral Support related to such Material Contract, in each case, at its own expense, and in connection with such collections and exercise, such Grantor shall take such action as such Grantor may reasonably deem necessary or advisable;

(iii) it shall use all commercially reasonable efforts to keep in full force and effect any Supporting Obligation or Collateral Support, in each case, relating to any Material Contract to which such Grantor is a party; and

(iv) after the date hereof, with respect to any Material Contract that is a Non-Assignable Contract, each Grantor shall, unless the relevant restrictions on transfer are overridden by Section 9-406 of the UCC, within thirty (30) days after the date hereof or, if such Non-Assignable Contract is entered into after the date hereof within thirty (30) days thereafter, request in writing the consent of the counterparty or counterparties to the Non-Assignable Contract pursuant to the terms of such Non-Assignable Contract or applicable law to the assignment or granting of a security interest in such Non-Assignable Contract to Lender and use commercially reasonable efforts to obtain such consent as soon as practicable thereafter.

### 4.6     Letter of Credit Rights.

(a)     Representations and Warranties.   Each Grantor hereby represents and warrants, as of the date hereof, that:

(i) all letters of credit to which such Grantor has rights with a value in excess of $1,000,000 is listed on <u>Schedule IV</u> (as such schedule may be amended, supplemented or restated from time to time); and

(ii) it has obtained the consent of each issuer of any material letter of credit to the assignment of the proceeds of the letter of credit to the Lender.

(b)    <u>Covenants and Agreements</u>.  Each Grantor hereby covenants and agrees that with respect to any letter of credit with a value in excess of $1,000,000 hereafter arising it shall obtain the consent of the issuer thereof to the assignment of the proceeds of the letter of credit to the Lender and shall deliver to the Lender a completed Pledge Supplement, substantially in the form of <u>Annex I</u>, together with all related Supplements to Schedules thereto.

### 4.7    **Intellectual Property.**

(a)    <u>Representations and Warranties</u>.  Except as disclosed in <u>Schedule V(e)</u> (as such schedule may be amended, supplemented or restated from time to time), each Grantor hereby represents and warrants, as of the date hereof, that:

(i) <u>Schedule V</u> (as such schedule may be amended, supplemented or restated from time to time) sets forth a true and complete list of (A) (l) all United States registrations of and applications for Patents, Trademarks, and Copyrights (if any) owned by such Grantor and (2) all state and foreign registrations of and applications for Patents, Trademarks, and Copyrights (if any) owned by such Grantor, which in the case of this clause (2) is material to the business of such Grantor and (B) all Patent Licenses, Trademark Licenses, Copyright Licenses, and Trade Secret Licenses (x) granting rights to any third party to use any Intellectual Property owned by or licensed to any Grantor and is material to the business of such Grantor or (y) granting rights to any Grantor to use Intellectual Property owned by a third party and that is material to the business of such Grantor;

(ii) all issued Patents and registrations and applications for other Intellectual Property identified on <u>Schedule V</u> are standing in the name of such Grantor as identified on <u>Schedule V</u>;

(iii) such Grantor is the sole and exclusive owner of the entire right, title, and interest in and to, or has secured licenses for, all Intellectual Property of such Grantor on <u>Schedule V</u> (as such schedule may be amended, supplemented or restated from time to time), and such Grantor owns or has the valid right to use all other Intellectual Property used in or necessary to conduct its business free and clear of all Liens, claims, encumbrances and material licenses, granted by such Grantor, except for the security interests created by this Agreement, any other Loan Document and the Liens permitted by the Loan Agreement and the Intellectual Property Licenses set forth on <u>Schedule V</u> (as such schedule may be amended, supplemented or restated from time to time);

(iv) all Intellectual Property owned by such Grantor and used or useful in the operation of its business and, to such Grantor's knowledge, all Intellectual

Property licensed to such Grantor and used or useful in its business: (i) is subsisting; (ii) to such Grantor's knowledge, is valid and enforceable and (iii) has not been adjudged invalid or unenforceable, in whole or in part;

(v)    such Grantor has performed all acts and has paid all renewal, maintenance, and other fees and taxes required to maintain each item of Intellectual Property set forth on <u>Schedule V</u>, in full force and effect except where (A) in the reasonable business judgment of the Borrower, it is in the best economic interest of the Grantors taken as a whole not to preserve and maintain such Intellectual Property and (B) such failure to preserve such Intellectual Property could not reasonably be expected to have a Material Adverse Effect;

(vi)    no action or proceeding before any court or administrative authority is pending or, to such Grantor's knowledge, threatened against such Grantor challenging such Grantor's right to register, the validity of, or such Grantor's rights to own, use, or license any Intellectual Property;

(vii)    such Grantor uses adequate and consistent standards of quality in the manufacture, distribution, and sale of all products and services sold under or in connection with each Trademark owned by such Grantor and has taken reasonable action to insure that licensees of each such Trademark uses such adequate and consistent standards of quality;

(viii)    to such Grantor's knowledge, the conduct of such Grantor's business does not infringe upon any trademark, patent, copyright, trade secret or similar intellectual property right owned or controlled by a third party where such an infringement could reasonably be expected to have a Material Adverse Effect; no claim is pending, or to such Grantor's knowledge, threatened, that the conduct of such Grantor's business or the use of any Intellectual Property owned or used by such Grantor violates the asserted rights of any third party where such a claim could reasonably be expected to have a Material Adverse Effect;

(ix)    no third party is, to such Grantor's knowledge, infringing upon, misappropriating or otherwise violating any Intellectual Property owned or used by such Grantor, or any of its respective licensees, in any material respect, and no claims of infringement or other violation have been asserted by such Grantor that remain unresolved;

(x)    such Grantor has not made or entered into any contracts to assign, sell, transfer, or grant an option to assign, sell or transfer any Intellectual Property included in the Collateral that is in use or is planned on being used in the future and has more than negligible value, that has not been terminated or released, unless permitted by this Agreement or the Loan Agreement;

(xi)    such Grantor has not made or entered into any contracts to assign, sell, transfer, or grant an option to assign, sell or transfer any Intellectual Property included in the Collateral that is in use or is planned on being used in the future and has

more than negligible value, that has not been terminated or released or is permitted by the Loan Agreement;

(xii) such Grantor is not a party to any contract pursuant to which it has obtained the exclusive rights to use any third party's Copyrights, except as set forth on <u>Schedule V</u>, and no license of Intellectual Property to which such Grantor is a party is reasonably likely to be construed as an assignment of such licensed Intellectual Property to such Grantor; and

(xiii) there is no effective financing statement or other document or instrument now executed, or on file or recorded in any public office, granting a security interest in or otherwise encumbering any part of the Intellectual Property owned, used or held for use by such Grantor, other than in favor of the Lender or evidencing liens permitted by the Loan Agreement.

(b)      <u>Covenants and Agreements</u>. Each Grantor hereby covenants and agrees (except with respect to Intellectual Property that is both not in use, including being practiced or licensed by any Grantor, and is of negligible value) as follows:

(i) such Grantor shall not do any act or omit to do any act whereby any of the Intellectual Property included in the Collateral may lapse, be assigned or become abandoned, dedicated to the public, or unenforceable unless (A) in the reasonable business judgment of the Borrower, it is in the best economic interest of the Grantors taken as a whole not to preserve and maintain such Intellectual Property and (B) the failure to preserve such Intellectual Property could not reasonably be expected to have a Material Adverse Effect;

(ii) such Grantor shall record its interest in any exclusive license of a Copyright to such Grantor (which license is material to its business) in the United States Copyright Office within thirty (30) days of the execution of such license;

(iii) such Grantor shall promptly notify the Lender if it knows that any item of registered Intellectual Property or other Intellectual Property material to the business of such Grantor included in the Collateral that is in use or is planned on being used in the future and has more than negligible value that is likely to become (a) abandoned or dedicated to the public or placed in the public domain, (b) invalid or unenforceable, or (c) subject to any adverse determination or development (including the institution of proceedings) in any action or proceeding in the USPTO, the United States Copyright Office, any state registry, any foreign counterpart of the foregoing, or any court arbitral tribunal or regulatory agency, in each of foregoing clauses (a)-(c) other than as permitted under <u>Section 4.7(b)(i)</u>;

(iv) such Grantor shall take all commercially reasonable steps in the USPTO, the United States Copyright Office, any state registry or any foreign counterpart of the foregoing, including the payment of applicable fees, to pursue any application for, and maintain any issued Patent and registration of, each Trademark, Patent, and Copyright owned by such Grantor and which is now or shall become included

27

in the Collateral including, but not limited to, those items on <u>Schedule V</u> (as such schedule may be amended, supplemented or restated from time to time) except for those items of Intellectual Property that are no longer in use, including practiced or licensed, or planned on being used in the future and which have negligible value and except where (A) in the reasonable business judgment of the Borrower, it is in the best economic interest of the Grantors taken as a whole not to pursue, preserve or maintain such Intellectual Property and (B) the failure to pursue, preserve or maintain such Intellectual Property could not reasonably be expected to have a Material Adverse Effect;

(v) in the event that any Intellectual Property owned by or exclusively licensed to such Grantor is infringed, misappropriated, diluted or otherwise violated by a third party, such Grantor shall promptly take all commercially reasonable actions to stop such infringement, misappropriation, dilution or other violation and to protect its exclusive rights in such Intellectual Property, except where (A) in the reasonable business judgment of the Borrower, it is in the best economic interest of the Grantors taken as a whole not to take such actions and (B) the failure to take such actions could not reasonably be expected to have a Material Adverse Effect;

(vi) such Grantor shall maintain adequate standards of quality of products and services sold under any Trademark owned by and material to the business of such Grantor (as reasonably determined by such Grantor but in no event less than as required to maintain its trademark rights), and such Grantor shall take commercially reasonable steps necessary to insure that licensees of such Trademarks use such standards of quality;

(vii) such Grantor shall take commercially reasonable steps necessary to protect the secrecy of all material Trade Secrets;

(viii) such Grantor shall promptly (but in no event less than quarterly) report to the Lender of any and all of the following: (i) the filing by such Grantor or on its behalf of any application to register any Intellectual Property owned by such Grantor in whole or in part, with the USPTO, the United States Copyright Office, any state registry or any foreign counterpart of the foregoing, (ii) the registration of any such Intellectual Property owned by such Grantor in whole or in part by any such office, or (iii) the acquisition by such Grantor of any issued Patent, or application or registration of any other Intellectual Property , and (iv) the existence of any contract granting an Intellectual Property license which is in the nature of a contract described in <u>Section 4.7(a)(xi)</u> , and, in each case, such Grantor shall execute and deliver to the Lender a completed Pledge Supplement, substantially in the form of <u>Annex I</u>, together with all Supplements to Schedules thereto and signed counterparts of the Trademark Security Agreement, Patent Security Agreement, or Copyright Security Agreement, as applicable, together with all supplements to the schedules thereto;

(ix) except with the unanimous approval of the Board or as permitted under the Loan Agreement, such Grantor shall not execute, and there will not be on file in any public office, any financing statement or other document or instruments, except financing statements or other documents or instruments filed or to be filed in favor

LA\1729098.1

of the Lender and evidencing Liens permitted by the Loan Agreement and such Grantor shall not sell, assign, transfer, license, grant any option with respect to, or create any Lien upon, the Intellectual Property, except for the security interest created by this Agreement and Liens permitted by the Loan Agreement;

(x) such Grantor shall use commercially reasonable efforts to avoid the inclusion in any Patent License, Copyright License, Trademark License, Trade Secret License or any other contract regarding Intellectual Property to which it hereafter becomes a party and which is material to its business, of provisions that would impair or prevent the creation of a security interest in, or the assignment of, such Grantor's rights and interests under such contract or in any Intellectual Property acquired under such contracts;

(xi) such Grantor shall use statutory notice of registration in connection with its use of any registered Trademarks, proper marking practices in connection with the use of Patents, and appropriate notice of copyright in connection with the publication of Copyrighted material, except where the failure to do so would not materially impair such Grantor's right to enforce such Intellectual Property or collect damages; and

(xii) such Grantor shall continue to collect, at its own expense, all amounts and royalties due or to become due to such Grantor in respect of any Intellectual Property. In connection with such collections, such Grantor may take (and, at the Lender's reasonable direction, shall take) such action as such Grantor or the Lender may reasonably deem necessary or advisable to enforce collection of such amounts. Notwithstanding the foregoing, the Lender shall have the right at any time at any time an Event of Default shall have occurred and be continuing, to notify, or require any Grantor to notify, any obligors with respect to any such amounts of the existence of the security interest created hereby.

### 4.8    Commercial Tort Claims.

(a)    <u>Representations and Warranties</u>.  Each Grantor hereby represents and warrants, as of the date hereof, that <u>Schedule VI</u> (as such schedule may be amended, supplemented or restated from time to time) sets forth all Commercial Tort Claims of such Grantor; and

(b)    <u>Covenants and Agreements</u>.  Each Grantor hereby covenants and agrees that with respect to any Commercial Tort Claim hereafter arising it shall deliver to the Lender a completed Pledge Supplement, substantially in the form of <u>Annex I</u>, together with all Supplements to Schedules thereto, identifying such new Commercial Tort Claims.

## SECTION 5    FURTHER ASSURANCES

(a)    Each Grantor agrees that, from time to time, at the expense of such Grantor, that it shall promptly Authenticate, execute and deliver all further instruments and documents, and take all further action, that may be necessary, or that the Lender may reasonably request, in order to create and/or maintain the validity, perfection or priority of and protect any

29

security interest granted or purported to be granted hereby or to enable the Lender to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, each Grantor shall:

        (i) file such financing or continuation statements, or amendments thereto, and execute and deliver such other agreements, instruments, endorsements, powers of attorney or notices, as may be necessary, or as the Lender may reasonably request, in order to perfect and preserve the security interests granted or purported to be granted hereby;

        (ii) take all actions necessary to ensure the recordation of appropriate evidence of the Liens and security interest granted hereunder in Intellectual Property with any intellectual property registry in which said Intellectual Property is registered or in which an application for registration is pending including, without limitation, the USPTO, the United States Copyright Office, the various Secretaries of State, and the foreign counterparts on any of the foregoing, where such foreign counterparts are material to the business of such Grantor;

        (iii) at any reasonable time during normal business hours, upon reasonable request by the Lender, make all or part of the Collateral as directed by the Lender and available for inspection by the Lender; and

        (iv) at the Lender's request, appear in and defend any action or proceeding that may adversely affect such Grantor's title to or the Lender's security interest in all or any part of the Collateral.

        (b)    Each Grantor hereby authorizes the Lender to take all steps it deems reasonably necessary to maintain and preserve the Collateral, consistent with such Grantor's obligations to do so hereunder, including, with respect to Intellectual Property included in the Collateral, the making of additional filings, the payment of maintenance fees, and the defense of challenges to such Grantor's title or validity, all at such Grantor's expense.

        (c)    Each Grantor hereby authorizes the filing of any financing statements or continuation statements, and amendments to financing statements, or any similar document in any jurisdictions and with any filing offices as the Lender may determine, in its reasonable discretion, are necessary or advisable to perfect the security interest granted to the Lender herein. Such financing statements may describe the Collateral in the same manner as described herein or may contain an indication or description of collateral that describes such property in any other manner as the Lender may determine, in its reasonable discretion, is necessary, advisable or prudent to ensure the perfection of the security interest in the Collateral granted to the Lender herein, including, without limitation, describing such property as "all assets" or "all personal property, whether now owned or hereafter acquired." Each Grantor shall furnish to the Lender from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Lender may reasonably request, all in reasonable detail.

(d)    Each Grantor hereby authorizes the Lender to modify this Agreement after obtaining such Grantor's written approval of or signature to such modification by amending <u>Schedule V</u> (as such schedule may be amended, supplemented or restated from time to time) to include reference to any right, title or interest in any existing Intellectual Property or any Intellectual Property acquired or developed by such Grantor after the execution hereof.

## SECTION 6     LENDER APPOINTED ATTORNEY-IN-FACT

**6.1     Power of Attorney**.  Each Grantor hereby irrevocably appoints the Lender (such appointment being coupled with an interest) as such Grantor's attorney-in-fact, with full authority in the place and stead of such Grantor and in the name of such Grantor, the Lender or otherwise, from time to time in the Lender's reasonable discretion, to take any action and to execute any instrument that the Lender may deem reasonably necessary or advisable to accomplish the purposes of this Agreement, including, without limitation, the following:

(a)    to prepare, sign, and file for recordation in any intellectual Property registry, appropriate evidence of the lien and security interest granted herein in the Intellectual Property in the name of such Grantor as assignor or pledgor;

(b)    to take or cause to be taken all actions necessary to perform or comply or cause performance or compliance with the terms of this Agreement, including, without limitation, access to pay or discharge taxes or Liens (other than the security interests created by this Agreement and Liens permitted by the Loan Agreement) levied or placed upon or threatened against the Collateral, the legality or validity thereof and the amounts necessary to discharge the same to be determined by the Lender in its reasonable discretion, any such payments made by the Lender to become obligations of such Grantor to the Lender, due and payable immediately without demand; and

(c)    upon occurrence and during continuance of an Event of Default, to receive, endorse and collect any drafts or other instruments, documents and chattel paper in connection with clause (b) above; and

(d)    if any Event of Default shall have occurred and be continuing:

(i) to file any claims or take any action or institute any proceedings that the Lender may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of the Lender with respect to any of the Collateral;

(ii) to ask for, demand, collect, sue for, recover, compound, receive and give acquaintance and receipts for moneys due and to become due under or in respect of any of the Collateral;

(iii) to obtain and adjust insurance required to be maintained by such Grantor or paid to the Lender pursuant to the Loan Documents; and

(iv) to sell, transfer, assign, lease, license, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Lender were the absolute owner thereof for all purposes, and to do, at the Lender's option and such Grantor's expense, at any time or from time-to-time, all acts and things that the Lender deems reasonably necessary to protect, preserve, or realize upon the Collateral and the Lender's security interest therein as fully and effectively as such Grantor might do.

6.2    **Discretionary Use**.  The powers conferred on the Lender hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the exercise of reasonable care in the custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Lender shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.  The Lender shall be deemed to have exercised reasonable care in the custody and preservation of Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Lender accords its own property, provided that such treatment is not less than required by applicable law.  Neither the Lender nor any of its directors, officers, employees or agents shall be liable for failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or otherwise.  If any Grantor fails to perform any agreement contained herein, the Lender may itself perform, or cause performance of, such agreement, and the expenses of the Lender incurred in connection therewith shall be payable by each Grantor under the Section in this Agreement relating to the payment of expenses (Section 10).

## SECTION 7    REMEDIES

### 7.1    **Generally.**

(a)    If any Event of Default shall have occurred and be continuing, and subject to the provisions of the Loan Agreement, the Lender may exercise in respect of the Collateral, in addition to all other rights and remedies provided for herein or otherwise available to it at law or in equity, all the rights and remedies of the Lender on default under the UCC (whether or not the UCC applies to the affected Collateral) to collect, enforce or satisfy any Secured Obligations then owing, whether by acceleration or otherwise, and also may pursue any of the following separately, successively or simultaneously:

(i)    require any Grantor to, and each Grantor hereby agrees that it shall at its expense and promptly upon request of the Lender forthwith, assemble all or part of the Collateral as directed by the Lender and make it available to the Lender at a place to be designated by the Lender that is reasonably convenient to both parties,

(ii)    enter onto the property where any Collateral is located and take possession thereof with or without judicial process;

(iii)    prior to the disposition of the Collateral, store, process, repair or recondition the Collateral or otherwise prepare the Collateral for disposition in any

32

manner to the extent the Lender deems appropriate; <u>provided</u> that processed, reconditioned, or repaired products that are sold under any Grantor's Trademarks shall be of at least substantially comparable quality to the same products sold under such Trademarks at the time of the Event of Default, and shall, if applicable, be labeled as "reconditioned," or the like, to the extent required by law; and

(iv) without notice, except as specified below or under the UCC, sell, assign, lease, license (on an exclusive or nonexclusive basis, to the extent the applicable Grantor has the lawful right to do so), or otherwise dispose of the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Lender's offices or elsewhere, for cash, on credit or for future delivery, at such time or times and at such price or prices and upon such other terms as the Lender may deem commercially reasonable.

(b)     The Lender or any Secured Party may be the purchaser of any or all of the Collateral at any public or private (to the extent to portion of the Collateral being privately sold is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations) sale in accordance with the UCC and the Lender, as agent for and representative of the Secured Parties, shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale made in accordance with the UCC, to use and apply any of the Secured Obligations as a credit on account of the purchase price for any Collateral payable by the Lender at such sale. Each purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of any Grantor, and each Grantor hereby waives (to the extent permitted by applicable law) all rights of redemption, stay and/or appraisal which it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. Each Grantor agrees that, to the extent notice of sale shall be required by law, at least ten (10) days notice to such Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Each Grantor agrees that it would not be commercially unreasonable for the Lender to dispose of the Collateral or any portion thereof by using Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets. Each Grantor hereby waives any claims against the Lender arising by reason of the fact that the price at which any Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale, even if the Lender accepts the first offer received and does not offer such Collateral to more than one offeree. If the proceeds of any sale or other disposition of the Collateral are insufficient to pay all the Secured Obligations, each Grantor shall be liable for the deficiency and the fees of any attorneys employed by the Lender to collect such deficiency. Each Grantor further agrees that a breach of any of the covenants contained in this Section will cause irreparable injury to the Lender, that the Lender has no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section shall be specifically enforceable against such Grantor, and such Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants

except for a defense that no default has occurred giving rise to the Secured Obligations becoming due and payable prior to their stated maturities. Nothing in this Section shall in any way alter the rights of the Lender hereunder.

(c)    The Lender may sell the Collateral without giving any warranties as to the Collateral. The Lender may specifically disclaim or modify any warranties of title or the like. This procedure will not be considered to adversely effect the commercial reasonableness of any sale of the Collateral.

(d)    The Lender shall have no obligation to marshal any of the Collateral.

**7.2    Application of Proceeds**.  Except as expressly provided elsewhere in this Agreement, all proceeds received by the Lender in respect of any sale, any collection from, or other realization upon all or any part of the Collateral shall be applied against, the Secured Obligations in the following order of priority: <u>first</u>, to the payment of all costs and expenses of such sale, collection or other realization, including reasonable costs and expenses of the Lender and its agents and counsel, and all other expenses, liabilities and advances made or incurred by the Lender in connection therewith, and all amounts for which the Lender is entitled to indemnification hereunder and all advances made by the Lender hereunder for the account of the applicable Grantor, and to the payment of all costs and expenses paid or incurred by the Lender in connection with the exercise of any remedy hereunder or under any Loan Document, all in accordance with the terms hereof or thereof; <u>second</u>, to the extent of any excess of such proceeds, to the payment of all other Secured Obligations as set forth in the Loan Agreement, and <u>third</u>, to the extent of any excess of such proceeds, to the payment to or upon the order of such Grantor or to whomsoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

**7.3    Sales on Credit.**  If Lender sells any of the Collateral upon credit, the applicable Grantor will be credited only with payments actually made by purchaser and received by Lender and applied to indebtedness of the purchaser. In the event the purchaser fails to pay for the Collateral, the Lender may resell the Collateral and the applicable Grantor shall be credited with proceeds of the sale.

**7.4    Investment Related Property.**

(a)    Each Grantor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933 and applicable state securities laws, the Lender may be compelled, with respect to any sale of all or any part of the Investment Related Property conducted without prior registration or qualification of such Investment Related Property under the Securities Act of 1933 and/or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Investment Related Property for their own account, for investment and not with a view to the distribution or resale thereof. Each Grantor acknowledges that any such private sale may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a registration statement under the Securities Act of 1933) and, notwithstanding such circumstances, each Grantor agrees that, unless such Investment Related Property could be sold

34

under Rule 144 promulgated under the Securities Act of 1933 in any three-month period or otherwise without restriction under Rule 144(k) promulgated under the Securities Act of 1933, any such private sale shall be deemed to have been made in a commercially reasonable manner and that the Lender shall have no obligation to engage in public sales and no obligation to delay the sale of any Investment Related Property for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the Securities Act of 1933 or under applicable state securities laws, even if such issuer would, or should, agree to so register it. If the Lender determines to exercise its right to sell any or all of the Investment Related Property, upon written request, each Grantor shall and shall cause each issuer of any Pledged Stock to be sold hereunder, each partnership and each limited liability company, in each case, which issuer is under such Grantor's Control, from time to time to furnish to the Lender all such information as the Lender may request in order to determine the number and nature of interest, shares or other instruments included in the Investment Related Property which may be sold by the Lender in exempt transactions under the Securities Act of 1933 and the rules and regulations of the Securities and Exchange Commission thereunder, as the same are from time to time in effect.

(b)      If any Event of Default shall have occurred and be continuing, the Lender shall have the right to apply the balance from any Deposit Account or instruct the bank at which any Deposit Account is maintained to pay the balance of any Deposit Account to or for the benefit of the Lender.

### 7.5    Intellectual Property.

(a)      Anything contained herein to the contrary notwithstanding, if any Event of Default shall have occurred and be continuing:

(i) the Lender shall have the right (but not the obligation) to bring suit or otherwise commence any action or proceeding in the name of any Grantor, the Lender or otherwise, in the Lender's reasonable discretion, to enforce any Intellectual Property which is included in the Collateral, in which event, such Grantor shall, at the request of the Lender, do any and all lawful acts and execute any and all documents required by the Lender in aid of such enforcement and such Grantor shall promptly, upon demand, reimburse and indemnify the Lender as provided in the Section in this Agreement relating to indemnity (Section 10) in connection with the exercise of its rights under this Section, and, to the extent that the Lender shall elect not to bring suit to enforce any Intellectual Property as provided in this Section, each Grantor agrees to take all commercially reasonable measures, whether by action, suit, proceeding or otherwise, to prevent the material infringement of any of the Intellectual Property by others, and for that purpose, agrees to diligently maintain any action, suit or proceeding against any Person so infringing as shall be necessary to prevent such infringement;

(ii) upon written demand from the Lender, each Grantor shall assign, convey or otherwise transfer to the Lender, or such Lender's designee, all of such Grantor's right, title and interest in and to the Intellectual Property included in the Collateral, and shall execute and deliver to the Lender such documents as are necessary

to effectuate and record such assignment, conveyance, or transfer of, or other evidence of foreclosure upon, such Intellectual Property;

(iii) in the event of any assignment, conveyance or other transfer of any of the Trademarks included in the Collateral, the goodwill symbolized by any such Trademarks shall be included in such sale or transfer, and such Grantor shall supply to the Lender or its designee such Grantor's manufacturing, advertising, and distribution know-how, and copies of records embodying such know-how, relating to products and services theretofore sold under such Trademarks;

(iv) each Grantor agrees that an assignment, conveyance, or transfer of any Intellectual Property included in the Collateral shall be applied to reduce the Secured Obligations outstanding only to the extent that the Lender receives cash proceeds in respect of such assignment, conveyance, or other transfer of the Intellectual Property,

(v) within five (5) Business Days after written notice from the Lender, each Grantor shall make available to the Lender, to the extent within such Grantor's power and authority, such personnel in such Grantor's employ as the Lender may reasonably designate, by name, title or by job responsibility, to permit such Grantor to continue, directly or indirectly, to produce, advertise, and sell the products and services sold or delivered by such Grantor under Intellectual Property included in the Collateral on the Lender's behalf and to be compensated by the Lender at such Grantor's expense) consistent with the salary and benefit structure applicable to each, as of the date of such Event of Default;

(vi) the Lender shall have the right to notify, or require each Grantor to notify, any obligors with respect to payments due or to become due to such Grantor in respect of the Intellectual Property, of the existence of the security interest created herein, to direct such obligors to make payment of all such amounts directly to the Lender, and, upon such notification and at the expense of such Grantor, to enforce collection of any such amounts and to adjust, settle or compromise the amount of such payment, to the same extent as such Grantor could have done; and

(vii) no Grantor shall adjust, settle or compromise the amount or payment of any such amount or release wholly or partly any obligor with respect thereto or allow any credit or discount thereon.

(b)    If (i) an Event of Default shall have occurred and, by reason of cure, waiver, modification, amendment or otherwise, no longer be continuing, (ii) no other Event of Default shall have occurred and be continuing, (iii) an assignment or other transfer to the Lender of any rights, title and interests in and to the Intellectual Property shall have been previously made and shall have become absolute and effective, and (iv) the Secured Obligations shall not have become immediately due and payable, upon the written request of any Grantor, the Lender shall promptly execute and deliver to such Grantor, at such Grantor's sole cost and expense, such assignments or other transfer as may be necessary to reassign to such Grantor any such rights, title and interests as may have been assigned to the Lender as aforesaid, subject to

any disposition thereof (including a lease or license) that may have been made by the Lender; provided, after giving effect to such reassignment, the Lender's security interest granted pursuant hereto, as well as all other rights and remedies of the Lender granted hereunder, shall continue to be in full force and effect; and provided further, the rights, title and interests so reassigned shall be free and clear of any Liens granted by or on behalf of the Lender.

(c)     Solely for the purpose of enabling the Lender to exercise rights and remedies under this Section 7, at such time as the Lender shall be lawfully entitled to exercise such rights and remedies, each Grantor hereby grants to the Lender, to the extent it has the lawful right to do so, an irrevocable, non-exclusive worldwide license (exercisable without payment of royalty or other compensation to such Grantor), to use, operate under, license, or sublicense any Intellectual Property now or hereafter owned by or licensed to such Grantor, subject, in the case of Trademarks, to the maintenance of quality standards with respect to the products and services sold under such Trademarks at a level at least substantially comparable to that prevailing at the time of such Event of Default. The foregoing license grant to the Lender is in addition to, and not in limitation of, Collateral Agreement's rights under Section 7.1 or the Power of Attorney granted under Section 6.

**SECTION 8     LENDER MAY PERFORM.**  If any Grantor fails to perform any agreement contained herein, the Lender may itself perform, or cause performance of, such agreement, and the reasonable, out-of-pocket expenses of the Lender incurred in connection therewith shall be payable by the Grantors.

**SECTION 9     LENDER'S DUTIES.**  The powers conferred on the Lender hereunder are solely to protect its interest and the interests of the Secured Parties in the Collateral and shall not impose any duty upon it to exercise any such powers. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Lender shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral, including, without limitation, ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Pledged Collateral, whether or not the Lender has or is deemed to have knowledge of such matters.

**SECTION 10     INDEMNITY AND EXPENSES.**

(a)     In accordance with the terms of the Loan Agreement, the Grantors will upon demand pay to the Lender the amount of any and all reasonable expenses, including the reasonable fees and disbursements of its counsel and of any experts and agents, which the Lender may incur in connection with (i) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, any of the Collateral or (ii) the exercise or enforcement of any remedies of the Lender hereunder.

(b)     The Grantors assume all responsibility and liability arising from the use of the Trademarks, Patents and Copyrights by the Grantors, and the Grantors hereby, jointly and severally, indemnify and hold the Lender harmless from and against any claim, suit, loss, damage or expense (including reasonable attorneys' fees) arising out of any alleged defect in any product manufactured, promoted or sold by any of the Grantors in connection with any

37

Trademark or out of the manufacture, promotion, labeling, sale or advertisement of any such product by any of the Grantors except as the same may have resulted from the gross negligence, willful misconduct or bad faith of the Lender.

(c)    Each of the Grantors agree that the Lender does not assume, and shall have no responsibility for, the payment of any sums due or to become due under any agreement or contract included in the Collateral or the performance of any obligations to be performed under or with respect to any such agreement or contract by any of the Grantors, and except as the same may have resulted from the gross negligence or willful misconduct of the Lender, each of the Grantors hereby jointly and severally agree to indemnify and hold the Lender harmless with respect to any and all claims by any person relating thereto.

**SECTION 11    SECURITY INTEREST ABSOLUTE.**  All rights of the Lender and security interests hereunder, and all obligations of each of the Grantors hereunder, shall be absolute and unconditional, irrespective of any circumstance which might constitute a defense available to, or a discharge of, any guarantor or other obligor in respect of the Secured Obligations.

**SECTION 12    AMENDMENTS.**  No amendment or waiver of any provision of this Agreement, nor any consent to any departure by any of the Grantors herefrom, shall in any event be effective unless the same shall be in writing and signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**SECTION 13    ADDRESSES FOR NOTICES.**  All notices and other communications provided for hereunder shall be in writing and shall be given in accordance with the applicable provisions of the Loan Agreement.

**SECTION 14    CONTINUING SECURITY INTEREST.**  This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect until payment in full of the Secured Obligations and the termination of the Commitment, (ii) be binding upon each of the Grantors, their successors and assigns and (iii) inure, together with the rights and remedies of the Lender hereunder, to the benefit of the Lender and each of the Secured Parties and their respective successors, transferees and assigns. Upon the payment in full of the Secured Obligations and the termination of the Commitment, the security interest granted hereby shall terminate and all rights to the Collateral shall revert to the Grantors subject to any existing liens, security interests or encumbrances on such Collateral. Upon any such termination, the Lender will, at the Grantors' expense, execute and deliver to the Grantors any and all Collateral in its possession and such documents as the Grantors shall reasonably request to evidence such termination.

**SECTION 15    GOVERNING LAW.**  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, except as required by mandatory provisions of law and except to the extent that the validity or perfection of the security interest hereunder, or remedies hereunder, in respect of any particular Collateral are governed by the laws of a jurisdiction other than the State of New York and by Federal law (including, without limitation, the Bankruptcy Code) to the extent the same has pre-empted the law of the State of New York or such other jurisdiction.

**SECTION 16     INCONSISTENCY.**  In the event of any conflict or inconsistency between the terms of this Agreement and the terms of the Loan Agreement, the terms of the Loan Agreement shall control.

**SECTION 17     HEADINGS.**  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

[Remainder of This Page Intentionally Left Blank]

**IN WITNESS WHEREOF**, each of the Grantors and the Lender have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

LENDER:

EMIGRANT GB LLC

By: Emigrant Bank, as Manager

By: _____
Name:
Title:


GRANTORS:

NICKLAUS COMPANIES, LLC

By: GOLDEN BEAR INTERNATIONAL, INC.,
a Florida corporation, its Member

By: _____
Name:
Title:


NICKLAUS GOLF EQUIPMENT
COMPANY, L.C.

By: GOLDEN BEAR INTERNATIONAL, INC.,
a Florida corporation, its Sole Member

By: _____
Name:
Title:


NICKLAUS MARKETING, INC.

By: _____
Name:
Title:

IN WITNESS WHEREOF, each of the Grantors and the Lender have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

LENDER:

EMIGRANT GB LLC

By: Emigrant Bank, as Manager

By: _____
        Name:
        Title:


GRANTORS:

NICKLAUS COMPANIES, LLC

By: GOLDEN BEAR INTERNATIONAL, INC., a Florida corporation, its Member

By: _____
        Name: Thomas E. Severson, Jr
        Title: Vice President


NICKLAUS GOLF EQUIPMENT COMPANY, L.C.

By: GOLDEN BEAR INTERNATIONAL, INC., a Florida corporation, its Sole Member

By: _____
        Name: Thomas E. Severson Jr.
        Title: Vice President


NICKLAUS MARKETING, INC.

By: _____
        Name: James H. Schnare II
        Title: Vice President

**NICKLAUS DESIGN, LLC**

By: THE NICKLAUS GROUP, INC.,
a Florida Corporation, its Sole Member

By: _____
Name: James H. Schnare, II
Title: Vice President

**N1JN-V, LLC**

By: GOLDEN BEAR INTERNATIONAL, INC.,
A Florida Corporation, its Sole Member

By: _____
Name: Thomas E. Severson Jr.
Title: Vice President

**GBI SERVICES, LLC**

By: GOLDEN BEAR INTERNATIONAL, INC.,
A Florida Corporation, its Sole Member

By: _____
Name: Thomas E. Severson Jr.
Title: Vice President

**JACK NICKLAUS GOLF CLUB, LLC**

By: NF DYNASTY, LLC, a Florida limited
liability company, its Sole Member

By: _____
Name: Thomas E. Severson Jr.
Title: Manager